ACCEPTED
12-15-00219-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
11/19/2015 8:06:13 PM
Pam Estes
CLERK

No. 12-15-00219-CV

In the Twelfth Court of Appeals

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS

11/19/2015 8:06:13 PM

PAM ESTES
Clerk

**MJS & Associates, L.L.C.**
Appellant

v.

**Judy Master, RN & Matthew Master**
Appellees

Appeal from the 145th Judicial District Court
Nacogdoches County, Texas
No. C127910, Hon. Campbell Cox, II, Presiding

# Brief of Appellant MJS

Russell R. Smith
Texas Bar No. 18682310
RSmith@fairchildlawfirm.com
W. Wade Flasowski
wflasowski@fairchildlawfirm.com
Texas Bar No. 24055482
Fairchild, Price, Haley & Smith, LLP
P.O. Drawer 631668
Nacogdoches, Texas 75963-1668
(936) 569-2327
(936) 569-7932 (fax)

Mark Kennedy
Texas Bar No. 24000122
mark@markkennedylaw.com
Joanna Martin
Texas Bar No. 24072153
joanna@markkennedylaw.com
Kennedy Attorneys & Counselors at Law
12222 Merit Drive, Suite 1750
Dallas, Texas 75251
(214) 445-0740
(972) 661-9320 (fax)

Michelle R. Meriam
Texas Bar No. 24063871
michellemeriam@warejackson.com
Timothy F. Lee
Texas Bar No. 12139500
timlee@warejackson.com
Ware, Jackson, Lee, O'Neill,
    Smith & Barrow, LLP
2929 Allen Parkway, 39th Floor
Houston, Texas 77019
(713) 659-6400
(713) 659-6262 (fax)

**Oral Argument Requested**

# Identity of Parties and Counsel

**Plaintiff/Appellant MJS and Associates, L.L.C.**

| | |
|---|---|
| **Trial Counsel:** | Russell R. Smith |
| | RSmith@fairchildlawfirm.com |
| | W. Wade Flasowski |
| | wflasowski@fairchildlawfirm.com |
| | Fairchild, Price, Haley & Smith, LLP |
| | P.O. Drawer 631668 |
| | Nacogdoches, Texas 75963-1668 |
| | (936) 569-2327 |
| | (936) 569-7932 (fax) |
| | |
| | Mark Kennedy |
| | mark@markkennedylaw.com |
| | Joanna Martin |
| | joanna@markkennedylaw.com |
| | Kennedy Attorneys & Counselors at Law |
| | 12222 Merit Drive, Suite 1750 |
| | Dallas, Texas 75251 |
| | (214) 445-0740 |
| | (972) 661-9320 (fax) |
| | |
| **Appellate Counsel:** | Michelle R. Meriam |
| | michellemeriam@warejackson.com |
| | Timothy F. Lee |
| | timlee@warejackson.com |
| | Ware, Jackson, Lee, O'Neill, |
| | Smith & Barrow, LLP |
| | 2929 Allen Parkway, 39th Floor |
| | Houston, Texas 77019 |
| | (713) 659-6400 |
| | (713) 659-6262 (fax) |

**Defendants/Appellees Judy Master, RN and Matthew Master**

**Counsel:**      Joseph M. Callow, Jr.
jcallow@kmklaw.com
Keating Muething & Klekamp
One East Fourth St., Suite 1400
Cincinnati, Ohio 45202
(513) 579-6400
(513) 579-6457 (fax)

Travis P. Clardy
travis.clardy@kellyhart.com
Jerry Baker
jerry.baker@kellyhart.com
Kelly, Hart & Hallman, LLP
209 E. Main St.
P.O. Box 635426
Nacogdoches, Texas 75961
(936) 564-2500
(936) 564-2507 (fax)

# Table of Contents

Identity of Parties and Counsel .................................................................... i

Table of Contents.................................................................................... iii

Index of Authorities.................................................................................. vi

Statement of the Case............................................................................... xi

Statement Regarding Oral Argument ........................................................ xii

Issues Presented

    **First Issue:** No court has ever held that the False Claims Act permits a *qui tam* relator to steal information belonging to a party not accused of any illegal conduct and disclose it. Master agreed not to take or disclose any confidential information to which she had access during her employment, but she did so anyway, and received $12 million as a result. Was Master's conduct protected under the federal statute? ................................... xiii

    **Second Issue:** The trial court erred granting summary judgment on causation based on an incompetent affidavit not made on personal knowledge that only addressed one category of damages, and because the allegation in the affidavit—that LHC terminated its contract with MJS due to MJS's poor performance—is contradicted by evidence that LHC did so because Master used its privileged and confidential information to initiate a *qui tam* action, thus raising a genuine issue of material fact. ................................................................... xiii

    **Third Issue:** The trial court erred in granting no-evidence summary judgment against MJS after MJS submitted more than a scintilla of evidence to establish each disputed element of its claims................................................................................ xiii

Introduction..............................................................................................1

Statement of Facts ................................................................................ 2

I.    The False Claims Act Litigation Against MJS's Client, LHC............... 2

      A.    Attorneys for LHC Hired MJS to Perform Health Care
            Compliance Audits ..................................................................... 2

      B.    MJS Hired Master, Who Agreed Not to Take MJS's
            Property or Disclose Its Confidential Information .................... 5

      C.    Master Secretly Copied, Took, and Disclosed MJS's
            Confidential Information to Start a *Qui Tam* Suit against
            LHC ........................................................................................... 7

      D.    LHC Canceled Its Contract with MJS ..................................... 10

      E.    Master Got Millions While MJS Nearly Went Broke................. 13

II.   The Litigation between MJS and Master.............................................14

      A.    The Federal Court Rejected Master's Argument that Her
            Conduct Was Protected Under the Act ....................................15

      B.    The Trial Court Accepted Master's Argument Under the
            Act and Granted Summary Judgment Against MJS................. 18

Summary of the Argument.....................................................................19

Argument and Authorities.....................................................................21

I.    First Issue: The Act Does Not Protect Master from Liability for
      MJS's State-Law Claims....................................................................21

      A.    Standard of Review.................................................................. 22

      B.    The Act Does Not Preempt MJS's Claims ................................ 23

      C.    Federal Policy Does Not Clearly Outweigh the Interests in
            Enforcing Master's Agreements with MJS .............................. 28

            1.    Master's Confidentiality Obligations Do Not Negate
                  the Policies Behind the Act ............................................ 29

2.    The Interests in Enforcing Master's Agreements Are Compelling ........................................................ 32

II.   Second Issue: Master Did Not Negate Causation as a Matter of Law ............................................................................ 37

III.  Third Issue: MJS Presented More than a Scintilla of Evidence to Support Each of Its Claims ................................................ 40

    A.    Standard of Review ................................................................ 40

    B.    Breach of Contract ................................................................ 40

    C.    Breach of Fiduciary Duty ...................................................... 41

    D.    Tortious Interference with Contract ..................................... 43

    E.    Texas Trade Secrets Act ........................................................ 43

    F.    Conversion ............................................................................ 45

    G.    Conspiracy ............................................................................ 46

    H.    Fraud ..................................................................................... 47

Prayer ............................................................................................... 48

Certificate of Compliance ................................................................ 50

Certificate of Service ........................................................................ 50

# Index of Authorities

## Cases

*Acad. of Skills & Knowledge, Inc. v. Charter Sch., USA, Inc.,*
    260 S.W.3d 529 (Tex. App.—Tyler 2008, pet. denied) .......................41

*Arizona v. U.S.,*
    ____ U.S. ____, 132 S. Ct. 2492 (2012) ................................................. 24

*BIC Pen Corp. v. Carter,*
    251 S.W.3d 500 (Tex. 2008) ................................................................. 24

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,*
    489 U.S. 141 (1989) ............................................................................... 28

*Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.,*
    637 F.3d 1047 (9th Cir. 2011) ........................................................ 30, 31

*Casso v. Brand,*
    776 S.W.2d 551 (Tex. 1989) ................................................................ 38

*Chamber of Commerce of U.S. v. Whiting,*
    563 U.S. 582, 131 S. Ct. 1968 (2011) ................................................. 24

*Cook v. Nacogdoches Anesthesia Group, L.L.P.,*
    167 S.W.3d 476 (Tex. App.—Tyler 2005, no pet.) ........................ 22, 23

*Cuidado Casero Home Health of El Paso, Inc. v. Ayuda Home Health
    Care Services, LLC,*
    404 S.W.3d 737 (Tex. App.—El Paso 2013, no pet.)........................... 42

*ERI Consulting Engineers, Inc. v. Swinnea,*
    318 S.W.3d 867 (Tex. 2010).................................................................. 38

*Four Bros. Boat Works, Inc. v. Tesoro Petroleum Companies, Inc.,*
    217 S.W.3d 653 (Tex. App.—Houston [14th Dist.] 2006, pet.
    denied) .................................................................................................. 47

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
    505 U.S. 88 (1992) ................................................................................. 24

*Graber v. Fuqua,*
    279 S.W.3d 608 (Tex. 2009) ..................................................... 23, 24, 27

---

*Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson,*
    559 U.S. 280 (2010) ....................................................................... 27

*Great Dane Trailers, Inc. v. Estate of Wells,*
    52 S.W.3d 737 (Tex. 2001) .......................................................... 24

*Gulbenkian v. Penn,*
    252 S.W.2d 929 (Tex. 1952) ........................................................ 38

*In re JDS Uniphase Corp. Secs. Litig.,*
    238 F. Supp. 2d 1127 (N.D. Cal. 2002) ...................................16, 35, 36

*Johnson v. Brewer & Pritchard, P.C.,*
    73 S.W.3d 193 (Tex. 2002) ...........................................................41

*King Ranch, Inc. v. Chapman,*
    118 S.W.3d 742 (Tex. 2003) ......................................................... 40

*Lake v. Premier Transp.,*
    246 S.W.3d 167 (Tex. App.—Tyler 2007, no pet.) .............................. 40

*Lawrence v. CDB Servs., Inc.,*
    44 S.W.3d 544 (Tex. 2001) .......................................................... 29

*Mabrey v. SandStream, Inc.,*
    124 S.W.3d 302 (Tex. App.—Fort Worth 2003, no pet.).................... 42

*MCI Sales & Serv., Inc. v. Hinton,*
    329 S.W.3d 475 (Tex. 2010) ...................................................... 23, 24

*Mut. Pharm. Co., Inc. v. Bartlett,*
    ___ U.S. ___, 133 S. Ct. 2466 (2013) .......................................... 23, 25

*Nixon v. Mr. Prop. Mgmt. Co., Inc.,*
    690 S.W.2d 546 (Tex. 1985) ......................................................... 22

*Patel v. City of Everman,*
    179 S.W.3d 1 (Tex. App.—Tyler 2004, pet. denied)........................... 46

*Patriotic Veterans, Inc. v. Indiana,*
    736 F.3d 1041 (7th Cir. 2013)........................................................ 26

*Patton v. Cox,*
276 F.3d 493 (9th Cir. 2002) ................................................................. 36

*Prudential Ins. Co. of Am. v. Fin. Review Services, Inc.,*
29 S.W.3d 74 (Tex. 2000) ..................................................................... 43

*Sears, Roebuck & Co. v. Meadows,*
877 S.W.2d 281 (Tex. 1994) ................................................................. 47

*Sherrill v. Union Lumber Co.,*
207 S.W. 149 (Tex. Civ. App.—Beaumont 1918, no writ) ................... 29

*Siebert v. Gene Sec. Network, Inc,*
11-CV-01987-JST, 2013 WL 5645309 (N.D. Cal. Oct. 16, 2013) ........31

*Sw. Energy Prod. Co. v. Berry-Helfand,*
411 S.W.3d 581 (Tex. App.—Tyler 2013, pet. granted) ....................... 45

*Thompson v. Weaver,*
429 S.W.3d 897 (Tex. App.—Tyler 2014, no pet.) ............................. 40

*Town of Newton v. Rumery,*
480 U.S. 386 (1987) ............................................................................ 29

*Transp. Ins. Co. v. Faircloth,*
898 S.W.2d 269 (Tex. 1995) ............................................................... 46

*U.S. ex rel. Doe v. X Corp.,*
862 F. Supp. 1502 (E.D. Va. 1994) ........................................ 21, 30, 35

*U.S. ex rel. Grandeau v. Cancer Treatment Ctrs. of Am.,*
350 F. Supp. 2d 765 (N.D. Ill. 2004) ....................................................16

*U.S. ex rel. Grubbs v. Kanneganti,*
565 F.3d 180 (5th Cir. 2009) ................................................................ 7

*U.S. ex rel. Head v. Kane Co.,*
668 F. Supp. 2d 146 (D.D.C. 2009) ............................................. 16, 30

*U.S. ex rel. Holmes v. Northrop Grumman Corp.,*
1:13CV85-HSO-RHW, 2015 WL 3504525 (S.D. Miss. June 3,
2015)..............................................................................................21, 34, 35

*U.S. ex rel. Mossey v. Pal-Tech, Inc.*,
    231 F. Supp. 2d 94 (D.D.C. 2002) ......................................................31

*U.S. ex rel. Rusher v. Omnicare, Inc.*,
    No. 4:08-cv-3396, 2015 WL 4389589 (S.D. Tex. July 15, 2015) ........31

*U.S. v. Northrop Corp.*,
    59 F.3d 953 (9th Cir. 1995) .................................................................. 29

*U.S. v. Quest Diagnostics Inc.*,
    734 F.3d 154 (2d Cir. 2013)....................................................21, 33, 34

*Walsh v. Amerisource Bergen Corp.*,
    CIV.A. 11-7584, 2014 WL 2738215 (E.D. Pa. June 17, 2014) .............31

*Wells Fargo Const. Co. v. Bank of Woodlake*,
    645 S.W.2d 913 (Tex. App.—Tyler 1983, no writ) ............................. 37

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ........................................................ 24, 25, 26, 28

*X Corp. v. Doe*,
    805 F. Supp. 1298 (E.D. Va. 1992), *aff'd, Under Seal v. Under
    Seal,* 17 F.3d 1435 (4th Cir. 1994) ................................................ 16, 30

*Zahodnick v. Int'l Bus. Machines Corp.*,
    135 F.3d 911 (4th Cir. 1997) ..............................................................31

## Statutes and Rules

21 C.F.R. § 314.70 (2015)............................................................................ 25

False Claims Act, 31 U.S.C. § 3729 (West 2009) ...................................... 7, 8

False Claims Act, 31 U.S.C. § 3730 (West 2010)................................. *passim*

Food, Drug, and Cosmetic Act, 21 U.S.C. § 355 (West 2013) ..................... 25

Health Insurance Portability and Accountability Act (HIPAA),
    45 C.F.R. § 160 *et seq.* (2013) .................................................... *passim*

Tex. R. Civ. P. 166a .................................................................22, 37, 40, 43

Texas Trade Secrets Act, Tex. Civ. Prac. & Rem. Code Ann. §
       134A.002 (West Supp. 2015) ....................................................... 43, 44

Texas Trade Secrets Act, Tex. Civ. Prac. & Rem. Code Ann. §
       134A.004 (West Supp. 2015) ........................................................ 44

## Statement of the Case

**Nature of the Case**        MJS sued its former employee, Judy Master, for breach of contract, violations of the Texas Trade Secrets Act, breach of fiduciary duty, conversion, conspiracy, tortious interference with contract, and fraud. Master had used documents surreptitiously taken from MJS against MJS's client in a federal *qui tam* action.

**Course of Proceedings**        After MJS filed this suit, Master removed it to federal district court in the Eastern District of Texas and joined MJS as a defendant in the pending *qui tam* action in the Western District of Louisiana. The federal court in Texas remanded this case based on the lack of any federal question. 1 CR 128-37. The state trial court then stayed the case in favor of the pending *qui tam* action. 2 CR 197. The federal court in Louisiana dismissed Master's claims against MJS with prejudice, 2 CR 255, and the trial court lifted its stay. The parties completed discovery and filed cross-motions for summary judgment.

**Trial Court's Disposition**        The trial court granted Master's motion for summary judgment and entered final judgment in Master's favor. 5 CR 773.

## Statement Regarding Oral Argument

This is a case of first impression in the nation. Master claims, and the trial court agreed, that the federal False Claims Act insulates her from civil liability for taking and disclosing her employer's confidential information, solely because that information was used to file a *qui tam* action. But the *qui tam* defendant was MJS's client, not MJS. No court in the nation has applied the Act to protect *qui tam* relators from liability to third parties such as MJS that were not accused of committing fraud against the U.S.

By granting Master's motion for summary judgment, the trial court has, in effect, ruled that confidentiality agreements are ineffective against those who wish to take confidential information from one party and initiate a *qui tam* action against another party in the hopes of receiving large monetary rewards. In light of the important and novel questions presented by this appeal, the Court may wish to hear oral argument.

## Issues Presented

**First Issue:** No court has ever held that the False Claims Act permits a *qui tam* relator to steal information belonging to a party not accused of any illegal conduct and disclose it. Master agreed not to take or disclose any confidential information to which she had access during her employment, but she did so anyway, and received $12 million as a result. Was Master's conduct protected under the federal statute?

**Second Issue:** The trial court erred granting summary judgment on causation based on an incompetent affidavit not made on personal knowledge that only addressed one category of damages, and because the allegation in the affidavit—that LHC terminated its contract with MJS due to MJS's poor performance—is contradicted by evidence that LHC did so because Master used its privileged and confidential information to initiate a *qui tam* action, thus raising a genuine issue of material fact.

**Third Issue:** The trial court erred in granting no-evidence summary judgment against MJS after MJS submitted more than a scintilla of evidence to establish each disputed element of its claims.

## Introduction

This appeal raises a question of first impression in the nation.

In the three months that Master worked for MJS, she purloined MJS's confidential, trade secret, and privileged information so that she could file a complaint under the False Claims Act against MJS's largest client. As a result, MJS lost its largest client and was disparaged in the media, leading to further business losses. But MJS, which is in the business of auditing health care providers to ensure that they comply with government regulations, did nothing wrong. Meanwhile, Master's breaches of her confidentiality obligations allowed her to reap a reward in excess of $12 million.

When MJS sued Master under Texas law for breaching her obligations, she insisted that her conduct was protected under the Act and that MJS was without recourse. The only court in the nation to address that question—the federal court that remanded this suit after Master tried to remove it—concluded that the Act has no bearing on MJS's purely state-law claims. Nevertheless, the trial court accepted Master's overtures that the Act insulated her from liability and granted summary judgment. That decision, if permitted to stand, would have a crippling effect on confidential

relationships traditionally subject to state regulation, and this Court should reverse.

## Statement of Facts

### I. The False Claims Act Litigation Against MJS's Client, LHC

#### A. Attorneys for LHC Hired MJS to Perform Health Care Compliance Audits

MJS is a healthcare consulting firm owned and operated by Jan and Charlie Spears.[1] It provides a wide array of services to health care providers, including auditing services to ensure compliance with government Medicare and Medicaid regulations.[2]

LHC Group, LLC is one of the largest providers of home health and hospice services in the nation.[3] In early 2005, attorneys from the Gachassin Law Firm hired MJS to provide external compliance audits for their client, LHC Group, LLC, "to assist their legal representation and advice [to their] client."[4] LHC provided documentation to MJS that MJS reviewed using specially-developed, proprietary software called The Auditor.[5] MJS assessed LHC's compliance with federal and state regulations, accreditation

---

[1] 4 CR 509.

[2] 4 CR 509, ¶¶ 2-3.

[3] 4 CR 618.

[4] 4 CR 509, ¶ 4; 4 CR 517-18.

[5] 4 CR 523.

standards, and agency policies and procedures. It then provided reports to the attorneys on a secure, password-protected website.[6]

The contract between MJS, the attorneys, and LHC stated that all information provided to MJS would be confidential and subject to the attorney-client and work product privileges.[7] It included a detailed confidentiality provision. Under the terms of that provision, MJS agreed that (1) MJS's services were confidential and performed under the direction and control of the attorneys, (2) MJS's reports would remain confidential, (3) MJS would provide all reports directly to the attorneys, not LHC, and (4) MJS would notify the attorneys of any third-party request concerning LHC and follow the attorneys' directions in responding.[8]

With respect to the information it received from LHC, MJS agreed that:

- MJS would use the material solely for the purpose of performing services for the attorneys and LHC;

- MJS and its employees would keep the material "strictly confidential";

- MJS would inform its employees of the information's confidential nature; and

---

[6] 4 CR 523, 525.

[7] 4 CR 517.

[8] 4 CR 518, ¶ 3(a).

- MJS and its employees would not disclose to any person, including any governmental entity, the fact that an investigation was taking place.[9]

Finally, MJS was required to immediately inform the attorneys of any request for information provided by LHC, and MJS agreed not to release any information until the latest reasonable date possible.[10]

As a home health care provider, LHC is subject to the Health Insurance Portability and Accountability Act (HIPAA), 45 C.F.R. § 160 *et seq.* (2013), which regulates the use and disclosure of personal health information and imposes penalties for violations. Because MJS received personal health information as part of its services for LHC, it, too, was subject to HIPAA regulations. An addendum to the contract memorialized HIPPA's disclosure restrictions and required MJS to ensure that its agents abided by the restrictions.[11]

In July 2007, MJS entered a new consultancy agreement with the Gachassin Law Firm that expanded the scope of MJS's services for LHC to include auditing hospice records and increased MJS's compensation.[12] The new agreement contained confidentiality provisions identical to the

---

[9] *Id.* at ¶ 3(b).

[10] *Id.* at ¶ 3(c).

[11] 4 CR 532-35.

[12] 4 CR 510, ¶ 6; 4 CR 543-44.

original.[13]

LHC's business grew, and by 2009, LHC served five times the number of home health locations as it had when MJS began consulting for it. As LHC grew, so too did MJS.[14] In April 2008, MJS again negotiated higher rates for its consulting services for LHC.[15]

### B. MJS Hired Master, Who Agreed Not to Take MJS's Property or Disclose Its Confidential Information

In March 2007, MJS hired Master, a registered nurse, to work on compliance audits, including those for LHC.[16] As a condition of her employment, Master signed an employment agreement and a statement of confidentiality.[17]

Under the employment agreement, Master agreed that all "files, records, documents, specifications, equipment, and similar items" relating to MJS's business were MJS's "exclusive property" and that she would not remove them from MJS's premises under any circumstances without MJS's prior written consent.[18] She also agreed that upon the end of her

---

[13] 4 CR 537-38. The 2007 Agreement incorporated a HIPAA addendum, although no addendum appears in the record. 4 CR 542, ¶ 13.

[14] 4 CR 510, ¶ 6.

[15] *Id.* at ¶ 8.

[16] *Id.* at ¶ 10.

[17] 4 CR 551-54.

[18] 4 CR 551, ¶ 1.

employment, she would return any MJS property.[19]

In the statement of confidentiality, Master further agreed that:

- She understood "the importance of observing strict ethical, moral, and professional standards with confidentiality policies";

- She would not discuss or release any information regarding any of MJS's clients with anyone not directly associated with MJS;

- She would obtain MJS's authorization prior to releasing any information obtained at MJS;

- She would not disclose or discuss treatment, financial, medical, or social information relating to any patients of MJS's clients without written authorization from MJS management;

- She would not conduct any research to seek out information not required for her assigned duties; and

- These confidentiality obligations would continue after her employment with MJS ended.[20]

Master quit after less than three months on the job.[21] She did not provide any notice, but simply sent an email to her supervisor stating that she was resigning "due to personal reasons" and that she had enjoyed working with her supervisor and the MJS team.[22]

---

[19] 4 CR 551, ¶ 2.

[20] 4 CR 554.

[21] 4 CR 556.

[22] *Id.*

### C. Master Secretly Copied, Took, and Disclosed MJS's Confidential Information to Start a *Qui Tam* Suit against LHC

Within a month of leaving MJS, Master filed a *qui tam* complaint against LHC in federal court in the Western District of Louisiana. The *qui tam* action was based exclusively on confidential documents and information she obtained during her brief employment with MJS.[23] MJS knew nothing about Master's *qui tam* action.

The False Claims Act, 31 U.S.C. § 3730 (West 2010), permits an individual to bring a *qui tam* action—a suit on her own behalf and in the name of the federal government—against an entity the individual believes has presented false or fraudulent claims for payment to the government, including Medicare and Medicaid health care claims. *See also* 31 U.S.C. § 3729 (West 2009); *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 183 (5th Cir. 2009). The Act requires the individual to serve a complaint on the government with a "written disclosure of substantially all material evidence and information the person possesses" to support her allegations. 31 U.S.C. § 3730(b)(2). The complaint and disclosure statement are initially filed *in camera* with the district court. 31 U.S.C. § 3730(b)(2)-(3).

---

[23] 1 CR 75; 4 CR 579-81. That case was styled *U.S. ex rel. Judy Master v. LHC Group, Inc.*, No. 6:07-cv-01117.

The government may elect to intervene and prosecute the action itself, with the *qui tam* relator remaining a party, or it can decline to intervene and permit the *qui tam* relator to pursue the action. 31 U.S.C. §§ 3729(b)(2), (c)(1), (c)(3). If the suit is successful, the defendant is liable to the government for treble damages, plus a penalty between $5,000 and $10,000 for each false claim. 31 U.S.C. § 3729(a). The *qui tam* relator is then entitled to between 15 percent and 25 percent of the proceeds of any settlement or judgment, plus expenses, attorney's fees, and costs. 31 U.S.C. § 3730(d).

In Master's *qui tam* suit, she accused LHC of filing false claims with the government for reimbursement under Medicare and other health care programs.[24] She claimed to have "direct and independent knowledge" of the information on which her allegations were based, "derived through her former employment with MJS."[25] Master did not join MJS as a defendant.[26]

The complaint recounted Master's employment at MJS, her role in performing compliance audits for LHC, the manner in which MJS performs audits using the Auditor software, and alleged that MJS determined that

---

[24] 1 CR 75.

[25] 1 CR 77, ¶ 9.

[26] 1 CR 75.

LHC had a high non-compliance rate.[27] Master's complaint also alleged that an unidentified person told Master that some of LHC's costs were allowable when Master believed they were not, and that Master "decided to quit rather than create such a false impression."[28]

MJS later learned that prior to quitting, Master made copies of documents relating to the LHC audit during work hours. The purloined documents included patient records and Auditor reports.[29] She also made handwritten notes about MJS records and conversations she allegedly overheard between MJS employees.[30] She conducted internet research about *qui tam* suits and contacted an attorney specializing in "whistleblower" cases.[31] She took home the documents and other information she obtained from MJS and turned them over to the attorney and later to the government.[32]

---

[27] 1 CR 86-88, ¶¶ 48-50.

[28] 1 CR 88-89, ¶ 53. The complaint also accused MJS of changing answers in the Auditor questionnaire to reduce LHC's non-compliance rate. 1 CR 88-89, ¶¶ 52-55. Master later testified that she did not know for sure that MJS changed any of her answers, but had heard that they had. She did not know how the answers were supposedly changed or who had changed them. 3 CR 443, 447.

[29] 3 CR 458-59; 4 CR 577-78.

[30] 3 CR 451; 4 CR 577-78.

[31] 4 CR 576.

[32] 3 CR 441-42, 464.

Master never told MJS that she suspected fraud or that she intended to file a *qui tam* action against LHC. She did not obtain permission to take or disclose any of MJS's information and did not tell anyone at MJS that she was doing so.[33] But Master attached to her *qui tam* complaint 128 pages of confidential materials that she took from MJS to support her allegations against LHC.[34]

Master knew she was not allowed to remove any documents from MJS's premises or to disclose any of MJS's or LHC's information of any kind to anyone outside MJS.[35] But she argued "that went out the door when [she] suspected fraud."[36] Whether Master's obligations to MJS did indeed go out the door when she formed suspicions about MJS's client is the central issue in this appeal.

## D. LHC Canceled Its Contract with MJS

Because the complaint was initially filed under seal, MJS did not know that Master took documents before she quit or that she had used that information to start a *qui tam* suit against MJS's largest client.[37]

---

[33] 3 CR 458-59; 4 CR 511, 580.

[34] 4 CR 575, 579-81; 4 CR 514-15, ¶ 32. It is unknown how many pages Master actually took.

[35] 3 CR 441.

[36] *Id.*

[37] 1 CR 74; *see also* 4 CR 513, ¶ 27.

In September 2008—over a year after Master filed her complaint—MJS received, without explanation, a subpoena from the U.S. Inspector General requiring it to turn over nearly every document in its possession relating to LHC.[38] MJS objected to the scope of the subpoena for nearly a year. The government eventually narrowed the subpoena to encompass documents related to LHC's services to Medicare beneficiaries.[39]

During that time, LHC began assessing its compliance program.[40] In April 2009, it hired a new Chief Compliance Officer, Josh Proffitt.[41] In June 2009, Proffitt held a meeting in Atlanta to evaluate MJS's audits, determine how to respond to the government investigation and subpoena, and determine how to calculate how much LHC would have to reimburse the government.[42] MJS learned for the first time during that meeting that LHC had not taken corrective action in response to MJS's findings of non-compliance in its auditing reports by reimbursing the government for non-covered services.[43]

---

[38] 1 CR 115-17.

[39] 4 CR 511-12, ¶¶ 14, 20.

[40] 3 CR 433.

[41] *Id.* at ¶ 2.

[42] 4 CR 511-12, ¶¶ 15-18.

[43] 4 CR 512, ¶ 16.

Shortly after the meeting, on June 22, 2009, MJS responded to the subpoena by producing the requested documents, as narrowed, to the government.[44] Three days later, Proffitt cancelled LHC's contract with MJS without explanation and instructed MJS to terminate all services being performed for LHC.[45]

According to Proffitt, LHC terminated its contract with MJS because it determined that MJS's reports were too long, detailed, and inconsistent.[46] He also claimed that "LHC would have terminated MJS regardless of whether Judy Master filed the Complaint or whether the government investigated the same."[47] MJS's owner, Jan Spears, on the other hand, testified that LHC had never complained about the services MJS provided, never mentioned that MJS's reports were unduly burdensome or challenging, and never told MJS that it was reevaluating its auditing functions.[48]

---

[44] *Id.* at ¶ 19.

[45] *Id.* at ¶ 20.

[46] 3 CR 434-35, ¶¶ 8-11.

[47] 3 CR 436.

[48] 4 CR 512-13, ¶¶ 20, 22-23.

### E. Master Got Millions While MJS Nearly Went Broke

More than two years later, in September 2011, the government settled its claims against LHC for $65 million plus interest.[49] The agreement provided that Master would receive 19% of the settlement amount, or $12.35 million plus interest, as well as over $1 million in attorney's fees.[50] But, Master did not tell the Louisiana federal court about the settlement, so her *qui tam* action remained pending.[51]

Also in September 2011, the court unsealed the record in the *qui tam* action.[52] Ten days later, an article about the suit and its settlement appeared in *Home Health Line*, a nationally-distributed health care industry periodical.[53] The article disclosed that Master initiated the suit against LHC and quoted extensively from her complaint.[54] It also insinuated, based on Master's complaint, that MJS was complicit in LHC's alleged fraud against the government, describing MJS's purported

---

[49] 4 CR 619.

[50] 4 CR 620.

[51] 2 CR 223.

[52] 2 CR 214-15. The court's order unsealing the *qui tam* record does not appear in the appellate record, but is available on Pacer. It confirms that (1) the complaint, but not the disclosure documents, were unsealed, and (2) the order was entered on September 30, 2011—the same day the settlement agreement was executed. App'x A, Doc. 64, Order Unsealing *Qui Tam* Record.

[53] 4 CR 513, ¶ 25; 4 CR 558-60.

[54] 4 CR 558-60.

involvement under a bold subheading: **Suit alleges consulting firm played along**.[55]

Through the article, MJS learned for the first time that a *qui tam* action had been filed against LHC and that its former employee, Master, was the one behind it.[56] Shortly after the article was published, many of MJS's substantial clients fled and its revenue began to decline dramatically.[57] Potential clients rejected MJS's pending proposals, and the number of requests for proposals it received dropped significantly.[58] From 2010 to 2013, MJS experienced a revenue shortfall of $1.2 million, which Baylor Economics Professor James Henderson attributes to LHC's cancellation of its contract in late 2009 and the publication of the article in late 2011.[59]

## II.  The Litigation between MJS and Master

MJS filed this lawsuit against Master in Texas state court on December 22, 2011, alleging breach of contract, violations of the Texas

---

[55] 4 CR 559.

[56] 4 CR 513, ¶ 25.

[57] *Id.* at ¶ 28; 4 CR 587.

[58] 4 CR 514, ¶ 28.

[59] 4 CR 587.

Trade Secrets Act, breach of fiduciary duty, conversion, conspiracy, tortious interference with contract, and fraud.[60]

## A. The Federal Court Rejected Master's Argument that Her Conduct Was Protected Under the Act

Master removed the suit to the U.S. District Court for the Eastern District of Texas.[61] The same day, she also joined MJS as a defendant in the still ongoing *qui tam* action in the Western District of Louisiana, asserting claims for retaliation under the Act[62] and seeking a declaratory judgment that the Act pre-empted MJS's claims in Texas and protected her conduct in taking and disclosing MJS's confidential materials.[63]

After removal, Master moved to dismiss MJS's suit, or alternatively, to transfer it to the *qui tam* action in Louisiana. MJS moved to remand.[64] Master argued that federal jurisdiction existed because MJS's state-law claims necessarily depended on a substantial question of federal law: whether Master's conduct was protected under the Act.[65] She claimed, as

---

[60] 1 CR 8-24.

[61] 1 CR 122-23, 126.

[62] Master alleged that MJS retaliated against her by instructing her to alter bills and harassing and discriminating against her when she complained and refused to participate in the alleged fraud involving LHC. She claimed post-termination retaliation based on MJS suing her in this case. 2 CR 208.

[63] 2 CR 205, 211.

[64] 1 CR 128.

[65] 1 CR 133.

she does now, that she cannot be liable for state-law claims related to her use of documents in *qui tam* actions.[66]

The federal court rejected Master's argument and granted MJS's motion to remand on April 2, 2012.[67] The order explains several reasons why MJS's claims do not implicate the Act:

- The Act "would appear to have little bearing on whether or not she—who quit her job only three months after being hired—breached a confidentiality agreement";

- The Act's purpose of preventing "harassment or retaliation against would-be relators for lawful acts [] has little bearing on whether Ms. Master can be civilly liable" for MJS's claims;

- This was especially true given that MJS was not the target of her *qui tam* action;

- Master did not cite any appellate decisions to support her argument;

- The four district court cases she cited involved preventing fraud by the relator's employer[68] (not a client of the relator's employer, as here), and one of those cases seemed to contradict, rather than support, Master's argument; and

- Even assuming that MJS's claims require some reference to the Act, the court was "far from convinced that the federal issue in this case is substantial, rather than simply tangential."[69]

---

[66] 1 CR 133.

[67] 1 CR 128-37.

[68] The cases mentioned in the remand order are: *U.S. ex rel. Head v. Kane Co.,* 668 F. Supp. 2d 146 (D.D.C. 2009); *U.S. ex rel. Grandeau v. Cancer Treatment Ctrs. of Am.,* 350 F. Supp. 2d 765 (N.D. Ill. 2004); *In re JDS Uniphase Corp. Secs. Litig.,* 238 F. Supp. 2d 1127 (N.D. Cal. 2002); *X Corp. v. Doe,* 805 F. Supp. 1298 (E.D. Va. 1992).

[69] 1 CR 133-35.

The court concluded:

> Ms. Master worked for an entity that is not being accused of fraud, and, under Ms. Master's theory, would essentially find itself without a recourse for Ms. Master's use of confidential information to prove a fraud perpetrated by another entity. Whether Ms. Master's actions were wrongful under Texas state law as to [MJS], an entity not the target of her FCA case, does not seem to [] require recourse to the FCA.[70]

After remand, Master argued that MJS's claims constitute retaliation under the Act and obtained a stay of this case pending resolution of her retaliation claims in the Louisiana federal court.[71] The Louisiana court, though, dismissed her retaliation and declaratory judgment claims against MJS with prejudice in March 2013.[72] The same day, she finally informed the Louisiana court of the settlement from September 2011, and the court ordered her to file a motion to dismiss all claims by the end of the month.[73] Shortly thereafter, final judgment was entered in the *qui tam* suit, dismissing all claims with prejudice.[74]

---

[70] 1 CR 135.

[71] 2 CR 146-77; 2 CR 197.

[72] 2 CR 203-22. The Louisiana court held that Master's pre-termination retaliation claims were time-barred, the FCA does not recognize post-termination retaliation claims, and the declaratory judgment claim could not proceed in federal court on its own. 2 CR 215-21.

[73] 2 CR 223.

[74] 2 CR 255.

**B.    The Trial Court Accepted Master's Argument Under the Act and Granted Summary Judgment Against MJS**

Back in Texas, the trial court lifted its stay and set the case for trial in June 2015.[75] The parties conducted discovery and filed cross-motions for summary judgment in May 2015. MJS moved for no-evidence summary judgment on ten of Master's affirmative defenses, including her claims that her conduct was "protected by the federal False Claims Act, 31 U.S.C. § 3730(h)" and that "[i]t is against public policy for [MJS] to attempt to use a contractual confidentiality agreement to try to thwart the purpose and effect of the federal False Claims Act."[76]

Master filed a traditional and no-evidence motion, arguing primarily that her conduct was protected by the language of the Act and policy behind it.[77] The only summary judgment evidence she presented consisted of excerpts from her own deposition testimony and Proffitt's affidavit claiming that LHC did not fire MJS because of Master's actions.[78] MJS responded with evidence consisting of other excerpts from Master's deposition testimony, Spears's affidavit, the confidentiality agreement, the employment agreement, the 2005 and 2007 contracts between LHC and

---

[75] 2 CR 256-57, 262.

[76] 3 CR 406-18; *see also* 3 CR 397-98, ¶¶ 3-4.

[77] 3 CR 420-31.

[78] 3 CR 433-64.

MJS, Master's email resignation, the *qui tam* settlement agreement, the disparaging article, an LHC corporate disclosure, and an expert report on damages. Master did not reply.[79]

On June 3 and 8, the trial court held a hearing on both parties' motions.[80] It granted Master's motions for traditional and no-evidence summary judgment in their entirety and entered an order to that effect on June 8.[81] The trial court later denied MJS's motion to modify the judgment, and MJS timely appealed.[82]

## Summary of the Argument

Master is attempting to escape liability for stealing her employer's confidential, trade secret, and privileged information and using it to her own benefit. To do so, she convinced the trial court that the Act insulates her from MJS's state-law claims because it required her to take the information and give it to the government.

For the Act to preempt MJS's state-law claims, however, Master had to overcome a presumption against preemption and meet the high threshold of establishing that the Act made compliance with her

---

[79] 4 CR 509-644.

[80] 2 RR; 3 RR.

[81] 5 CR 773; 3 RR 45. The trial court also granted MJS's no-evidence motion on Master's defenses of unclean hands, ratification, and failure to mitigate, but denied the motion as to Master's other affirmative defenses. 5 CR 768.

[82] 5 CR 780-83.

confidentiality obligations impossible. She did neither. The Act did not, in fact, require her to do anything. And it certainly did not require her to steal protected information from a company that was not accused of fraud, but rather in the business of preventing noncompliance. Similarly, the policies behind the Act do not invalidate her confidentiality obligations. Courts have enforced obligations concerning confidential, trade secret, and privileged information, even when those obligations are owed to an alleged fraudfeasor. But no court has ever held that a *qui tam* relator may breach its obligations to parties not accused of fraud.

The trial court further erred in accepting Master's argument that MJS cannot establish causation because the only evidence Master relied upon (1) was not competent summary judgment evidence, (2) did not address every category of damages MJS seeks, and (3) is controverted by MJS's evidence, which raises a fact issue.

Finally, the trial court erred in granting Master's no-evidence points because MJS presented more than a scintilla of evidence on each of the challenged elements. The trial court's summary judgment should be reversed and this case remanded for trial on the merits.

I.    **First Issue: The Act Does Not Protect Master from Liability for MJS's State-Law Claims**

Several courts have recognized that "while the FCA *permits* any person to bring a *qui tam* suit, it does not authorize that person to violate state laws in the process." *U.S. v. Quest Diagnostics Inc.*, 734 F.3d 154, 163 (2d Cir. 2013) (emphasis in original); *U.S. ex rel. Doe v. X Corp.*, 862 F. Supp. 1502, 1507 (E.D. Va. 1994); *U.S. ex rel. Holmes v. Northrop Grumman Corp.*, 1:13CV85-HSO-RHW, 2015 WL 3504525, at *3 (S.D. Miss. June 3, 2015). Nothing in the language of the Act creates an affirmative defense against state-law claims, especially those brought against the *qui tam* relator by a third party that has not been accused of fraud against the government.[83] *See* 31 U.S.C. § 3730.

A federal district court in this case—apparently the only court in the nation to address this specific issue—has already rejected the notion that the Act determines the outcome of this case. When the Texas federal court remanded this case, it stated: "Ms. Master worked for an entity that is not being accused of fraud, and, under Ms. Master's theory, would essentially

---

[83] The Act creates a private right of action, not a defense, against an entity believed to have defrauded the government or an employer who retaliates against its employee for "lawful acts" the employee takes pursuant to the FCA. 31 U.S.C. §§ 3730(b)(1), 3730(h)(1). Master never accused MJS of committing fraud against the government, and the Louisiana federal court dismissed the retaliation claim she brought against MJS after MJS sued her in this case. 1 CR 75; 2 CR 203-22.

find itself without [] recourse for Ms. Master's use of confidential information to prove a fraud perpetrated by another entity."[84]

Nevertheless, after remand, Master continued to argue that the Act is an affirmative defense to all of MJS's claims against her.[85] The trial court erred by accepting her argument and granting summary judgment,[86] and this Court should reverse.

## A. Standard of Review

The party moving for traditional summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). To determine whether there is a genuine issue of material fact, a court must take as true all evidence favorable to the non-movant, indulge every reasonable inference in its favor, and resolve any doubts in its favor. *Nixon v. Mr. Prop. Mgmt. Co., Inc.*, 690 S.W.2d 546, 549 (Tex. 1985).

Whether summary judgment is warranted is a question of law, so is reviewed *de novo. Cook v. Nacogdoches Anesthesia Group, L.L.P.*, 167 S.W.3d 476, 481 (Tex. App.—Tyler 2005, no pet.). Where, as here, the trial court does not specify the ground on which it granted summary judgment,

---

[84] 1 CR 135.

[85] 3 CR 422-26.

[86] 3 RR 45.

the appellant "must defeat each summary judgment ground argued by the movant." *Id.*

## B.    The Act Does Not Preempt MJS's Claims

Master argued that she cannot be held liable for MJS's state-law claims because the Act required her to take the documents at issue and give them to the government, and because holding her liable would frustrate the Act's purpose to encourage those with knowledge of fraud to come forward.[87] This is really an argument that, as a matter of federal law, the Act preempts MJS's state-law claims.[88] That argument should be rejected.

The preemption doctrine bars state-law claims under certain limited circumstances because "a court may not hold a civil defendant liable under state law for conduct federal law requires." *Mut. Pharm. Co., Inc. v. Bartlett*, ____ U.S. ____, 133 S. Ct. 2466, 2476-77 (2013). Courts must begin with a presumption that Congress did not intend to preempt claims arising under state law. *MCI Sales & Serv., Inc. v. Hinton*, 329 S.W.3d 475, 489 (Tex. 2010); *Graber v. Fuqua*, 279 S.W.3d 608, 611 (Tex. 2009).

A party arguing for preemption must therefore meet "a high threshold," particularly when state and federal law have co-existed in a

---

[87] 3 CR 423-25.

[88] In the Louisiana federal court, Master also sought a judicial declaration that MJS's claims were preempted by federal law, but that claim was dismissed along with her retaliation claims. 2 CR 205.

given field for a long period of time. *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 131 S. Ct. 1968, 1985 (2011). In such circumstances, Congress has had the opportunity to expressly preempt state law, but chosen not to, and the Supreme Court will give little to no deference even to a federal agency's opinion that state laws interfere with its objectives. *Wyeth v. Levine*, 555 U.S. 555, 580-81 (2009).

Preemption is implied when compliance with both state and federal law is impossible, or where "state law obstructs accomplishing and executing Congress' full purposes and objectives."[89] *BIC Pen Corp. v. Carter*, 251 S.W.3d 500, 504 (Tex. 2008) (quoting *Great Dane Trailers, Inc. v. Estate of Wells*, 52 S.W.3d 737, 743 (Tex. 2001)). "Courts must cautiously approach this interpretive task lest it become a 'free wheeling judicial inquiry into whether a state law is in tension with federal objectives,' which 'undercuts the principle that it is Congress rather than the courts that pre-empts state law.'" *MCI*, 329 S.W.3d at 483 (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in the judgment)).

---

[89] Preemption may be express, *Arizona v. U.S.,* ____ U.S. ____, 132 S. Ct. 2492, 2500-01 (2012), but the Act does not explicitly preempt state-law claims. It may also be implied where Congress evidences an intent to foreclose state regulation in an entire field, such as bankruptcy, *Graber v. Fuqua*, 279 S.W.3d 608, 623 (Tex. 2009), but the Act does not purport to regulate the field of confidential relationships.

For example, federal drug regulations require that the label on a generic drug be identical to the label on the previously-approved brand-name drug. Food, Drug, and Cosmetic Act, 21 U.S.C. § 355(j)(2)(A)(v) (West 2013). But some state products liability laws would require the manufacturer to change its label. *Bartlett*, 133 S. Ct. at 2476-77. It is impossible for the manufacturer to comply with its duty under state law without violating federal law; therefore, the federal law prevails. *Id.*

On the other hand, the Supreme Court held in *Wyeth v. Levine*, 555 U.S. 555, 568-81 (2009) that state product liability laws, which required the manufacturer of a the drug Phenergan to warn of the risks associated with directly injecting the drug into a patient's vein, are not preempted by federal drug regulations. The Court rejected Wyeth's impossibility argument because the FDA permits a manufacturer to supplement its labeling application and unilaterally strengthen its warnings before receiving official approval. *Id.* at 568-73; *see also* 21 C.F.R. §§ 314.70 (c)(6)(iii)(A), (C) (2015).

Requiring Master to abide by her contractual, fiduciary, and related obligations under state law does not make compliance with the False Claims Act impossible. The case law is clear that "[c]onflict preemption requires complete impossibility—not mere inconvenience or hardship."

*Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1050 (7th Cir. 2013); *see also Wyeth*, 555 U.S. at 568-73. The Act does not require or even authorize a person to obtain evidence by unlawful means. It does not require or authorize a person to disclose her employer's confidential and proprietary information to third parties[90] for use against the employer's client. In fact, it does not require someone who suspects fraud against the government to come forward in the first place; it merely authorizes one to do so. As one court aptly concluded:

> The Act permits "a person" to file a *qui tam* suit; it does not require him to do so. Nor does the Act immunize a relator for actions taken in pursuance of a *qui tam* action that violate state law.

*U.S. ex rel. Doe v. X Corp.,* 862 F. Supp. 1502, 1507 (E.D. Va. 1994).

Rather, the Act provides that *if* a person suspects fraud against the government, *if* that person wishes to file a complaint on the government's behalf, and *if* that person hopes to share in the proceeds of any settlement or judgment, *then* that person must provide the government with relevant evidence and information *in that person's possession.* 31 U.S.C. §§ 3730(b)(1)-(2), 3730(d). But Master only obtained possession of the

---

[90] Master repeatedly states that she only gave the documents she took from MJS to her attorneys and the government, and that it was not made available to the public. *E.g.*, 3 CR 421, 425. That does not show she complied with her confidentiality obligations. Her attorneys and the government are third parties to her confidentiality agreement with MJS, so disclosure to them without authorization violated her obligations.

documents and information she disclosed to her attorneys and the government by stealing them from MJS, in breach of her agreements with MJS and her fiduciary duty to MJS.

The Court should also reject Master's argument that holding her to her confidentiality obligations would thwart Congress's purpose of incentivizing individuals with knowledge of fraud to come forward. In *Graber v. Fuqua*, 279 S.W.3d 608, 616-17 (Tex. 2009), the Texas Supreme Court rejected a similar argument that malicious prosecution claims premised on bankruptcy litigation are preempted because they would "change the incentives for participation in bankruptcy." The False Claims Act includes several incentives for individuals to bring *qui tam* actions, including monetary rewards and protection from retaliation. But unbridled authority to steal information from parties not accused of fraud is not an incentive Congress chose to include. "To effectuate a change in this result [], Congress must speak more clearly than it has." *Id.* at 617.

In the 150 years since Congress enacted the Act, it has never expressly permitted *qui tam* relators to take and use confidential information in violation of state laws. Meanwhile, Congress enacted retaliation provisions in 1986 that affect state laws concerning at-will employment. *See* 31 U.S.C. §3930(h); *Graham County Soil & Water Conservation Dist. v. U.S. ex rel.*

*Wilson*, 559 U.S. 280, 309 (2010) (Sotomayor, J., dissenting). "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts." *Wyeth*, 555 U.S. at 575 (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166–167 (1989)).

No court has considered it necessary to abrogate the rights of parties not accused of wrongdoing in order to incentivize individuals to gather evidence of fraud. To the extent the trial court's judgment rests on a finding of preemption, it should be reversed.

## C. Federal Policy Does Not Clearly Outweigh the Interests in Enforcing Master's Agreements with MJS

The trial court also erred if it accepted Master's argument that "any confidentiality agreement under state law has to give way to the federal public policy [behind the Act] and the federal common law."[91] Because she has not identified any federal policy other than the Act itself, Master's policy argument is no different than her preemption argument, and it fails for similar reasons.

Under federal law, a private agreement is unenforceable on public policy grounds only if "the interest in its enforcement is clearly outweighed

---

[91] 3 RR 8; *see also* 3 CR 420-21, 425-26.

by a public policy against such terms." *Town of Newton v. Rumery*, 480 U.S. 386, 392 (1987). Courts must therefore analyze not only the effect of the agreement at issue on a federal policy, but also interests that are served by enforcing the agreement. *Id.* at 397-98. The Texas Supreme Court has cautioned against invalidating private agreements on policy grounds:

> Public policy . . . is a term of vague and uncertain meaning, which it pertains to the law-making power to define, and courts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well-established rule of law.

*Lawrence v. CDB Servs., Inc.,* 44 S.W.3d 544, 553 (Tex. 2001) (quoting *Sherrill v. Union Lumber Co.,* 207 S.W. 149, 153–54 (Tex. Civ. App.—Beaumont 1918, no writ)).

### 1. Master's Confidentiality Obligations Do Not Negate the Policies Behind the Act

The federal policies behind the Act are to discourage fraud against the government and encourage insiders with knowledge of fraud to come forward. *U.S. v. Northrop Corp.,* 59 F.3d 953, 963 (9th Cir. 1995). Some federal district courts in other jurisdictions, but no appellate courts, have relied on these policies to invalidate confidentiality agreements, but only when the party seeking to enforce the agreement is the one accused of fraud.

In *U.S. ex rel. Head v. Kane Co.,* 668 F. Supp. 2d 146, (D.D.C. 2009), for example, the court dismissed the *qui tam* defendant's counterclaim for breach of a separation agreement, stating:

> Enforcing a private agreement that requires a qui tam plaintiff to turn over his or her copy of a document, which is likely to be needed as evidence at trial, *to the defendant who is under investigation* would unduly frustrate the purpose of the [Act].

*Id.* at 152 (emphasis added). And in *X Corp. v. Doe*, 805 F. Supp. 1298, 1310 n. 24 (E.D. Va. 1992), *aff'd, Under Seal v. Under Seal,* 17 F.3d 1435 (4th Cir. 1994), the court preliminarily enjoined a company's former in-house counsel from disclosing confidential documents, but noted that public policy precluded the company from relying on its confidentiality agreement "to conceal illegal activity."[92]

The Ninth Circuit noted in *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1062 (9th Cir. 2011), that a public policy exception to enforcing confidentiality agreements may have "some merit" under the Act. But it declined to adopt an exception under the facts of the case, where the defendant had accused the relator of taking thousands of confidential documents. *Id.* It explained that "[t]he need to facilitate valid

---

[92] The general counsel subsequently initiated a *qui tam* action, which the company and the government settled, and the court disqualified the general counsel from serving as relator because his complaint relied on information and documents obtained in violation of his confidentiality obligations. *Doe,* 862 F. Supp. at 1503, 1509-10.

claims does not justify the wholesale stripping of a company's confidential documents." *Id.* With *Cafasso* as their only appellate guidance, other courts have recognized a possible policy exception but permitted counterclaims for breach of contract when some of the confidential documents at issue might not be relevant to the *qui tam* complaint.[93] *E.g.*, *U.S. ex rel. Rusher v. Omnicare, Inc.*, No. 4:08-cv-3396, 2015 WL 4389589, at \*5 (S.D. Tex. July 15, 2015); *Walsh v. Amerisource Bergen Corp.*, CIV.A. 11-7584, 2014 WL 2738215, at \*7 (E.D. Pa. June 17, 2014); *Siebert v. Gene Sec. Network, Inc*, 11-CV-01987-JST, 2013 WL 5645309, at \*8 (N.D. Cal. Oct. 16, 2013).

Still other courts have permitted counterclaims related to the taking of confidential information without discussing the agreements' implications on public policy. In a retaliation suit under the Act, the Fourth Circuit held that the former employee breached nondisclosure agreements by taking the company's confidential information without its consent and disclosing it to his attorneys. *Zahodnick v. Int'l Bus. Machines Corp.*, 135 F.3d 911, 915 (4th Cir. 1997). And the district court in *U.S. ex rel. Mossey v. Pal-Tech, Inc.*, 231 F. Supp. 2d 94, 99 (D.D.C. 2002) permitted counterclaims for violation of Virginia's Uniform Trade Secrets Act and breach of contract resulting from the disclosure and retention of confidential information.

---

[93] It is not known whether Master took more documents and information than she included in her *qui tam* disclosures.

No court has held that an agreement between a *qui tam* relator and a third party to the *qui tam* suit is void for public policy, and this Court should not be the first to do so. As the federal court held in remanding this case, any relationship between MJS's claims and the policies behind the Act are attenuated at best.[94] MJS did not commit fraud against the government, and is not invoking its agreements with Master in an attempt to conceal its own wrongdoing. Refusing to enforce those agreements would not, therefore, discourage fraud. Nor would it discourage true insiders—employees or agents of the purported fraudfeasor—from providing the government with evidence of fraud they lawfully obtain.

### 2. The Interests in Enforcing Master's Agreements Are Compelling

The interests in enforcing Master's agreements with MJS, which implicate a number of protected relationships, greatly outweigh the policy concerns behind the Act. LHC's patients' information was protected under HIPAA,[95] 45 C.F.R. § 160 *et seq.*, and the information MJS received from LHC was protected not only under HIPAA, but by the attorney-client privilege. MJS was, in fact, an agent of LHC's attorneys and contractually agreed to keep the information it used to audit LHC strictly confidential in

---

[94] 1 CR 134.

[95] 4 CR 532-35.

accordance with the attorneys' confidentiality duties.[96] LHC's attorneys required MJS to extend those confidentiality obligations to MJS employees who had access to LHC's information.

MJS was not the target of Master's *qui tam* action, but she secretly copied stacks of MJS's confidential documents while still employed, took them home, and disclosed them in the hopes of financial gain. Master not only breached her confidentiality agreement, but jeopardized HIPAA-protected patient information and attorney-client confidentiality, as well as MJS's confidentiality obligations and Trade Secrets information associated with the Auditor software.

A series of federal cases have squarely held that the Act does not excuse disclosure of a client's confidential information. In *U.S. v. Quest Diagnostics Inc.,* 734 F.3d 154 (2d Cir. 2013), the general counsel for a clinical laboratory, responsible for all compliance matters, expressed concerns that that the company was violating the Act and federal anti-kickback statutes and was subsequently replaced. *Id.* at 159-61. He then joined two other former executives and formed a partnership to bring a *qui tam* action against the company, using information that was otherwise protected by his confidentiality obligations. *Id.* at 161. The district court

---

[96] 4 CR 517.

dismissed the complaint and disqualified the relators and their counsel from bringing another complaint, without prejudice to the government or other potential relators. *Id.* at 162-63. The Second Circuit affirmed, stating that "[n]othing in the [Act] evinces a clear legislative intent to preempt state statutes and rules that regulate an attorney's disclosure of client confidences." *Id.* at 163.

Similarly, the district court in *U.S. ex rel. Holmes v. Northrop Grumman Corp.*, 1:13CV85-HSO-RHW, 2015 WL 3504525, at *10 (S.D. Miss. June 3, 2015) held that an attorney who acted as relator "violated his duty to retain confidential information by allowing his own interest in pursing this *qui tam* action to override his duties to [his client]." Holmes represented an insurance company, Munich Re, in an arbitration regarding a coverage dispute and entered a confidentiality agreement covering documents produced by the opposing party, Northrop. *Id.* at *1. Holmes also obtained documents from the Navy, purportedly for use in the arbitration. *Id.* He then filed a *qui tam* complaint against Northrop based on documents obtained from both Northrop and the Navy. *Id.* at *1-2.

Munich Re, like MJS, was not accused of fraud or joined in the *qui tam* action. But, Northrop moved to disqualify Holmes and dismiss the complaint "based on the totality of the circumstances surrounding his

conduct as relator," including his use of confidential documents. *Id.* at *1. The court granted both motions, holding that Holmes violated his ethical duties by using documents obtained on his client's behalf for personal gain, and that he breached his confidentiality agreement with Northrop. *Id.* at *8 n. 8. The dismissal was without prejudice to the government pursuing its own action or to any other potential relators who could file a complaint without using documents obtained by breaching their legal and ethical obligations. *Id.* at *10; *see also X Corp.*, 862 F. Supp. at 1509-10 ("Because the complaint contains X Corp.'s confidences and secrets, which Doe has been enjoined under state law from disclosing, Doe cannot serve as a relator in this action.").

Finally, *In re JDS Uniphase Corp. Sec. Litig.*, 238 F. Supp. 2d 1127, 1135 (N.D. Cal. 2002) acknowledges that even employers who are accused of ongoing fraud may enter valid agreements to protect their confidential information and trade secrets. The State of Connecticut filed a securities fraud class action against JDS and was conducting investigations into the allegations, but JDS's former employees believed they could not provide information to the investigators because of confidentiality agreements they had signed during employment. *Id.* at 1130. Connecticut asked the court to hold that the agreements were void, at least in part, due to the policy in

favor of allowing employees to assist in securities fraud investigations. *Id.* at 1130, 1136.

In analyzing relevant precedent, the court noted that "[h]ighly personal medical information is the sort of information, like trade secrets, that a party unquestionably has the right to ask another party to keep confidential." *Id.* at 1137 (discussing *Patton v. Cox,* 276 F.3d 493 (9th Cir. 2002)). JDS's confidentiality agreements, however, were overly broad, so the court limited their scope to protect only truly confidential, trade secret, and privileged information. *Id.* at 1137-38.

Master has not argued that her confidentiality agreements were overly broad. All of the information and documents Master stole from MJS related to its services for LHC's attorneys was protected by the attorney-client privilege.[97] Master admitted that everything she took was MJS's confidential property.[98] And the documents included MJS's trade secrets and LHC patient information protected under HIPAA.[99] Thus, both Master and MJS had heightened confidentiality obligations that did not dissipate simply because Master suspected that LHC had engaged in wrongdoing.

---

[97] 4 CR 517.

[98] 3 CR 441.

[99] 3 CR 458-59; 4 CR 577-78.

The trial court therefore erred to the extent it granted Master's motion for summary judgment based on her policy arguments.

## II. Second Issue: Master Did Not Negate Causation as a Matter of Law

In both her traditional and no-evidence motions, Master contended that Proffitt's declaration negated causation as a matter of law because he stated that LHC did not terminate its contract with MJS because of Master's actions. 3 CR 426, 430. But supporting affidavits must "be made on personal knowledge." Tex. R. Civ. P. 166a(f). "An affidavit based on information and belief is insufficient as verification by oath and its content is not factual proof in a summary judgment proceeding." *Wells Fargo Const. Co. v. Bank of Woodlake*, 645 S.W.2d 913, 914 (Tex. App.—Tyler 1983, no writ). Proffitt's declaration is not based on personal knowledge, and he does not state that he speaks on behalf of LHC or that he personally made the decision to terminate LHC's contract with MJS.[100] Instead, his statements are based on "information and belief."[101] His declaration is not, therefore, competent summary judgment evidence and cannot support summary judgment for Master.[102]

---

[100] 3 CR 433-36.

[101] 3 CR 433, ¶ 1.

[102] MJS objected to the declaration for lack of foundation and on the basis that Proffitt's statements were speculation, conclusory, and improper opinions. 4 CR 476-77.

Even if Proffitt's declaration were competent summary judgment evidence, it does not address all of MJS's causation and damages arguments. MJS alleged that Master's actions damaged its business not only because of the loss of LHC, but also because its current and potential customers fled after Master's complaint was made public. And MJS also requested disgorgement, which is premised on Master's improper benefit at MJS's expense.[103] *See ERI Consulting Engineers, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010) (noting that disgorgement of wrongdoer's ill-gotten gains is equitable remedy for breach of fiduciary duty); Restatement (Third) of Restitution § 39 (2011).

The supreme court has also noted that "[i]f the credibility of the affiant or deponent is likely to be a dispositive factor in the resolution of the case, then summary judgment is inappropriate." *Casso v. Brand*, 776 S.W.2d 551, 558 (Tex. 1989). That is especially true when the non-movant submits controverting evidence. *Id.* "The duty of the court hearing the motion for summary judgment is to determine if there are any issues of fact to be tried, and not to weigh the evidence or determine its credibility, and thus try the case on the affidavits." *Gulbenkian v. Penn*, 252 S.W.2d 929, 931 (Tex. 1952).

The trial court overruled these objections. 5 CR 767.

[103] 3 CR 279-80, 284; 4 CR 497-98.

MJS submitted controverting evidence that could lead a reasonable juror to conclude that Proffitt's statements were self-serving and not credible, including evidence that:

- LHC terminated its contract with MJS just three days after MJS provided documents to the government in response to the subpoena. 4 CR 512, ¶¶ 19-20.

- Over the course of the four-year business relationship, LHC expanded MJS's scope of services and twice increased its compensation. 4 CR 510, ¶¶ 6, 8; 4 CR 537-49.

- LHC never told MJS that it was reevaluating its auditing functions. 4 CR 513, ¶ 23.

- LHC never complained about the services MJS provided. 4 CR 512, ¶¶ 20, 22.

- LHC never mentioned that MJS's reports were unduly burdensome, challenging, or contradictory. 4 CR 512, ¶ 22.

This evidence, based primarily on Spears's affidavit, directly contradicts the Proffitt declaration on which Master relies, and raises a genuine issue of material fact as to whether Master's actions caused MJS damages.

The trial court therefore erred to the extent it granted summary judgment on the basis that Proffitt's declaration conclusively establishes that Master did not cause injury to MJS.

## III. Third Issue: MJS Presented More than a Scintilla of Evidence to Support Each of Its Claims

### A. Standard of Review

A party may move for summary judgment without presenting evidence on the ground that there is no evidence of one or more essential elements of a claim on which the opposing party has the burden of proof at trial. Tex. R. Civ. P. 166a(i). The burden then shifts to the non-movant to bring forth evidence that raises a fact issue on the challenged elements. *Id.*; *Thompson v. Weaver*, 429 S.W.3d 897, 901-02 (Tex. App.—Tyler 2014, no pet.). To do so, the non-movant need only present more than a scintilla of probative evidence, which is evidence that rises to a level that would enable reasonable and fair-minded people to differ in their conclusions as to a vital fact. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex. 2003); *Thompson*, 429 S.W.3d at 902.

### B. Breach of Contract

The elements of a breach of contract action are: (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages sustained by the plaintiff as a result of the breach. *Lake v. Premier Transp.*, 246 S.W.3d 167, 173 (Tex. App.—Tyler 2007, no pet.). Master did not challenge the first

element.[104] Though she challenged the remaining elements, she also repeatedly admitted that she received confidential information from MJS in exchange for her employment and agreement to keep that information confidential, and that she did not comply with her agreements.[105] And MJS presented uncontroverted expert evidence of the damages it sustained as a result of Master's breaches of her agreements, including drastic declines in revenue following the loss of LHC's business and the release of the article when the *qui tam* complaint was unsealed.[106]

## C.   Breach of Fiduciary Duty

The elements of a breach of fiduciary duty action are: (1) the existence of a fiduciary relationship between the parties, (2) the defendant's breach of her fiduciary duty, and (3) either injury to the plaintiff or benefit to the defendant resulting from the breach. *Acad. of Skills & Knowledge, Inc. v. Charter Sch., USA, Inc.*, 260 S.W.3d 529, 540 (Tex. App.—Tyler 2008, pet. denied).

The Texas Supreme Court has held that an employee may owe fiduciary duties to her employer when acting in an agency capacity. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002). In

---

[104] 3 CR 427.

[105] 3 CR 441-42.

[106] 4 CR 586-605.

particular, a fiduciary duty arises in an employment relationship that prevents an employee from using confidential or proprietary information acquired during the relationship in a manner adverse to the employer. *Cuidado Casero Home Health of El Paso, Inc. v. Ayuda Home Health Care Services, LLC*, 404 S.W.3d 737, 752-53 (Tex. App.—El Paso 2013, no pet.); *Mabrey v. SandStream, Inc.,* 124 S.W.3d 302, 316 (Tex. App.—Fort Worth 2003, no pet.). The court in *Cuidado Casero* held that there was more than a scintilla of evidence to support a breach of fiduciary duty claim where the evidence showed that an employee of a home health care agency had access to confidential patient and Trade Secrets information that she used for her own benefit in violation of a confidentiality agreement. 404 S.W.3d at 753.

Master admits receiving confidential and proprietary information as part of her employment with MJS, and admits that she took that information in violation of the express language of her confidentiality agreements and disclosed it to third parties.[107] As a result, Master benefited at MJS's expense by receiving over $12 million while MJS's business suffered.[108] The trial court erred in finding that there was no evidence that Master breached a fiduciary duty to MJS.

---

[107] 3 CR 441-42.

[108] 4 CR 620; 4 CR 586-89.

### D. Tortious Interference with Contract

The elements of tortious interference with contract are: (1) an existing contract subject to interference, (2) willful and intentional interference with the contract, (3) proximate causation, and (4) actual damage or loss. *Prudential Ins. Co. of Am. v. Fin. Review Services, Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). Master, however, recited the elements of tortious interference with prospective business relations, rather than with an existing contract. 3 CR 429-30. For that reason alone, she did not meet Rule 166a(i)'s requirement that the motion "state the elements as to which there is no evidence."

But setting that point aside, her only argument—that Proffitt's declaration stating that LHC's termination of its contract with MJS had nothing to do with the *qui tam* action—does not entitle her to summary judgment on MJS's claim for tortious interference for the reasons discussed above under issue two.

### E. Texas Trade Secrets Act

A person is liable for misappropriation under the Texas Trade Secrets Act if she acquires knowledge of another's trade secret "under circumstances giving rise to a duty to maintain its secrecy or limit its use" and subsequently discloses the trade secret without the owner's consent. Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(3)(B)(ii)(b) (West Supp.

2015). A trade secret under the statute is, among other things, information, including formulas, programs, methods, techniques, and processes that:

> (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

> (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6). Damages for misappropriation include unjust enrichment. Tex. Civ. Prac. & Rem. Code Ann. § 134A.004 (West Supp. 2015).

MJS's Auditor software, the process by which Master used the software to conduct compliance audits for MJS, and the reports it produced are all trade secrets within the meaning of the statute.[109] The employment agreement Master signed also included the following provision:

> **Trade Secrets** During the term of employment, Employer will make available and Employee will have access to, and become familiar with, various trade secrets, consisting of processes and compilations of information, records, customer lists, and specifications, owned by Employer and regularly used in the operation of the business of the Employer. Employee shall not disclose any such trade secrets, directly or indirectly, nor use them in any way. . . .[110]

It is undisputed that Master took information generated by MJS's software and disclosed it to her attorneys and the government without MJS's

---

[109] *See* 4 CR 523-24.

[110] 4 CR 551.

knowledge or consent. And Master discusses MJS's trade secrets processes in the *qui tam* complaint, which is now unsealed and publicly available.[111]

This Court has noted that plaintiffs in trade secret cases "can seldom establish a specific injury" to calculate lost profits, so courts use "flexible and imaginative methods" to measure damages in light of the circumstances surrounding the misappropriation. *Sw. Energy Prod. Co. v. Berry-Helfand*, 411 S.W.3d 581, 609 (Tex. App.—Tyler 2013, pet. granted). Both the statute and the common law permit a plaintiff to recover for unjust enrichment associated with the misappropriation, or for the value of the Trade Secrets at the time it was misappropriated. *Id.* Only by using the Auditor software was Master able to assess LHC's compliance, which led her to form the belief that LHC was violating the Act. She then provided the Auditor information to the government and ultimately gained $12 million as a result of her misappropriation. This is sufficient evidence of damages to which MJS is entitled for Master's misappropriation to defeat summary judgment.

## F.    Conversion

To establish a claim for conversion, the plaintiff must prove that (1) the plaintiff owned, possessed, or had the immediate right to possession

---

[111] 1 CR 87.

of personal property, (2) the defendant wrongfully exercised dominion or control over the property, and (3) the plaintiff was injured. *Patel v. City of Everman*, 179 S.W.3d 1, 16 (Tex. App.—Tyler 2004, pet. denied). Master only challenged the second element. Once again, she argued that the Act permitted her to take MJS's personal property, so she did not wrongfully exercise dominion or control over that property.[112] This is not a true no-evidence point, and reasons why Master's argument is wrong are discussed above under the first issue.

## G. Conspiracy

"Civil conspiracy requires a meeting of the minds between two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 278 (Tex. 1995). Master did not challenge the evidence of conspiracy, but argued, without citing any authority, that "the sole allegation in this cause of action relates to the filing of a sealed complaint, which is protected conduct." 3 CR 429. As discussed above under the first issue, Master's conduct was not protected by the Act. There is also more than a scintilla of evidence that Master conspired with both her husband and her attorney to use MJS's confidential and proprietary information to pursue a *qui tam*

---

[112] 3 CR 428-29.

action against LHC,[113] which was a meeting of the minds to achieve a lawful purpose by unlawful means.

## H.     Fraud

Actionable fraud requires a false, material misrepresentation that was either known to be false when made or was asserted without knowledge of its truth, intent that the claimant act on the misrepresentation, and reliance on the misrepresentation that caused injury. *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994). Silence is the equivalent of a material misrepresentation when the circumstances impose a duty to speak, such as when there is a confidential or fiduciary relationship or when new information makes the party's prior representation misleading or untrue. *Four Bros. Boat Works, Inc. v. Tesoro Petroleum Companies, Inc.*, 217 S.W.3d 653, 670-71 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

Master argued that "[h]er conduct is protected by statute" and that there is no evidence that she made a material misrepresentation. 3 CR 431. We have already addressed the first assertion above under issue one. Nothing in the Act protects a party from liability for its own fraud.

---

[113] 4 CR 576.

In exchange for receiving access to MJS's confidential and proprietary information, Master represented that she would not take or disclose any of that information. In reliance on that representation, MJS provided her access to the confidential information. Master either never intended to keep that information confidential or failed to disclose that she changed her mind when she began making copies, contacted an attorney, and began sharing the confidential information. The trial court erred in granting summary judgment on MJS's fraud claim.

## Prayer

For these reasons, there is a genuine issue of material fact as to each of MJS's claims against Master, and the trial court erred in granting summary judgment. MJS respectfully requests that the Court reverse the trial court's summary judgment and remand for trial on the merits.

Respectfully submitted,

　　/s/ Michelle R. Meriam

Michelle R. Meriam
Texas Bar No. 24063871
michellemeriam@warejackson.com
Timothy F. Lee
Texas Bar No. 12139500
timlee@warejackson.com
Ware, Jackson, Lee, O'Neill,
　　Smith & Barrow, LLP
2929 Allen Parkway, 39th Floor
Houston, Texas 77019
(713) 659-6400
(713) 659-6262 (fax)

Russell R. Smith
Texas Bar No. 18682310
RSmith@fairchildlawfirm.com
W. Wade Flasowski
Texas Bar No. 24055482
Fairchild, Price, Haley & Smith, LLP
P.O. Drawer 631668
Nacogdoches, Texas 75963-1668
(936) 569-2327
(936) 569-7932 (fax)

Mark Kennedy
Texas Bar No. 24000122
mark@markkennedylaw.com
Joanna Martin
Texas Bar No. 24072153
joanna@markkennedylaw.com
Kennedy Attorneys & Counselors at Law
12222 Merit Drive, Suite 1750
Dallas, Texas 75251
(214) 445-0740
(972) 661-9320 (fax)

**Attorneys for Appellant**

## Certificate of Compliance

According to Microsoft Word's word count function, the Rule 9.4(i)(1) portion of this document contains 10,148 words.

/s/ Michelle R. Meriam
Michelle R. Meriam

## Certificate of Service

On November 19, 2015, on or before the last day for filing this brief, a true and correct copy was provided to all counsel of record via ProDoc or email, as follows:

Joseph M. Callow, Jr.
jcallow@kmklaw.com
Keating Muething & Klekamp
One East Fourth St., Suite 1400
Cincinnati, Ohio 45202
(513) 579-6400
(513) 579-6457 (fax)

Travis P. Clardy
travis.clardy@kellyhart.com
Jerry Baker
jerry.baker@kellyhart.com
Kelly, Hart & Hallman, LLP
209 E. Main St.
P.O. Box 635426
Nacogdoches, Texas 75961
(936) 564-2500
(936) 564-2507 (fax)

**Attorneys for Appellees**

/s/ Michelle R. Meriam
Michelle R. Meriam

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| JUDY MASTER | CIVIL ACTION NO. 07-1117 |
| | **\*SEALED\*** |
| VERSUS | JUDGE ELIZABETH ERNY FOOTE |
| L H C GROUP INC, ET AL. | MAGISTRATE JUDGE HORNSBY |

## ORDER

The United States having intervened in part of this action and having declined to intervene in part of this action pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(2) and (4),

**IT IS ORDERED** that, upon good cause shown by the United States relating to the protection of its investigative process, the record in this matter be unsealed, with the exception of the following documents, which **shall remain under seal**:  Record Document 9, Record Document 10, Record Document 14, Record Document 15, Record Document 16, Record Document 17, Record Document 18, Record Document 19, Record Document 20, Record Document 21, Record Document 22, Record Document 24, Record Document 25, Record Document 27, Record Document 28, Record Document 29, Record Document 32, Record Document 37, Record Document 38, Record Document 39, Record Document 40, Record Document 41, Record Document 42, Record Document 43, Record Document 44, Record Document 45, Record Document 46, Record Document 47, Record Document 50, Record Document 51, Record Document 52, Record Document 53, Record Document

54, Record Document 55, Record Document 56, Record Document 57, Record Document 58, Record Document 59, and Record Document 60.

**IT IS FURTHER ORDERED** that within five days from the date of today, the United States shall file its Partial Dismissal upon completion of settlement.

**IT IS FURTHER ORDERED** that upon the filing of the Partial Dismissal by the United States, this case shall be stayed for thirty days.

**IT IS FURTHER ORDERED** that within thirty days, the Relator shall file a status report updating the Court on the settlement of the declined claims, whether an extension of the stay will be necessary, and whether a telephone conference with the Court is needed.

**IT IS FURTHER ORDERED** that as to the part of the action in which the United States has declined to intervene, the parties serve all pleadings and motions filed in that part of the action, including supporting memoranda, upon the United States, as provided for in 31 U.S.C. § 3730(c)(3).  The United States may order any deposition transcripts and is entitled to intervene in that part of the action, for good cause, at any time.

**IT IS FURTHER ORDERED** that the parties shall serve all notices of appeal upon the United States.

**IT IS FURTHER ORDERED** that all Orders of this Court be sent to the United States.

**IT IS FURTHER ORDERED** that should the Relator or Defendant propose that the part of the action in which the United States has declined to intervene be dismissed, settled, or otherwise discontinued, the Court will solicit the written consent of the United

States before ruling or granting its approval.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 30th day of September, 2011.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| MJS & ASSOCIATES, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 9:12-CV-19 |
| v. | § | |
| | § | |
| JUDY MASTER et al, | § | JUDGE RON CLARK |
| | § | |
| Defendants. | § | |

## ORDER GRANTING PLAINTIFF'S MOTION TO REMAND AND DENYING AS MOOT DEFENDANTS' MOTION TO DISMISS OR TRANSFER VENUE

Plaintiff MJS & Associates, LLC filed suit against Defendants Judy Master and Matthew Master in Texas state court on December 22, 2011, alleging state law claims for breach of contract, violation of the Texas Trade Secrets Act, breach of fiduciary duty, conversion, conspiracy, tortious interference with a contract, and fraud. No federal claims were asserted. Defendants timely removed the case on federal question grounds, claiming that a "substantial federal question regarding the False Claims Act" existed, Doc. # 1 at Page ID # 2, despite the fact that no federal claim was actually presented in the Complaint. Defendants then filed a motion to dismiss and/or transfer to the United States District Court for the Western District of Louisiana. After Defendants' motion was filed, Plaintiff filed a motion to remand the case to state court.

The court does not have subject matter jurisdiction to hear the case. No federal question is presented, as Plaintiff's well-pled complaint does not establish either that federal law creates an asserted cause of action or that Plaintiff's right to relief necessarily depends on resolution of a

A TRUE COPY I CERTIFY
DAVID J. MALAND, CLERK
U.S. DISTRICT COURT
EASTERN DISTRICT, TEXAS
BY

substantial question of federal law. Plaintiff's motion is granted, and the case remanded to the 145th Judicial District Court of Nacogdoches County, Texas. Defendants' motion to dismiss or transfer is denied as moot.

## I. BACKGROUND

The following facts are primarily drawn from Plaintiff's Complaint, and the court makes no determination as to their veracity at this time.

Plaintiff is a healthcare consulting firm, and provides services to agencies and providers that participate in federal and state healthcare programs, including Medicare and Medicaid. In 2005, Plaintiff was retained by a law firm in Lafayette, Louisiana to perform an external compliance audit of LHC Group, Inc. In performing the audit, Plaintiff obtained and reviewed LHC records containing confidential and proprietary personal health information that was protected by the Health Insurance Portability and Accountability Act, or HIPPA.

Plaintiff hired Defendant Judy Master in March 2007 to work as a nurse consultant on the LHC compliance audit and, after she was hired, trained her to review skilled nurse visits provided by Medicare home health agencies. Ms. Master signed an employment agreement in which she agreed not to disclose or use any trade secrets—including information, records, and customer lists owned and used by Plaintiff in the regular course of business—during or after her employment, except as required by her employment. Doc. # 1-1 at Page ID # 51. Plaintiff also utilized computer passwords to limit LHC record and document access.

Ms. Master quit her job with Plaintiffs in June 2007. During her employment, Plaintiff alleges that Ms. Master and co-Defendant Matthew Master conspired to misappropriate confidential and proprietary information from Plaintiff as pertained to LHC. Ms. Master than used this

2

129

information as the basis of a *qui tam* suit, filed in the United States District Court for the Western District of Louisiana in July 2007 pursuant to the False Claims Act, against LHC. *United States of America ex rel Judy Master v. LHC Group, Inc.*, 6:07-cv-1117 (W.D. La.).

During the course of the Western District case, the United States issued subpoenas to both Plaintiff and LHC, requesting information regarding the compliance audit Plaintiff performed. LHC, upon receipt of the subpoena, terminated its contract with Plaintiff. The Western District case was unsealed in September 2011, and Plaintiff then allegedly learned for the first time that Defendants had misappropriated Plaintiff's confidential information.

In the Western District case, the United States opted to intervene with respect to certain of Relator's—i.e., Ms. Master's—claims that LHC violated the False Claims Act, but declined to intervene in the other claims in the case. These claims were subsequently settled, with Ms. Master receiving over $12,000,000. The remainder of the claims in the case were stayed in October 2011, and remain stayed at this time.[1]

Ms. Master filed her Second Amended Complaint on January 27, 2012 in the Western District case, which added Plaintiff in the instant case, MJS, as a party for the first time.[2] According to the January 2012 Complaint, MJS retaliated against Ms. Master by harassing and discriminating against her in response to her complaints and refusal to participate in fraud, in violation of the False Claims Act, 31 U.S.C. § 3730(h). The Complaint also seeks a declaratory judgment that the state law

---

[1] A status conference in the Western District case is set for April 16, 2012 regarding scheduling issues, presumably with respect to the stayed claims.

[2] Although MJS is mentioned in the first two Complaints Relator filed—the original Complaint on July 30, 2007 and First Amended Complaint on November 29, 2007—it does not seem to actually be named as a party until the January 2012 Second Amended Complaint.

3

claims relating to Ms. Master's duties of confidentiality are preempted by federal law (i.e., the False Claims Act) and that she did not violate any employment agreement with MJS.

The instant case was originally filed in Texas state court on December 22, 2012 by Plaintiff. It was removed on January 27, 2012, which was the same day that Ms. Master's Second Amended Complaint was filed in the Western District action. Defendants filed their motion to dismiss or transfer to the Western District on February 3, 2012, and Plaintiff filed its motion to remand on February 26, 2012. As far as the court can tell from these motions, the only thing the parties agree on is that this is the wrong court to hear this case.

## II. THE COURT WILL CONSIDER PLAINTIFF'S MOTION TO REMAND BEFORE DEFENDANTS' MOTION TO DISMISS/TRANSFER

Although the parties do not spend much, if any, time addressing this point in their briefing[3], the court will consider Plaintiff's motion to remand before considering Defendants' motion to dismiss/transfer, even though Defendants' motion was filed first.

The court "shall" remand a case "at any time before final judgment [if] it appears that the district court lacks subject matter jurisdiction . . . .", 28 U.S.C. § 1447(c), and the Fifth Circuit has stated that a district court does not err "by first resolving its jurisdictional concerns" by ruling on a motion to remand prior to ruling on a motion to dismiss. *Harden v. Field Mem'l Cmty. Hosp.*, 265 F. App'x 405, 408 (5th Cir. 2008); *see also Cuevas v. BAC Home Loans Servicing, LP*, 648 F.3d 242, 246-47 (5th Cir. 2011) (noting without comment that the district court ruled on a later-filed motion to remand before ruling on an earlier-filed motion to dismiss).

---

[3]Plaintiff states, without elaboration, that Defendants' motion to dismiss is premature, and should be considered only after the motion to remand is disposed of. Doc. # 15 at 2. Defendants do not seem to address the point at all.

4

The court will therefore consider the merits of Plaintiff's motion to remand before reaching Defendants' motion to dismiss/transfer.

### III. PLAINTIFF'S MOTION TO REMAND IS GRANTED

This is a court of limited jurisdiction and may hear a case only when jurisdiction is both authorized by the United States Constitution and confirmed by statute. *Owen Equip. Co. v. Kroger*, 437 U.S. 365, 371, 98 S. Ct. 2396, 2401 (1978). There is no diversity jurisdiction in this case[4], so for jurisdiction to exist there must be a federal question presented. 28 U.S.C. § 1331.

**A.    Applicable law**

> Federal question jurisdiction arises when . . . plaintiffs set forth allegations founded on a claim or right arising under the Constitution, treaties, or laws of the United States . . . In general, questions concerning federal question jurisdiction are resolved by application of the well-pleaded complaint rule . . . The rule provides that the plaintiff's properly pleaded complaint governs the jurisdictional inquiry.

*Hart v. Bayer Corp.*, 199 F.3d 239, 243-44 (5th Cir. 2000) (internal quotations omitted).

> A federal question exists only [in] those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law . . . In other words, federal question jurisdiction exists where (1) resolving a federal issue is necessary to resolution of the state-law claim; (2) the federal issue is actually disputed; (3) the federal issue is substantial; and (4) federal jurisdiction will not disturb the balance of federal and state judicial responsibilities.

*Singh v. Duane Morris LLP*, 538 F.3d 334, 337-38 (5th Cir. 2008) (internal quotation omitted; brackets in original).

**B.    Analysis**

Defendants concede that Plaintiff's Complaint actually pleads only state law claims; however, they argue that, under the four factor test articulated in *Singh*, federal question jurisdiction

---

[4]All parties are Texas citizens. Doc. # 1-1 at Page ID #6.

5

exists nevertheless because the state law claims Plaintiff has pled necessarily depend on resolution of a substantial question of federal law. Specifically, Defendants suggest that Plaintiff's claims turn on whether Ms. Master's conduct is protected under the False Claims Act. To resolve this issue, the court considers each of the *Singh* factors in turn.

      1.     *Whether resolution of a federal issue is necessary to resolution of the state law claims (factor (1))*

As noted above, Plaintiff alleges Texas state law claims for breach of contract, violation of the Texas Trade Secrets Act, breach of fiduciary duty, conversion, conspiracy, tortious interference with a contract, and fraud, all stemming from Ms. Master's conduct in acquiring information in the course of her employment regarding LHC that she later used in the Western District *qui tam* suit. All of these claims require Plaintiff to demonstrate that Ms. Master's taking of the information was wrongful; that is, in breach of her employment contract. Defendants essentially contend that Plaintiff cannot demonstrate the taking was wrongful without recourse to the False Claims Act, specifically 31 U.S.C. § 3730(h).

The court disagrees. 31 U.S.C. § 3730(h)(1) allows an employee to avoid retaliation based on "lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." This provision is invoked in a civil action by an employee who was discharged, discriminated against, demoted, suspended, threatened, or harassed in the terms and conditions of her employment. Regardless of whether or not Ms. Master can prove such a retaliation claim in the Western District case, it would appear to have little bearing on whether or not she—who quit her job only three months after being hired—breached a confidentiality agreement she signed with Plaintiff upon her hiring. Plaintiff asserts that her actions violated her employment contract, which seems to require no recourse to the False Claims Act.

6

Defendants make much of the legislative history behind the False Claims Act. While the court agrees that Section 3730(h) is aimed at preventing harassment or retaliation against would-be relators for lawful acts, this has little bearing on whether Ms. Master can be civilly liable on Plaintiff's allegations that she breached an employment contract she entered into upon her hiring. This is especially true because Plaintiff in this case was not the target of Ms. Master's False Claims Act case, and was not added as a Defendant in the Western District case until one month after Plaintiff filed the instant case in Texas state court.

Defendants also cite several district court cases for the proposition that relators may disclose documents to the United States in *qui tam* cases without breaching confidentiality agreements. No appellate court opinions are cited by Defendants to support this idea. At least one of those cases seems to partly contradict, rather than support, Defendants' argument. *In re JDS Uniphase Corp. Secs. Litig.*, 238 F. Supp. 2d 1127 (N.D. Cal. 2002). Regardless, unlike the case at bar, all involve preventing fraud by the relator or Plaintiff's *employer*.[5] Here, the *qui tam* suit was against a client of Ms. Master's employer (LHC), rather than her employer itself (Plaintiff).

---

[5]*United States ex rel. Head v. Kane Co.*, 668 F. Supp. 2d 146 (D.D.C. 2009) (where relator brought *qui tam* action against former employer, and employer raised a counterclaim for breach of the employment contract which was dismissed because the contract was void as against public policy; the court specifically stated that "[e]nforcing a private agreement that requires a *qui tam* plaintiff to turn over his or her copy of a document, which is likely to be needed as evidence at trial, *to the defendant who is under investigation* would unduly frustrate the purpose" of the FCA) (emphasis added); *United States ex rel Grandeau v. Cancer Treatment Ctrs. of Am.*, 350 F. Supp. 2d 765 (N.D. Ill. 2004) (relator's employer was the *qui tam* Defendant and brought counterclaims for breach of contract, breach of fiduciary duty, and conversion); *In re JDS Uniphase Corp. Secs. Litig.*, 238 F. Supp. 2d 1127 (N.D. Cal. 2002) (in a securities fraud case, confidentiality agreements between the Defendant employer and former employees were void as against public policy "[t]o the extent that those agreements preclude former employees from assisting in investigations of wrongdoing that have nothing to do with trade secrets or other confidential business information"); *X Corp. v. Doe*, 805 F. Supp. 1298 (E.D. Va. 1992) (where employer brought suit to prevent its former in-house counsel from disclosing information to the United States, the in-house counsel stated that the documents disclosed ongoing fraud on the part of the employer).

7

134

The court understands the concerns of those district courts and the importance of the FCA in preventing fraud. If Ms. Master had worked directly for LHC, the court may very well have agreed with those opinions. However, Ms. Master worked for an entity that is not being accused of fraud, and, under Ms. Master's theory, would essentially find itself without a recourse for Ms. Master's use of confidential information to prove a fraud perpetrated by another entity. Whether Ms. Master's actions were wrongful under Texas state law as to Plaintiff, an entity not the target of her FCA case, does not seem to have require recourse to the FCA.

2. *Whether the federal issue is actually disputed and whether it is substantial (factors (2) and (3))*

As the court has concluded resolution of a federal issue is not necessary to resolution of the state law claims, both of these factors are not applicable. Even assuming the court is incorrect as to its conclusion on factor (1) and the parties would dispute the federal issue if it existed (factor (2)), "federal jurisdiction demands not only a contested federal issue, but a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313, 125 S. Ct. 2363, 2367 (2005).

Granting, for the sake of argument, that a court would have to consult the FCA to resolve Plaintiff's purely state law claims, this is by far the only issue that would likely arise in the case. Plaintiff would have to prove, for example, with respect to one or more of its causes of action that Ms. Master acquired the information later used in the *qui tam* action in the course of her employment, that the information was covered under the confidentiality agreement, that she owed a fiduciary duty to Plaintiff, that she conspired with her co-Defendant, and that Plaintiff was harmed by her actions. In other words, the court is far from convinced that the federal issue in this case is substantial, rather than simply tangential.

8

135

3. *Federal jurisdiction will not disturb the balance of federal and state judicial responsibilities (factor (4))*

Finally, even assuming the first three factors would support Defendants' position,

> even when the state action discloses a contested and substantial federal question, the exercise of federal jurisdiction is subject to a possible veto. For the federal issue will ultimately qualify for a federal forum only if federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of [28 U.S.C.] § 1331 . . . [T]he presence of a disputed federal issue and the ostensible importance of a federal forum are never necessarily dispositive; there must always be an assessment of any disruptive portent in exercising federal jurisdiction.

*Grable*, 545 U.S. at 313-14, 125 S. Ct. at 2367-68.

Here, Plaintiff, a Texas entity, filed its state law claims in a Texas state court against two Texas citizens on December 22, 2011. At that time, Plaintiff was not a party in the Western District of Louisiana *qui tam* action; Plaintiff was not added as a party until one month *after* the state case was filed. This may not be an attempt by Defendants at forum manipulation *per se*, but not even Defendants wish this case to stay in a Texas federal court. In fact, if Defendants had their way, the issues Plaintiff raises would be litigated by a Louisiana federal court, either by dismissal of this case in favor of the pending Louisiana case or by transfer to the Western District. It makes little sense to handle a case involving Texas parties and Texas claims in any federal court, much less a Louisiana federal court, and much more sense to remand it to the Texas state court from whence it came.

## C. Conclusion

The removing party bears the burden of showing that federal jurisdiction exists and that removal was proper. *Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002). Because the removal statute is strictly construed in favor of remand, any doubts should be resolved against removal. *Id.*

Keeping this burden in mind, the court will grant Plaintiff's motion to remand. This case is remanded to the 145th Judicial District Court of Nacogdoches County, Texas.

9

## IV. DEFENDANTS' MOTION TO DISMISS/TRANSFER IS DENIED AS MOOT

Because the court remands the case, it need not consider the arguments raised in Defendants' motion to dismiss/transfer. That motion is denied as moot.

IT IS THEREFORE ORDERED that Plaintiff MJS & Associates, LLC's Motion to Remand [Doc. # 10] is GRANTED. This case is remanded to the 145th Judicial District Court of Nacogdoches County, Texas.

IT IS FURTHER ORDERED that Defendants Judy Master and Matthew Master's Motion to Dismiss or Transfer [Doc. # 2] is DENIED AS MOOT.

So **ORDERED** and **SIGNED** this **2** day of **April, 2012.**

Ron Clark, United States District Judge

10

137

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| JUDY MASTER | CIVIL ACTION NO. 07-1117 |
| VERSUS | JUDGE ELIZABETH ERNY FOOTE |
| LHC GROUP INC, ET AL. | MAGISTRATE JUDGE HORNSBY |

## FINAL JUDGMENT

Pursuant to the Court's Memorandum Ruling [Record Document 150] and Qui Tam Plaintiff Judy Master's Notice of Voluntary Dismissal [Record Document 154], the Court hereby enters final judgment **DISMISSING** all claims with prejudice, with costs to be borne by each party respectively. Accordingly, the Motion for Entry of Judgment under Rule 54(b) filed by MJS & Associates, L.L.C. [Record Document 153] is hereby **DENIED AS MOOT**. The clerk is hereby ordered to close this case.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, on this 15th day of April, 2013.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE

255

EXHIBIT
4

# AGREEMENT
## FOR
## PROFESSIONAL SERVICES

**THIS AGREEMENT** ("*Agreement*") is made and entered into effective the 1st day of February, 2005 by and between **Gachassin Law Firm, LLC** (the "*Attorneys*") in regard to legal services to be performed on behalf of **LHC Group, L.L.C.**, on behalf of it subsidiaries and affiliates, (hereinafter collectively referred to as the "*Client*") and **MJS & Associates** (hereinafter the "*Consultant*"). The Client joins this Agreement for the limited purpose of agreeing to the specific provisions referenced above the Client's signature at the end of this Agreement.

### WITNESSETH:

**WHEREAS**, the Attorneys have been engaged to provide legal advice to the Client; and,

**WHEREAS**, the Consultant represents that it is knowledgeable and skilled in the review of home health licensure, certification, reimbursement and documentation regulations, and that the Consultant is able to provide the services herein contemplated; and,

**WHEREAS**, as part of providing such legal advice, the Attorneys consider it appropriate to engage the services of Consultant to provide the Attorneys expert and technical information regarding home health licensure and certification, and documentation regulations, and the other matters addressed herein as Services (defined below) as they relate to the Client (as described on Exhibit "A" attached hereto); and,

**WHEREAS**, the Client, the Attorneys and the Consultant have entered into this Agreement with the intention and expectation that the Services to be rendered by the Consultant under the terms of this Agreement will be confidential and access to any information, reports, and analysis will be restricted to only those persons authorized by the Client and the Attorneys, and will be subject to the "attorney-client" and "work product" privilege; and,

**WHEREAS**, for convenience, the Attorneys authorize and direct that the Consultant interact directly with the Client for purposes of conducting the described Services, as well as obtaining and reviewing the Evaluation Material (as hereinafter defined), but direct that all results, analysis, reports, and recommendations be provided directly and exclusively to the Attorneys to assist the Attorneys in providing the requested legal advice to the Client.

**NOW, THEREFORE**, in exchange for the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged by the parties, the parties agree as follows:

1.      **Performance of Services.** The Consultant shall perform the services denoted on the attached Exhibit "A" (the "*Services*") for and on behalf of the Attorneys. The Consultant shall be solely responsible for the performance of such Services and shall control such performance. Consultant agrees to perform such Services in a professional manner, minimizing the disruption to the Client's business activities to the greatest extent reasonably possible. The Services shall be performed by persons selected by Consultant, whose qualifications, performance and payment shall be the sole responsibility of Consultant. The Consultant shall not be responsible for any services or obligations other than the specific Services described herein and performed by Consultant. The Services to be

517

performed by Consultant may be modified or amended only by a written agreement, executed by Consultant, the Attorneys, and the Client.

2. **Cooperation by Attorneys and Client**. The Attorneys shall facilitate the Consultant's access to the materials, records and facility of the Client in a manner which permits the Consultant to reasonably perform the Services in an efficient and economical manner.

3. **Confidentiality**. (a) The Services are provided to the Attorneys to assist their legal representation and advice to the Client regarding, among other things, the matters to be reviewed by the Consultant as part of the Services. All such Services are confidential and are under the control and direction of the Attorneys (as to dissemination of the results, reports, and recommendations, whether in electronic or written form, including access to "The Auditor" as provided in Exhibit A [the "*Reports*"]); not as to the actual performance of the Services, which performance is and shall be the sole responsibility of the Consultant). The Consultant acknowledges that all such Reports, as well as the information accumulated or created by the Consultant as part of the process of performing the Services and generating the Reports (all together, with the Reports, referred to herein as the "*Confidential Information*") is and shall remain confidential. Such Confidential Information shall be marked *"Confidential Report to Attorneys"* and shall only be released to the Attorneys (and shall not be delivered directly to the Client). Consultant shall notify the Attorneys in the event that any person or entity shall contact Consultant regarding the Services, the Client (in regard to the Services) or the Confidential Information, and shall follow the direction of the Attorneys regarding responding to such request, except as otherwise provided herein.

(b) The Consultant, in assisting the Attorneys with its investigation of the Client, will request certain information of and regarding the Client which is confidential, proprietary and/or has not been made available to the general public. As a condition of either the Attorneys or the Client furnishing such information, the Consultant agrees to treat confidentially such information and any other information (hereinafter collectively referred to as the "*Evaluation Material*") furnished by or on behalf of the Client. It is hereby agreed that the Evaluation Material will be used only for the purpose of performing the Services and that the Evaluation Material will be kept strictly confidential by the Consultant and its representatives; provided, however, that any of such information may be disclosed to the Consultant's representatives who need to know such information for the purpose of the investigation (it is understood that such representatives shall be informed of the confidential nature of such information and shall be directed to treat such information confidentially, and that the Consultant shall be responsible for compliance hereunder by its representatives.) As used herein, the term "representatives" shall mean the Consultant's directors, officers, employees and agents who are assigned or engaged by the Consultant to perform the Services, to the extent that such representatives receive or are permitted access to the Evaluation Material. The Consultant will not, and will direct its representatives not, to disclose to any person the fact that an investigation is taking or has taken place. The term "person" as used herein shall include, without limitation, any government (local, state or federal) entity, department or agency, corporation, Consultant, partnership and individual.

(c) In the event that the Consultant is requested or required (by oral questions, interrogatories, requests for information or documents, subpoena or similar process) to disclose any information supplied to it, the Consultant will provide the Attorneys immediate written notice of such request or requirements so that the Attorneys may seek an appropriate protective order. Consultant agrees not to release such information until the latest date which the Consultant, on advice of counsel, determines that such response can be delayed without censure or penalty, by Consultant's reasonable determination.

# Business Associate
## Contract Addendum

THIS BUSINESS ASSOCIATE ADDENDUM, is incorporated into the Professional Services Agreement entered into between the parties; including, **LHC GROUP, LLC** and its subsidiaries and affiliates (hereafter collectively the "**Client**"), and **MJS and ASSOCIATES** (hereafter "**Consultant**") to set forth the relationships and obligations of the parties in respect to compliance with the requirements of the Health Insurance Portability and Accountability Act of 1996.

**1. Introduction:** The Client is subject to the Standards for Privacy of Individually Identifiable Health Information (45 CFR Parts 160 and 164) (the "Privacy Rule"). The Client and Consultant have entered into an Professional Services Agreement (the "Agreement") of even date herewith. The Client and Consultant may provide, for or on behalf of one another, certain services described in the Agreement and, in the process, receive individually identifiable health information which is protected under the Privacy Rule ("PHI"). As a result, the Client and Consultant enter into this Addendum in order to comply with the Privacy Rule.

**2. Uses and Disclosures of PHI:** Except as provided in Paragraph 3, the Client and Consultant are permitted and/or required to use and disclose the PHI they obtain from one another, only to the extent such use or disclosure is: (i) necessary to provide services to one another; (ii) permitted under the Privacy Rule or (iii) in accordance with the terms contained herein. The Client and Consultant are specifically prohibited from any use or disclosure of the PHI that would violate the requirements of the Privacy Rule.

**3. Other Permitted Uses and Disclosures:** Notwithstanding Paragraph 2, the Client and Consultant may use the PHI to perform data aggregation services (as defined in the Privacy Rule) if such use is necessary for the proper management and administration of Client's operations, or to carry out their legal responsibilities hereunder. Consultant may disclose the PHI if necessary for the proper management and administration of the Consultant or to carry out its legal responsibilities, but only if:

(A)    The disclosure is required by law; or

(B)    The Client or Consultant obtains reasonable assurances from the person to whom the PHI is disclosed that it will be held confidentially and used or further disclosed only as required by law or for the purpose for which it was disclosed to the person, and the person notifies the Client or Consultant of any instances of which it is aware in which the confidentiality of the PHI has been breached.

**4. Other Obligations of the Client and Consultant:** In addition to the foregoing, the Client and Consultant shall, with regard to the PHI:

(A) Not use or further disclose the PHI other than as permitted or required by the Agreement or as required by law;

(B) Use appropriate and commercially reasonable safeguards to prevent use or disclosure of the information other than as provided for by the Agreement;

(C) Promptly report to the other any use or disclosure of the information not provided for by the Agreement of which it becomes aware, and have in place procedures to mitigate any harmful effects from the inappropriate use or disclosure;

(D) Ensure that any agents, including a subcontractor, to whom they provide the PHI agrees to the same restrictions and conditions that apply to the Client and Consultant with respect to such information;

(E) Promptly make the PHI available to the other upon request in compliance with the access provisions of the Privacy Rule;

(F) Promptly make the PHI available for amendment and incorporate any amendments to the PHI maintained by the Client and Consultant as required by the Privacy Rule;

(G) Maintain data on all disclosures of PHI for which accounting is required by the Privacy Rule for at least six years after the date of the last such disclosure, and make that data available to the Company as necessary to provide accountings of disclosures in accordance with the Privacy Rule;

(H) Make its internal books, and records relating to the use and disclosure of the PHI available to the Secretary for purposes of determining the Client's compliance with the Privacy Rule; and

(I) At termination of the Agreement, to the extent feasible, recover all PHI in the possession of its agents and subcontractors return or destroy all of the PHI that the Client and Consultant still maintain in any form and retain no copies of such information or, if such return or destruction is not feasible, extend the protections of the Agreement to the remaining PHI and limit further uses and disclosures to those purposes that make the return or destruction of the information infeasible.

(J) Remain knowledgeable of the requirements applicable to health care providers under the Privacy Rule and provide appropriate education and training to employees, officers, directors, commissioners, agents, and contractors to ensure their knowledge of and compliance with those provisions.

**5. Term:** This Addendum shall become effective immediately upon execution of the Professional Services Agreement and, except as hereinafter provided, shall remain in force and effect until the last of the PHI is returned to the Client or destroyed.

**6. Termination of Agreement:** Notwithstanding any provision of the Agreement to the contrary regarding term or termination, as hereinafter provided, the Client is authorized to terminate the Agreement if it determines that the Consultant has violated a material term of this Addendum (a

533

"Privacy Breach").

    A. Upon learning of a Privacy Breach, unless the Client reasonably believes that the Consultant has already remedied the condition leading to or causing the Privacy Breach, the Client shall give written notice to the Consultant ("Notice").

    B. If the Client has not received satisfactory assurances within ten (10) days of the date of the Notice that Consultant has cured the breach or ended the violation, as applicable, then the Client shall immediately terminate the Agreement if, in the its sole discretion, it determines that termination is feasible. If it determines that termination is not feasible, it shall immediately report the problem to the Secretary of the Department of Health & Human Services.

**7. Conflicting provisions:** In the event that any requirements or provisions of this Addendum should be in conflict with any requirements or provisions of the Agreement, the requirements or provisions of this Addendum shall control.

**8. Changes required by law:** The parties hereto have acknowledged that this Addendum is entered into in order to comply with the requirements of the Privacy Rule. In the event that the provisions or interpretation of the Privacy Rule are materially changed, or in the event that other law is enacted or interpreted which materially effects the terms of this Addendum, the parties agree to enter into a mutually acceptable amendment to this Addendum, on or before the effective date of that change, to bring the terms hereof into compliance therewith.

**9. Definitions:** As used in this Addendum, the following terms have the following meanings:

    "Business Associate" includes not only the person or entity executing this Addendum, but also includes all of its employees, officers, directors, commissioners, agents, and contractors.

    "Disclosure" or "disclose" means the release, transfer, provision of access to, or divulging in any other manner of information outside the entity holding the information, as more fully described in the Privacy Rule.

    "Use" means, with respect to individually identifiable health information, the sharing, employment, application, utilization, examination, or analysis of such information within an entity that maintains such information, as more fully described in the Privacy Rule.

**10. Miscellaneous:**

    A. <u>Ownership of PHI:</u> The PHI to which the Client and Consultant have access under the Agreement or this Addendum shall be and remain the property of the Client.

534

B. Indemnification: Each party to this Addendum shall indemnify and hold the other harmless from any and all liability, damages, costs and expenses, including attorneys fees and costs of defense, resulting from the action or omission of the other party with respect to the obligations undertaken by either of them under this Addendum.

C. Injunctive Relief: Notwithstanding any rights or remedies provided for in this Addendum, the Client retain all rights to seek injunctive relief to prevent or stop the inappropriate use or disclosure of PHI directly or indirectly by the Consultant.

D. No Third Party Beneficiaries: Nothing in this Addendum is intended to confer upon or create in, nor shall anything herein confer upon or create in, any person other that the parties and their successors and assigns, any rights, remedies, obligations, or liabilities whatsoever.

E:\00500\000Corporate\Corporate Compliance\PSA-Jan Spears-01-24-2005.wpd

Confidential to Attorney

## EMPLOYMENT AGREEMENT

By this Agreement, M. Jan Spears and Associates, Inc., referred to in this Agreement as Employer, located at 1620 West Seale, Nacogdoches, Texas, 75964, employs _Judy Master RN_ , referred to in this Agreement as Employee, of _MJS, LLC_ , who, for consideration of the providing of confidential and proprietary information, trade secrets, trade specific training and other such benefits incident to their employment, by M. Jan Spears and Associates, agrees and acknowledges the following terms and conditions:

1. **Trade Secrets**   During the term of employment, Employer will make available and Employee will have access to, and become familiar with, various trade secrets, consisting of processes and compilations of information, records, customer lists, and specifications, owned by Employer and regularly used in the operation of the business of the Employer. Employee shall not disclose any such trade secrets, directly or indirectly, nor use them in any way, either during the term of this Agreement or at any time thereafter, except as required in the course of employment. All files, records, documents, specifications, equipment, and similar items relating to the business of the Employer, whether or not prepared by the Employee, shall remain the exclusive property of the Employer and shall not be removed from the premises of the Employer under any circumstances without the prior written consent of the Employer.

2. **Return of Employer's Property**   On the termination of employment or whenever requested by Employer, Employee shall immediately deliver to Employer all property in Employee's possession or under Employee's control belonging to the Employer, including, but not limited to all accounting records, computer terminals, hardware, software and tapes, accounting machines, and all office furniture and fixtures, supplies, and other personal property in good condition, ordinary wear and tear excepted.

3. **Noncompetition By Employee**   During the term of this Agreement, Employee shall not, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity, engage or participate in any business that is in competition in any manner whatever with the business of the Employer. Furthermore, on the termination of this Agreement, Employee expressly agrees not to engage or participate, directly or indirectly, in any business located within the East Texas Region, from Nacogdoches County North to Smith County, West to Madison County, East to Louisiana and South to the Gulf Coast, including but not limited to the Greater Houston/Harris County Area, or any area that employee worked in, served or called upon as an employee of M. Jan Spears and Associates, that is in competition with the business of the Employer or a current client of the Employer for a period of two (2) years.

Confidential to Attorney



1620 West Seale
Nacogdoches, Texas 75964

Phone: 936-559-7234
Fax: 936-560-4652
Cell: 936-554-7226

charliespears@mjanspears.com

**MJS & Associates LLC**

## STATEMENT OF CONFIDENTIALITY

I understand the importance of observing strict ethical moral and professional standards with confidentiality policies. I agree not to **DISCUSS OR RELEASE** any information obtained within the company regarding any MJS client, record, personnel or any other information with or to any individual not directly associated with MJS or any other party or individual not directly associated with the information. I fully agree that any information that is released will only be done with proper authorization and/or in accordance with policy for the release of approved information.

I will not disclose or discuss client's patient's conditions, treatments, or status, even if they are known to me personally, with anyone at or outside the Company except to carry out my regular duties that I am assigned within authorized responsibilities.

I will not release or discuss information to anyone concerning financial, medical or social information of those patients of the clients, their family, MJS employees, or the Company as a whole, which is not authorized in writing by an official in management in authority to release such information.

I will not seek or retain, copy or disclose confidential information about our client's or MJS employees for my own or others use by researching computer terminals, billing information, personnel or medical records, or any other sources except to carry out duties as assigned. I will not at anytime, share or disclose any MJS computer systems access username or password to anyone. I will not at anytime tamper with any MJS computer system (hardware, software, or firmware) to gain unauthorized access. I will not at anytime disclose to any unauthorized personnel, any procedures (in whole or in part) in order to gain unauthorized access to any MJS computer system.

My signature on this document indicates that I understand and agree to abide by the aforementioned policies, and that any breach of the policies will result in disciplinary procedures up to and including termination. In addition to, if I leave employment with MJS, I understand professional conduct is expected also in reference to compliance with the above agreement and penalties or damages may also apply to the breach of this agreement up to $10,000 per violation.

I fully agree and accept these terms as a condition of my employment. I also accept the aforementioned with moral, ethical and professional standards applicable thereafter any MJS employment.

_____  3/26/2007  _____  3/26/07
Applicant Signature          Date  40 of 153   MJS Representative          Date

554

Sheri Foster , Supervisor Compliance

From: Judy Master RN

Dear Sheri

I am resigning from MJS effective June 11, 2007 due to personal reasons.
I have enjoyed working with you and TJ and the MJS team.

I will mail the key or have my husband drop it by.  This is my written
permission to mail my check(s) to me.

Sincerely,

Judy Master
1345 CR 3408
Jacksonville, Texas 75766

556

FILED
4:45 P.M.

JUN 8 2015

JESSICA HILL
DISTRICT CLERK
NACOGDOCHES COUNTY, TX

CAUSE NO. C1127910

| | | |
|---|---|---|
| MJS and ASSOCIATES, L.L.C. | § | IN THE DISTRICT COURT OF |
| A Texas Limited Liability | § | |
| Corporation, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | NACOGDOCHES COUNTY, TEXAS |
| | § | |
| JUDY MASTER, R.N., | § | |
| MATTHEW MASTER, | § | |
| | § | |
| Defendants. | § | 145th JUDICIAL DISTRICT |

### ORDER ON DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

On this day came on to be considered Defendants Judy Master, R.N. and Matthew

Master's Motion for Summary Judgment. After considering the Motion and hearing the arguments

of counsel, it appears to the Court that such Motion and should in all things be GRANTED.

This order finally disposes of all parties and all claims and is appealable.

SIGNED on this the ___8___ day of ___June___, 2015.

_____
JUDGE PRESIDING

773

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted    **Limited on Constitutional Grounds by**    U.S. v. Hawley,    N.D.Iowa,    Aug. 01, 2011

United States Code Annotated
    Title 31. Money and Finance (Refs & Annos)
        Subtitle III. Financial Management
            Chapter 37. Claims (Refs & Annos)
                Subchapter III. Claims Against the United States Government (Refs & Annos)

31 U.S.C.A. § 3729

§ 3729. False claims

Currentness

**(a) Liability for certain acts.--**

**(1) In general.**--Subject to paragraph (2), any person who--

**(A)** knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

**(B)** knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

**(C)** conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

**(D)** has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

**(E)** is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

**(F)** knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

**(G)** knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410 [1] ), plus 3 times the amount of damages which the Government sustains because of the act of that person.

**(2) Reduced damages.**--If the court finds that--

**(A)** the person committing the violation of this subsection furnished officials of the United States responsible for investigating false claims violations with all information known to such person about the violation within 30 days after the date on which the defendant first obtained the information;

**(B)** such person fully cooperated with any Government investigation of such violation; and

**(C)** at the time such person furnished the United States with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced under this title with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation,

the court may assess not less than 2 times the amount of damages which the Government sustains because of the act of that person.

**(3) Costs of civil actions.**--A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

**(b) Definitions.**--For purposes of this section--

**(1)** the terms "knowing" and "knowingly" --

**(A)** mean that a person, with respect to information--

**(i)** has actual knowledge of the information;

**(ii)** acts in deliberate ignorance of the truth or falsity of the information; or

**(iii)** acts in reckless disregard of the truth or falsity of the information; and

**(B)** require no proof of specific intent to defraud;

**(2)** the term "claim"--

**(A)** means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

**(i)** is presented to an officer, employee, or agent of the United States; or

**(ii)** is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

**(I)** provides or has provided any portion of the money or property requested or demanded; or

**(II)** will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

**(B)** does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

**(3)** the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

**(4)** the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

**(c) Exemption from disclosure.**--Any information furnished pursuant to subsection (a)(2) shall be exempt from disclosure under section 552 of title 5.

**(d) Exclusion.**--This section does not apply to claims, records, or statements made under the Internal Revenue Code of 1986.

**[(e) Redesignated (d)]**

**CREDIT(S)**
(Pub.L. 97-258, Sept. 13, 1982, 96 Stat. 978; Pub.L. 99-562, § 2, Oct. 27, 1986, 100 Stat. 3153; Pub.L. 103-272, § 4(f)(1)(O), July 5, 1994, 108 Stat. 1362; Pub.L. 111-21, § 4(a), May 20, 2009, 123 Stat. 1621.)

Notes of Decisions (1429)

Footnotes
1       So in original. Probably should read "Public Law 101-410".
31 U.S.C.A. § 3729, 31 USCA § 3729
Current through P.L. 114-61 (excluding P.L. 114-52, 114-54, 114-59, and 114-60) approved 10-7-2015

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 31. Money and Finance (Refs & Annos)
    Subtitle III. Financial Management
      Chapter 37. Claims (Refs & Annos)
        Subchapter III. Claims Against the United States Government (Refs & Annos)

31 U.S.C.A. § 3730

§ 3730. Civil actions for false claims

Effective: July 22, 2010
Currentness

**(a) Responsibilities of the Attorney General.**--The Attorney General diligently shall investigate a violation under section 3729. If the Attorney General finds that a person has violated or is violating section 3729, the Attorney General may bring a civil action under this section against the person.

**(b) Actions by private persons.--(1)** A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

**(2)** A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. [1] The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

**(3)** The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2). Any such motions may be supported by affidavits or other submissions in camera. The defendant shall not be required to respond to any complaint filed under this section until 20 days after the complaint is unsealed and served upon the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure.

**(4)** Before the expiration of the 60-day period or any extensions obtained under paragraph (3), the Government shall--

  **(A)** proceed with the action, in which case the action shall be conducted by the Government; or

  **(B)** notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action.

**(5)** When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.

**(c) Rights of the parties to qui tam actions.--(1)** If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action. Such person shall have the right to continue as a party to the action, subject to the limitations set forth in paragraph (2).

**(2)(A)** The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion.

**(B)** The Government may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances. Upon a showing of good cause, such hearing may be held in camera.

**(C)** Upon a showing by the Government that unrestricted participation during the course of the litigation by the person initiating the action would interfere with or unduly delay the Government's prosecution of the case, or would be repetitious, irrelevant, or for purposes of harassment, the court may, in its discretion, impose limitations on the person's participation, such as--

    **(i)** limiting the number of witnesses the person may call;

    **(ii)** limiting the length of the testimony of such witnesses;

    **(iii)** limiting the person's cross-examination of witnesses; or

    **(iv)** otherwise limiting the participation by the person in the litigation.

**(D)** Upon a showing by the defendant that unrestricted participation during the course of the litigation by the person initiating the action would be for purposes of harassment or would cause the defendant undue burden or unnecessary expense, the court may limit the participation by the person in the litigation.

**(3)** If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action. If the Government so requests, it shall be served with copies of all pleadings filed in the action and shall be supplied with copies of all deposition transcripts (at the Government's expense). When a person proceeds with the action, the court, without limiting the status and rights of the person initiating the action, may nevertheless permit the Government to intervene at a later date upon a showing of good cause.

**(4)** Whether or not the Government proceeds with the action, upon a showing by the Government that certain actions of discovery by the person initiating the action would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts, the court may stay such discovery for a period of not more than 60 days. Such a showing shall be conducted in camera. The court may extend the 60-day period upon a further showing in camera that the Government has pursued the criminal or civil investigation or proceedings with reasonable diligence and any proposed discovery in the civil action will interfere with the ongoing criminal or civil investigation or proceedings.

**(5)** Notwithstanding subsection (b), the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty. If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section. Any finding of fact or conclusion of law made in such other proceeding that has become final shall be conclusive on all parties to an action under this section. For purposes of the preceding sentence, a finding or conclusion is final if it has been finally determined on appeal to the appropriate court of the United States, if all time for filing such an appeal with respect to the finding or conclusion has expired, or if the finding or conclusion is not subject to judicial review.

**(d) Award to qui tam plaintiff.--(1)** If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. Where the action is one which the court finds to be based primarily on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government $^2$ Accounting Office report, hearing, audit, or investigation, or from the news media, the court may award such sums as it considers appropriate, but in no case more than 10 percent of the proceeds, taking into account the significance of the information and the role of the person bringing the action in advancing the case to litigation. Any payment to a person under the first or second sentence of this paragraph shall be made from the proceeds. Any such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

**(2)** If the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages. The amount shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds. Such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

**(3)** Whether or not the Government proceeds with the action, if the court finds that the action was brought by a person who planned and initiated the violation of section 3729 upon which the action was brought, then the court may, to the extent the court considers appropriate, reduce the share of the proceeds of the action which the person would otherwise receive under paragraph (1) or (2) of this subsection, taking into account the role of that person in advancing the case to litigation and any relevant circumstances pertaining to the violation. If the person bringing the action is convicted of criminal conduct arising from his or her role in the violation of section 3729, that person shall be dismissed from the civil action and shall not receive any share of the proceeds of the action. Such dismissal shall not prejudice the right of the United States to continue the action, represented by the Department of Justice.

**(4)** If the Government does not proceed with the action and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.

**(e) Certain actions barred.--(1)** No court shall have jurisdiction over an action brought by a former or present member of the armed forces under subsection (b) of this section against a member of the armed forces arising out of such person's service in the armed forces.

**(2)(A)** No court shall have jurisdiction over an action brought under subsection (b) against a Member of Congress, a member of the judiciary, or a senior executive branch official if the action is based on evidence or information known to the Government when the action was brought.

**(B)** For purposes of this paragraph, "senior executive branch official" means any officer or employee listed in paragraphs (1) through (8) of section 101(f) of the Ethics in Government Act of 1978 (5 U.S.C. App.).

**(3)** In no event may a person bring an action under subsection (b) which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party.

**(4)(A)** The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--

   **(i)** in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

   **(ii)** in a congressional, Government [2] Accountability Office, or other Federal report, hearing, audit, or investigation; or

   **(iii)** from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

**(B)** For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

**(f) Government not liable for certain expenses.**--The Government is not liable for expenses which a person incurs in bringing an action under this section.

**(g) Fees and expenses to prevailing defendant.**--In civil actions brought under this section by the United States, the provisions of section 2412(d) of title 28 shall apply.

**(h) Relief from retaliatory actions.--**

   **(1) In general.**--Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

**(2) Relief.**--Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

**(3) Limitation on bringing civil action.**--A civil action under this subsection may not be brought more than 3 years after the date when the retaliation occurred.

**CREDIT(S)**

(Pub.L. 97-258, Sept. 13, 1982, 96 Stat. 978; Pub.L. 99-562, §§ 3, 4, Oct. 27, 1986, 100 Stat. 3154, 3157; Pub.L. 100-700, § 9, Nov. 19, 1988, 102 Stat. 4638; Pub.L. 101-280, § 10(a), May 4, 1990, 104 Stat. 162; Pub.L. 103-272, § 4(f)(1)(P), July 5, 1994, 108 Stat. 1362; Pub.L. 111-21, § 4(d), May 20, 2009, 123 Stat. 1624; Pub.L. 111-148, Title X, § 10104(j)(2), Mar. 23, 2010, 124 Stat. 901; Pub.L. 111-203, Title X, § 1079A(c), July 21, 2010, 124 Stat. 2079.)

Notes of Decisions (2154)

Footnotes

1      See, now, Rule 4(i) of the Federal Rules of Civil Procedure.

2      So in original. Probably should be "General".

31 U.S.C.A. § 3730, 31 USCA § 3730

Current through P.L. 114-9 approved 4-7-2015

**End of Document**                                                                © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Declined to Extend by** Saini v. International Game Technology, D.Nev., May 16, 2006

238 F.Supp.2d 1127
United States District Court,
N.D. California.

In re: JDS UNIPHASE CORPORATION SECURITIES LITIGATION
This document relates to All Actions

No. C-02-1486 CW EDL. | Oct. 18, 2002.

Lead plaintiff in securities fraud class action against company moved for order limiting scope of confidentiality agreements signed by former employees. The District Court, Laporte, United States Magistrate Judge, held that confidentiality agreements binding former employees did not preclude former employees from disclosing non trade secret, non privileged information regarding securities fraud.

Motion granted.

West Headnotes (1)

[1]    **Federal Civil Procedure**    Actions in which remedy is available

Private Securities Litigation Reform Act (PSLRA) prohibition, on discovery during pendency of motion to dismiss in securities fraud action, did not preclude court from granting request, of claimants that confidentiality obligations of former employees of company be limited to disclosures of trade secrets, allowing employees and former employees wishing to do so to disclose non trade secret and nonprivileged information regarding securities fraud; discovery was not involved. Securities Exchange Act of 1934, § 21D(b)(3)(B), as amended, 15 U.S.C.A. § 78u-4(b)(3)(B).

13 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1127** Darren J. Robbins, San Diego, CA, John Frith Stewart, Segal, Stewart, Cutler, Lindsay, Janes & Ber, Louisville, KY, Reed R. Kathrein, Milberg Weiss Bershad Hynes & Lerach, San Francisco, CA, for Pipefitters Local 522 & 633 Pention Trust Fund, Plaintiff.

Christopher T. Heffelfinger, Jennifer Sharon Abrams, Berman DeValerio Pease & Tabacco, P.C., San Francisco, CA, Jonathan M. Plasse, Louis J. Gottlieb, Goodkind Labation Rudoff & Sucharow LLP, New York City, for Connecticut Retirement Plans and Trust Funds, Lead Plaintiff.

Timothy J. Burke, Stull Stull & Brody, Los Angeles, CA, for Edward Cantamount, Consol Plaintiff.

Behram V. Parekh, Weiss & Yourman, Los Angeles, CA, for Jerold Sorensen, Consol Plaintiff.

Darren J. Robbins, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA, Paul J. Geller, Cauley Geller Bowman & Coates LLP, Boca Raton, FL, **\*1128** Reed R. Kathrein, Milberg Weiss Bershad Hynes & Lerach, San Francisco, CA, for Joel Abrams, Consol Plaintiff.

Alfred G. Yayes, Law Offices of Alfred G. Yates, Pittsburgh, PA, Reed R. Kathrein, Milberg Weiss Bershad Hynes & Lerach, San Francisco, CA, for Kimberly Saleik, Consol Plaintiff.

Darren J. Robbins, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA, Reed R. Kathrein, Milberg Weiss Bershad Hynes & Lerach, San Francisco, CA, for Greg Brockwell, Consol Plaintiff.

Darren J. Robbins, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA, Marc S. Henzel, Law Offices of Marc C. Henzel, Bala Cynwyd, PA, Reed R. Kathrein, Milberg Weiss Bershad Hynes & Lerach, San Francisco, CA, for Gene Dolzhansky, Consol Plaintiff.

Gregory M. Egleston, Bernstein Liebhard & Lifshitz LLP, New York City, Lionel Z. Glancy, Glancy Binkow LLP, Los Angeles, CA, Mel E. Lifshitz, Bernstein Liebhard & Lifshitz, LLP, New York City, Michael M. Goldberg, Glancy & Binkow LLP, Los Angeles, CA, for John F. Raymond, Pond Equities, Consol Plaintiffs.

Jennifer Sharon Abrams, Berman, De Valerio Pease Tabacco Burt & Pucillo, San Francisco, CA, Steven J. Toll, Cohen Milstein Hausfeld & Toll, PLLC, Seattle, WA, for Gary T. Grabar, Consol Plaintiff.

Jacqueline Sailer, Rabin & Peckel LLP, New York City, Joseph J. Tabacco, Jr., Berman DeValerio Pease Tabacco Burt & Pucillo, San Francisco, CA, for Hene Armour, Consol Plaintiff.

Behram V. Parekh, Weiss & Yourman, Los Angeles, CA, Jordan L. Lurie, Weiss & Yourman, Los Angeles, CA, Kevin J. Yourman, Weiss & Yourman, Los Angeles, CA, Michael D. Braun, Stull, Stull & Brody, Los Angeles, CA, for Martin Hacker, Consol Plaintiff.

Betsy C. Manifold, Francis A. Bottini, Jr., Francis M. Gregorek, Wolf Haldenstein Adler Freeman & Herz, San Diego, CA, for L. A. Murphy, Consol Plaintiff.

Andrew Schatz, Schatz & Nobel, P.C., James Albert Caputo, Spector Roseman & Kodroff, PC, San Diego, CA, Patrick A. Klingman, Schatz & Nobel P.C., Hartford, CT, for John Erisman, Harriet Goldstein, Consol Plaintiffs.

Michael Donovan, Donovan Searles, LLC, Paul J. Scarlato, Weinstein Kitchenoff Scarlato & Goldman, Philadelphia, PA, for Saffi Omar, Consol Plaintiff.

Jules Brody, Stull Stull & Brody, New York City, Kevin J. Yourman, Weiss & Yourman, Los Angeles, CA, Michael D. Braun, Timothy J. Burke, Stull, Stull & Brody, Los Angeles, CA, for Steven Cantamount., Consol Plaintiff.

Laurence D. King, Kaplan Fox & Kilsheimer LLP, San Francisco, CA, for Seymour Halpern, Consol Plaintiff.

John Emerson, The Emerson Firm, Houston, TX, for Victor Cape, Consol Plaintiff.

David R. Scott, James E. Miller, Scott & Scott LLC, Colchester, CT, for Rudolf Skubella, Consol Plaintiff.

Deborah R. Gross, Law Offices of Bernard M. Gross, PC, Philadelphia, PA, for Ralph Kirk, Consol Plaintiff.

Curtis V. Trinko, Law Offices of Curtis V. Trinko, New York City, for Warren C. Sterrett, Consol Plaintiff.

William B. Federman, Dreier Baritz & Federman, Oklahoma City, OK, for Larry Thomas, Consol Plaintiff.

Elizabeth E. Leland, Juli F. Desper, Lynn Lincoln Sarko, Keller Rohrback L.L.P., Seattle, WA, for Grover Ellis, Linda Raybine, Consol Plaintiffs.

Jeffrey Neiman, The Neiman Law Firm, Brooklyn, NY, Joseph P. Garland, **\*1129** Klein & Solomon LLP, Kenneth A. Elan, Law Offices of Kenneth A. Elan, New York City, Lionel Z. Glancy, Glancy & Binkow LLP, Mel Urbach, Law Offices of Mel Urbach, Jersey City, NJ, Michael M. Goldberg, Glancy & Binkow LLP, Los Angeles, CA, for Aaron Jungreis, Consol Plaintiff.

Barbara A. Podell, Savett Frutkin Podell & Ryan, P.C., Philadelphia, PA, Charles J. Piven, Law Offices of Charles J. Piven, P.A., Baltimore, MD, Joseph M. Barton, Gold Bennett Cera & Sidener LLP, San Francisco, CA, Sherrie R. Savett, Berger & Montague, P.C., Philadelphia, PA, Solomon B. Cera, Gold Bennett Cera & Sidener LLP, San Francisco, CA, for Leonard Sollins, Consol Plaintiff.

Karen M. Hanson, Lockridge Grindal Nauen P.L.L.P., Minneapolis, MN, for Michael Salter, Consol Plaintiff.

Bruce D. Oakes, Law Office of Bruce D. Oakes, St. Louis, MO, for Richard Reinsich, Consol Plaintiff.

Joseph M. Barton, Gold Bennett Cera & Sidener LLP, San Francisco, CA, Mark S. Willis, Matthew J. Ide, Cohen Milstein Hausfeld & Toll PLLC, Washington, DC, for Houston Municipal Employees Pension System, Consol Plaintiff.

Joseph M. Barton, Gold Bennett Cera & Sidener LLP, Solomon B. Cera, San Francisco, CA, Mark S. Willis, Steven J. Toll, Cohen Milstein Hausfeld & Toll, P.L.L.C., Seattle, WA, for Houston Municipal Employees Pension System, Consol Plaintiff.

Aaron H. Darsky, Schubert & Reed LLP, San Francisco, CA, Andrew J. Morganti, Donald J. Enright, Finkelstein Thompson & Loughran, Washington, DC, for Paul Hesano, Consol Plaintiff.

Christopher J. Gray, Christopher Lovell, Lovell & Stewart, LLP, New York City, for Suresh Khanna, Consol Plaintiff.

Aaron H. Darsky, Schubert & Reed LLP, San Francisco, CA, Carol V. Gilden, Michael E. Moskovitz, Much Shelist FreedDeneberg Ament & Rub, Chicago, IL, Juden Justice Reed, Robert C. Schubert, Willem F. Jonckheer, Schubert & Reed LLP, San Francisco, CA, for Steven J. Greenfogel, Mike Gray, Consol Plaintiffs.

Juli F. Desper, Keller Rohrback LLP, Seattle, WA, Timothy J. Burke, Stull Stull & Brody, Los Angeles, CA, for Edwin Cancilla, Movant.

Holly H. Tambling, Morrison & Foerster LLP, Terri Garland, Morrison & Foerster, San Francisco, CA, for JDS Uniphase Corporation, Jozef Straus, Anthony R. Muller, Charles J. Abbe, Defendants.

Holly H. Tambling, Morrison & Foerster LLP, San Francisco, CA, Howard S. Caro, Michael L. Charlson, Heller Ehrman White & McAuliffe LLP, Menlo Park, CA, Michael J. Shepard, Heller Ehrman White & McAuliffe LLP, San Francisco, CA, for Kevin Kalkhoven, Defendant.

Holly H. Tambling, Morrison & Foerster LLP, San Francisco, CA, for Dan E. Pettit, M. Zita Cobb, Joseph Ip, Frederick Leonberger, Michael C. Phillips, Donald R. Scrifes, Casimir S. Skrzypczak, Peter A. Guglielmi, Robert E. Enos, Bruce D. Day, Martin A. Kaplan, Defendants.

Angela N. O'Rourke, Joseph A. Meckes, Mark C. Dosker, Squire Sanders & Depsey LLP, San Francisco, CA, Daniel L. Bockett, Squire Sanders & Depsey LLP, Cleveland, OH, for The Furukawa Electric Co., Ltd., Defendant.

**ORDER GRANTING IN PART LEAD PLAINTIFF'S MOTION TO LIMIT THE SCOPE OF CONFIDENTIALITY AGREEMENTS SIGNED BY FORMER JDS UNIPHASE EMPLOYEES**

LAPORTE, United States Magistrate Judge.

In this securities action, lead plaintiff Connecticut Retirement Plans and Trust **\*1130** Funds ("Connecticut") moves to limit the scope of confidentiality agreements signed by former employees of defendant JDS Uniphase Corporation ("JDSU"). For the reasons set forth below, the motion is granted, with modifications.

## I. Background

As lead plaintiff in this action, Connecticut has been investigating acts of JDSU and the individual defendants relating to alleged artificial inflation of the price of JDSU securities during the putative class period of July 27, 1999 through July 26, 2001. Investigators hired by lead counsel have identified and have spoken with numerous former employees of JDSU. Many of these former employees have informed the investigators that they are willing to talk about relevant activities at JDSU during the class period, but they believe they are unable to do so because of one or more confidentiality agreements that they entered into with JDSU (or with companies later acquired by JDSU) at the time they were hired, at the time they were terminated, or both.

One such agreement is entitled "Employee Proprietary Information and Inventions Agreement." (Gottlieb Decl., Ex. A.) That agreement provides, in relevant part:

(a) *Confidential Restrictions.* I understand that, in the course of my work as an employee of the Company, I [have had and] may have access to Proprietary Information (as defined below) concerning the Company. I acknowledge that the Company has developed, compiled, and otherwise obtained, often at great expense, this information, which has great value to the Company's business. I agree to hold in strict confidence and in trust for the sole benefit of the Company all Proprietary Information and will not disclose any Proprietary Information, directly or indirectly, to anyone outside of the Company, or use, copy, publish, summarize, or remove from Company premises such information (or remove from the premises any other property of the Company) except (i) during my employment to the extent necessary to carry out my responsibilities as en employee of the Company or (ii) after termination of my employment, as specifically authorized in writing by a duly authorized officer of the Company. I further understand that the publication of any Proprietary Information through literature or speeches must be approved in advance in writing by a duly authorized officer of the Company.

(b) *Proprietary Information Defined.* I understand that the term "Proprietary Information" in this Agreement means all information and any idea in whatever form, tangible or intangible, whether disclosed to or learned or developed by me, pertaining in any manner to the business of the Company or to the Company's affiliates, consultants, or business associates, unless (i) the information is or becomes publicly known through lawful means; (ii) the information was rightfully in my possession or part of my general knowledge prior to my employment by the Company; or (iii) the information is disclosed to me without confidential or proprietary restriction by a third party who rightfully possesses the information (without confidential or proprietary restriction) and did not learn of it, directly or indirectly, from the Company. I further understand that the Company considers the following information to be included, without limitation, in the definition of Proprietary Information: (A) notebooks, schematics, techniques, employee suggestions, development tools and processes, computer printouts, computer programs, design drawings and manuals, and improvements; (B) information about costs, profits, markets, and sales; (C) plans for future development and new product concepts; and (D) all documents, books, **\*1131** papers, drawings, models, sketches, and other data of any kind and description, including electronic data recorded or retrieved by any means, that have been or will be given to me by the Company (or any affiliate of it), as well as written or verbal instructions or comments.

(*Id.* at 1.)

Another such agreement is entitled "Separation Agreement and General Release." (Gottlieb Decl., Ex. B.) That agreement provides, in relevant part:

You agree to return all Company property, including, without limitation, all books, manuals, records, reports, notes, contracts, lists, blueprints, and other documents, or materials, or copies thereof, and equipment furnished to or prepared by you in the course of or incident to your employment. You also acknowledge and reaffirm your continuing obligations under the Proprietary Information Agreement you signed with the Company on original date of hire.

... You also agree that this Agreement is confidential and that you will not discuss it, or any of its terms, with anyone without the Company's prior consent, except your spouse and to any legal or financial advisors for legitimate business reasons, or as otherwise compelled by law. Further, you agree that you will not make or publish, either orally or in writing, any disparaging statement regarding the Company, its employees, clients, vendors, or customers, or in any way impede or interfere with the Company's customer relationships.

(*Id.* at 2.)

A third agreement is entitled "E-Tek Dynamics, Inc. Proprietary Information and Inventions Agreement." (Macika Decl., Ex. A.) That agreement provides, in relevant part:

a. *Definition* Employee acknowledges and agrees that Employee has obtained or may now or hereafter obtain from the Company certain of the Company's confidential information, which confidential information includes but is not limited to all of the Company's (i) past, present and future research, (ii) business, development and marketing plans, (iii) customer lists and customer relationships, (iv) prices (except where publicly disclosed by the Company) and pricing strategies, (v) secret inventions, processes, methods and specifications, (vi) compilations of information (including without limitation studies, records, reports, drawings, memoranda, drafts and any other related information), (vii) trade secrets, (viii) product development proposals, and (ix) other ideas, concepts, strategies, designs, suggestions and recommendations relating without limitation to any of the foregoing or to any product developed or proposed to be developed by the Company or by the Employee and/or others for the Company (collectively, the "Confidential Information"). Employee further acknowledges and agrees that the Company is the owner of all such Confidential Information, any copies thereof, and of all copyright, trade secret, patent, trademark and other intellectual or industrial property rights therein or associated therewith. Employee understands and agrees that the unauthorized use or disclosure of the Confidential Information and any of the Company's related intellectual and industrial property rights constitutes unfair competition, and promises not to engage in any unfair competition with the Company during Employee's employment or at anytime thereafter.

b. *Term.* Employee agrees that for a period of five (5) years following either the disclosure to Employee of any of the Company's Confidential Information or the termination of Employee's employment with the Company, whichever is last to occur, Employee will not disclose **\*1132** said information or any portion thereof to any person, firm, corporation or other entity, or make use of such information in any way without the Company's prior written consent, or reverse engineer, de-compile, or disassemble any of the Company's products without such consent.

(*Id.* at 1.)

## II. Discussion

Connecticut argues that the Court should limit the scope of these agreements and any other confidentiality agreements between JDSU and its former employees so that they would not prohibit former JDS Uniphase employees from responding to questions posed by investigators for Lead Plaintiff and/or by Lead Counsel related to the alleged securities fraud. No proposed order has been submitted. Connecticut contends that to the extent JDSU seeks to use the agreements for purposes other than the protection of trade secrets, the agreements are unduly broad and should be deemed void as against public policy. Alternatively, Connecticut requests "that the Court: (a) grant plaintiffs permission to depose a limited number of former JDS Uniphase employees prior to the Court's decision on the motion to dismiss, or (b) grant plaintiffs an adverse inference that, despite public disclosures to the contrary, defendants were aware of the Company's sharply declining financial condition and results prior to their selling of more than one billion dollars' worth of Company stock." (Motion at 12.)

**A. The Reform Act's ban on discovery during the pendency of a motion to dismiss does not bar plaintiffs' motion**

JDSU argues that Connecticut's motion is an impermissible attempt to evade the statutory restrictions on early discovery that are imposed by the Private Securities Litigation Reform Act of 1995 ("Reform Act"). [1] The purpose of the Reform Act was "to restrict abuses in securities class-action litigation, including: (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of "deep pocket" defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys." *SG Cowen Securities Corporation v. United States District Court for the Northern District of California,* 189 F.3d 909, 911 (9th Cir.1999) (quoting *In re Advanta Corp. Secs. Litig.,* 180 F.3d 525, 530-31 (3d Cir.1999)). The Reform Act instituted a heightened pleading standard, and "mandated a stay of discovery during the pendency of a summary judgment or dismissal motion." *Id.*

[1]   The Court has also received an opposition brief from defendant The Furukawa Electric Co. Ltd. ("Furukawa"), which correctly notes that they are not a party to the confidentiality agreements at issue, and thus Connecticut's references to "defendants" should not be taken to include Furukawa.

Under the Reform Act, "all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. § 78u-4(b)(3)(B). This section was "intended to prevent unnecessary imposition of discovery costs on defendants." *SG Cowen,* 189 F.3d at 911 (citing H.R. Conf. Rep. No. 104-369, 104th Cong. 1st Sess. at 32 (1995), reprinted in 1995 U.S.C.C.A.N. Sess. 731). The Ninth Circuit has held that the Reform Act's discovery stay provision "clearly contemplates that 'discovery should be permitted in securities class actions *only after the court has sustained the legal sufficiency of the complaint.*' " *Id.* at 912 (quoting **\*1133** S.Rep. No. 104-98, at 14 (1995), reprinted in U.S.C.C.A.N. 693). Thus, the Ninth Circuit has construed the Reform Act's discovery stay to apply not only during the pendency of a motion to dismiss, but until the Court has sustained the legal sufficiency of the complaint.

Here, there is no motion to dismiss pending, but the time for responding to the consolidated complaint has not yet elapsed. On September 12, Judge Wilken signed a stipulation granting defendants until December 9 to respond to the consolidated complaint. JDSU's counsel indicated at the hearing that they are likely to file a motion to dismiss. As the Court has not yet sustained the legal sufficiency of the consolidated complaint, plaintiffs are not yet entitled to take discovery. Accordingly, under the Ninth Circuit's interpretation of the Reform Act in *SG Cowen,* plaintiffs are not yet entitled to take discovery. *Id.*

There are two exceptions to the Reform Act's discovery stay. Discovery is stayed "unless the courts finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice." With respect to the first exception, there is not a hint of a suggestion in the plaintiff's papers that there is an urgent need to preserve evidence. As for the second exception, the Ninth Circuit has held that a plaintiff's inability, without discovery, to obtain the facts needed to meet the Reform Act's heightened pleading requirements is not the sort of "undue prejudice" contemplated by the Reform Act. *SG Cowen,* 189 F.3d at 913.

> The Act requires the trial court to dismiss the complaint if it fails to satisfy the Act's heightened pleading standards. *See* § 78u-4(b)(3)(A). Thus, as a matter of law, failure to muster facts sufficient to meet the Act's pleading requirements cannot constitute the requisite "undue prejudice" to the plaintiff justifying a lift of the discovery stay under § 78u-4(b)(3)(B). To so hold would contravene the purpose of the Act's heightened pleading standards.

*Id.* Thus, plaintiffs have not shown any justification for lifting the Reform Act's discovery stay to allow them to take depositions before the Court rules on the upcoming motion to dismiss.

By filing this motion, however, plaintiffs are not seeking discovery in the ordinary sense of the word. In essence, what the plaintiffs are asking for is an order from the Court allowing former JDSU employees to speak voluntarily to plaintiffs' lead counsel about certain topics without fear of breaching JDSU's confidentiality agreements. This is not discovery, because plaintiffs are not using court process to require these third parties to provide information about the lawsuit. Instead, plaintiffs are merely seeking an order that would allow former employees to speak voluntarily if they wish to do so.

JDSU argues, however, that Connecticut's motion falls within the scope of the Reform Act's stay of "all discovery *and other proceedings.*" 15 U.S.C. § 78u-4(b)(3)(B) (emphasis added). In *Medhekar v. United States District Court,* 99 F.3d 325 (9th Cir.1996), the Ninth Circuit was asked to determine whether initial disclosures are stayed under the Reform Act during the pendency of a motion to dismiss. The court held that initial disclosures are discovery, and therefore are included in the Reform Act's stay of discovery until the district court upholds the complaint. *Id.* The court then went on to hold that even if initial disclosures are not the same as discovery, they are at a minimum included in the Reform Act's stay of "discovery and other proceedings." *Id.* In defining the term "other proceedings," the Ninth Circuit held that "[g]iven the context and legislative history of the Act, it **\*1134** appears that the term was intended to include litigation relating to discovery, which would certainly include disclosures and would not, as real party fears, include all litigation activity in general." *Id.*

Here, however, Connecticut does not seek discovery, but merely seeks a ruling on the scope of JDSU's confidentiality agreements with its former employees, so that it may speak with former employees who wish to voluntarily cooperate with Connecticut's investigation. Unlike discovery and initial disclosures, these interviews are not compelled by the Federal Rules of Civil Procedure. Neither the former employees nor the defendants are required to participate in these interviews in any way. The Court agrees with *In re Tyco International Ltd. Securities Litigation,* 2001 U.S. Dist. Lexis 819 (D.N.H.2001), in which the district court declined to prohibit voluntary discussions between plaintiffs and third party witnesses because "[n]either logic, tradition, the constitution nor the PSLRA prohibit interviewing prospective witnesses." *Id.* at \*8. In fact, the Reform Act's heightened pleading standard encourages plaintiffs to do *more* investigation before filing a complaint, not less.

*In re Flir Systems Inc. Securities Litigation,* 2000 WL 33201904 (D.Or.2000) is also instructive. In *Flir,* the court was asked to permit a deposition of Palmquist, a former employee of the defendant, during the discovery stay. The court distinguished *SG Cowen* by noting that discovery was not being sought against the defendant, but against a third party, and thus the discovery would not impose any significant burden on the defendant. *Id.* at \*2. Because Palmquist had filed a civil complaint in state court alleging accounting fraud by the defendant, the court found that the proposed discovery was not a mere fishing expedition. *Id.* The court also noted that the only reason Palmquist would not talk to the plaintiffs voluntarily was that defendants were asserting a confidentiality provision in Palmquist's employment contract. *Id.* at \*3. The court found that the Reform Act "is a shield intended to protect security-fraud defendants from costly discovery requirements, [citation omitted], not to be a sword with which defendants can destroy the plaintiffs' ability to obtain information from third parties who are otherwise willing to disclose it." *Id.* It is questionable whether *Flir* 's holding that plaintiffs could depose Palmquist is consistent with *SG Cowen.* The Court agrees, however, with the *Flir* court's conclusion that the Reform Act was not intended to provide defendants with the means to bar all investigation into their conduct. The Reform Act was not intended to provide defendants with immunity from suit, but, rather, was intended to protect defendants from the burdens of defending against frivolous litigation.

Plaintiffs' proposed interviews with former employees of JDSU do not impose any burden or cost on JDSU. The Court finds that plaintiffs' proposed voluntary interviews with former employees do not fall within the scope of "discovery." Accordingly, the Reform Act's ban on discovery during the pendency of a motion to dismiss has no application to plaintiffs' motion.

### B. The merits of plaintiffs' motion

Connecticut states that it has no interest in any information that could be construed as a trade secret, and is willing to discuss reasonable measures to accommodate any legitimate concerns of JDSU with respect to use of the information obtained from former employees in the course of its investigation. In Connecticut's reply brief, it provides examples of the types of questions that it wishes to ask former employees, all of which relate directly to the **\*1135** allegations of wrongdoing that are at issue in this case. None of these questions appears to implicate any trade secrets of JDSU, or any other information that JDSU can

legitimately claim is confidential. Thus, contrary to JDSU's attempts at misdirection, the issue is not whether JDSU can lawfully enter into contracts with its employees to protect its confidential business information and trade secrets. Connecticut concedes that such agreements are lawful. Instead, the issue is whether JDSU's confidentiality agreements can lawfully be used to prohibit its former employees from providing whistleblower-type information about allegedly unlawful acts that occurred during their employment with JDSU.

In *Chambers v. Capital Cities/ABC,* 159 F.R.D. 441 (S.D.N.Y.1995), an age discrimination case, plaintiffs' counsel wished to interview former employees of the defendant. Plaintiffs sought an order authorizing them to inform those former employees that they could safely disregard agreements with the defendant not to disclose various types of information. The court recognized the legitimacy of agreements between employers and employees that are designed to protect dissemination of confidential information. *Id.* at 444. The court also held, however, that:

> It has been recognized that at least in some circumstances, agreements obtained by employers requiring former employees to remain silent about underlying events leading up to disputes, or concerning potentially illegal practices when approached by others can be harmful to the public's ability to rein in improper behavior, and in some contexts ability of the United States to police violations of its laws. Absent possible extraordinary circumstances not present here, it is against public policy for parties to agree not to reveal, at least in the limited contexts of depositions or pre-deposition interviews concerning litigation arising under federal law, facts relating to alleged or potential violations of such law.

*Id.* (footnote omitted). The Court also noted that "agreements restricting former employee revelation of events in the workplace which are not privileged but may involve violations of federal law have the effect of 'hindering' implementation of the 'Congressionally mandated duty to enforce the provisions' of federal statutes." *Id.* (quoting *EEOC v. United States Steel,* 671 F.Supp. 351, 357 (E.D.Pa.1987)). The court declined to authorize plaintiffs' counsel to tell former employees that they need not be concerned about the confidentiality agreements, however, because such a remedy "would make plaintiff's counsel the decisionmaker concerning what confidentiality requirements were related to genuine trade secrets or other legitimately privileged information, and which dealt with concealment of information relating to potential improprieties on the part of the employee." *Id.* at 445. Instead, it ordered the defendant to either (1) notify all former employees whom plaintiff wanted to interview, in writing, that no unfavorable consequences for the employees would flow from providing information to plaintiffs' counsel about specific subjects, or (2) accept an adverse inference that the information, if disclosed, would be contrary to defendant's position. *Id.*

> If applied to depositions or pre-deposition interviewing with respect to litigation under federal substantive law, agreements calling or appearing to call for silence concerning matters relevant to alleged legal violations, whether or not such agreements are sought to be enforced, inherently chill communication relevant to the litigation. Where conduct of a party tends to preclude availability of information relevant to a litigation and where no genuine basis for keeping that information confidential exists, **\*1136** a court or factfinder may infer that the information, if disclosed, would be contrary to the position of the party engaging in such conduct.

*Id.*

Another case from the Southern District of New York also held that "[d]isclosures of wrongdoing do not constitute revelations of trade secrets which can be prohibited by agreements binding on former employees." *McGrane v. The Reader's Digest Association, Inc.,* 822 F.Supp. 1044, 1052 (S.D.N.Y.1993). That court also noted that "[c]ourts are increasingly reluctant to enforce secrecy arrangements where matters of substantial concern to the public-as distinct from trade secrets or other legitimately confidential information-may be involved." *Id.* at 1046.

Congress has also indicated a public policy in favor of whistleblowers in securities cases. The recently enacted Sarbanes-Oxley Act of 2002 prohibits companies from discriminating against employees because of any lawful act by the employee to assist in

an investigation of securities fraud. 18 U.S.C. § 1514A(a)(1). At oral argument, defendants correctly pointed out that this section only applied to investigations conducted by the government, or by the company itself. Nonetheless, the statute demonstrates the public policy in favor of allowing even current employees to assist in securities fraud investigations. It certainly does not establish a public policy in favor of allowing employers to muzzle their employees with overbroad confidentiality agreements.

Other than their argument that plaintiffs are attempting to circumvent the discovery stay provision of the Reform Act, JDSU provides very few specific arguments against plaintiff's motion, relying instead primarily on straw-man arguments about the validity of confidentiality agreements in general. JDSU argues that it used several types of agreements containing provisions designed to protect its confidential and competitively sensitive business information, and that the form of those agreements evolved over the years. (DeWees Decl. ¶¶ 10, 14.) JDSU does not state, however, that these agreements differed in any material way from the sample agreements provided by Connecticut. In any event, the issue is not about the specific language of any of these agreements, but whether JDSU can ever enforce these types of agreements against former employees to prevent them from providing non-tradesecret, unprivileged information about JDSU's allegedly illegal activities.

JDSU does point to *Patton v. Cox,* 276 F.3d 493 (9th Cir.2002), however, which arguably provides some support to JDSU's position. In that case, a doctor, Cox, conducted a court-ordered psychological examination of the plaintiff, Patton, allegedly pursuant to an oral agreement with Patton to keep the results of the examination confidential. *Id.* at 494. Patton and his former wife were involved in a bitter child custody dispute, and Patton's teenage sister-in-law had alleged that Patton had engaged in improper sexual conduct with her. *Id.* at 494, 501. Patton was also a doctor, and as a result of his sister-in-law's allegations, the Arizona Board of Medical Examiners ("BOMEX") filed a complaint against him for unprofessional conduct and unfitness to practice medicine. *Id.* at 494. Dr. Cox voluntarily testified at the BOMEX hearing, and revealed that as a result of his examination of Patton, he believed that Patton was a pedophile and a danger to children. *Id.* at 495. Patton then sued Dr. Cox for breach of contract. *Id.*

The district court granted Dr. Cox's motion to dismiss on the ground that absolute witness immunity precluded any liability arising from Dr. Cox's testimony at a quasi-judicial hearing. *Id.* The Ninth Circuit **\*1137** reversed, applying Arizona law. The Court recognized that Dr. Cox served the public interest by bringing to light the potential danger facing Patton's young, female patients. *Id.* at 498. Nonetheless, the court concluded that:

> applying our perception of Arizona law, we hold that witness immunity does not bar an action for breach of contract when, as in this case, the witness participated voluntarily in a quasi-judicial proceeding. This ruling will not hinder "the resolution of disputes and the ascertainment of truth," [citation omitted] because witnesses can be compelled to testify as needed, which would then trigger immunity protection.

*Id.* at 500. The Ninth Circuit noted that because Dr. Cox voluntarily entered into the confidentiality agreement, "[h]e chose to limit his ability to share information he obtained about Dr. Patton, and he was not at liberty to breach his obligation even if he felt it was in the public's best interest to do so." *Id.*

The Ninth Circuit did not discuss whether such agreements would be unenforceable in violation of public policy, and thus *Patton* does not directly conflict with *Chambers.* Nonetheless, by holding that the public interest did not trump Cox's confidentiality agreement with Patton, a reasonable argument could be made that the Ninth Circuit would not find the confidentiality agreements at issue here to be in violation of public policy, at least under Arizona law. This Court, of course, is applying federal law. *Patton* is also distinguishable because, unlike the instant case, *Patton* involved disclosure of private medical information, which is at the core of an individual's right to privacy. *See id.* ("we cannot help but consider the reasonable expectation of Dr. Patton that this extremely private information would not be disseminated beyond the scope of the Utah court order.") Highly personal medical information is the sort of information, like trade secrets, that a party unquestionably has the right to ask another party to keep confidential.

Here, however, JDSU's confidentiality agreements are so broad that they cover information that cannot possibly be considered confidential. To the extent that those agreements preclude former employees from assisting in investigations of wrongdoing

that have nothing to do with trade secrets or other confidential business information, they conflict with the public policy in favor of allowing even current employees to assist in securities fraud investigations.

In addition, one of the agreements, entitled "Separation Agreement and General Release," bars former employees who signed it from making "any disparaging statement" about the company, its clients, vendors or customers. Unlike the agreement at issue in *Patton,* which the court found was voluntarily entered into, plaintiffs stated at the hearing that this agreement was imposed on a former employee in a mass layoff as a condition of receiving severance benefits. Defense counsel acknowledged that plaintiffs' characterization may be correct. To the extent that this agreement can be read to prohibit an employee from providing any information about any wrongdoing by JDSU, it is plainly unenforceable.

Accordingly, the Court finds that *Chambers* is more applicable here than *Patton.* The Court agrees with the *Chambers* court that JDSU cannot use its confidentiality agreements to chill former employees from voluntarily participating in legitimate investigations into alleged wrongdoing by JDSU. JDSU unquestionably has a legitimate interest in preventing dissemination of trade secrets and confidential business information, however. In order to properly balance these competing interests between Connecticut and JDSU, the Court **\*1138** also agrees with the *Chambers* court that the appropriate remedy is not to allow plaintiffs to be the sole arbiters of whether their investigation avoids infringing on legitimate confidentiality concerns.

The Court finds that the procedural restrictions imposed in *Chambers* are unduly cumbersome and elaborate, however. Rather than requiring the defendants to provide written notice to all former employees that plaintiff wished to interview, or accept an adverse inference, as in *Chambers,* the Court will simply rule that answering the questions set forth in plaintiffs' reply brief and the additional question requested at the hearing do not violate JDSU's confidentiality agreements. In addition, the Court will require the parties to enter into a protective order providing that any information plaintiffs learn during the course of these interviews may be used only for purposes of this litigation. This will be far less intimidating to the former employee, and far less intrusive to the plaintiffs' investigation, than requiring the plaintiffs to provide JDSU with the name of each person they wish to interview and requiring JDSU's counsel to attend each interview. By issuing this order restricting the interviews to the questions that plaintiffs have requested, and to narrow followup questions on those topics, the risk that the interviews will expand into areas of legitimate concern to JDSU is minimized.

### III. Conclusion

For the reasons set forth above, the Court grants Connecticut's motion to limit the scope of confidentiality agreements signed by former JDSU employees, with the following restrictions:

1. All former employees of JDSU may answer the following questions, and any followup questions on the same topic, without fear of breaching any confidentiality agreement with JDSU:

   a. At what time during the Class Period did you become aware of a significant downturn in JDSU sales or sale/revenue projections?

   b. Do you have any reason to believe that JDSU managers, officers or directors became aware of that downtown in sales or projections at any time during the Class Period?

   c. At what time during the Class Period did you become aware of a significant decrease in purchasing (including cancellation or modification or contracts) by JDSU?

   d. Do you have any reason to believe that JDSU managers, officers or directors became aware of that downturn in purchasing (or cancellation or modification of contracts) by JDSU?

   e. At what time during the Class Period did you become aware of a downturn in JDSU's production needs, e.g., eliminating work shifts, reducing overtime, instituting a hiring freeze?

f. At what time during the Class Period did you become aware of significant decrease in JDSU inventory?

g. Do you have any reason to believe that JDSU managers, officers or directors became aware of that inventory increase at any time during the Class Period?

h. At what time during the Class Period did you become aware of any inventory obsolescence problems at JDSU?

i. Do you have any reason to believe that JDSU managers, officers or directors became aware of that inventory obsolescence problem at any time during the Class Period?

j. Are you aware of any reason why any JDSU managers, officers or directors sold their JDSU stock during the Class Period?

 **\*1139**  2. In answering these questions, former JDSU employees should not disclose any information protected by the attorney-client privilege, nor should they disclose any confidential business methods used by JDSU.

3. Any information plaintiffs learn during the course of their interviews with former JDSU employees may be used only for purposes of this litigation.

4. Plaintiffs have not demonstrated that they are entitled to take any depositions prior to the Court's decision on the upcoming motion to dismiss.

5. Plaintiffs have not shown that they are entitled to an inference that, despite public disclosures to the contrary, defendants were aware of JDSU's sharply declining financial condition and results prior to their selling of more than one billion dollars' worth of Company stock.

IT IS SO ORDERED.

**All Citations**

238 F.Supp.2d 1127

---

     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3504525
Only the Westlaw citation is currently available.
United States District Court,
S.D. Mississippi,
Southern Division.

UNITED STATES ex rel. HOLMES, Plaintiff

v.

NORTHROP GRUMMAN CORPORATION and Huntington Ingalls Incorporated, Defendants.

Civil No. 1:13cv85–HSO–RHW.  |  Signed June 3, 2015.

**Attorneys and Law Firms**

Donald C. Holmes, Greensboro, MD, pro se.

David H. Fulcher–Federal Gov, U.S. Attorney's Office, Jackson, MS, Elizabeth Anne Strawn, U.S. Department of Justice, Washington, DC, for Plaintiff.

Richard P. Salloum, Franke & Salloum, PLLC, Gulfport, MS, Angela R. Jones–PHV, David F. Taylor–PHV, Perkins Coie, LLP, Seattle, WA, Jeffrey N. Eisenstein–PHV, William Hartmann Young–PHV, Perkins Coie, LLP, Washington, DC, for Defendant.

*MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' [151] MOTION TO DISQUALIFY RELATOR AND DISMISS FIRST AMENDED COMPLAINT AND DENYING AS MOOT DEFENDANTS' [102] MOTION TO DISMISS AMENDED COMPLAINT*

HALIL SULEYMAN OZERDEN, District Judge.

**\*1** BEFORE THE COURT is the Motion to Disqualify Relator and Dismiss First Amended Complaint [151] filed by Defendants Northrop Grumman Corporation and Huntington Ingalls Incorporated. Relator Donald Holmes has filed a Response [156], and Defendants have filed a Reply [157]. Also before the Court is the Motion to Dismiss Amended Complaint [102] filed by Defendants, Relator's Response [117], and Defendants' Reply [103]. [1] Having considered the parties' submissions, relevant legal authorities, and the record, the Court is of the opinion that the Motion to Disqualify Relator and Dismiss First Amended Complaint [151] should be granted, Relator Donald Holmes should be disqualified from serving as a relator based on the totality of the circumstances surrounding his conduct as a relator, and this civil case should be dismissed without prejudice to any rights of the United States government. The Court further finds that the Motion to Dismiss Amended Complaint [102] should be denied as moot.

[1]   This case was transferred from the United States District Court for the District of Columbia to this Court by Order [73] dated February 28, 2013. The Motion to Dismiss Amended Complaint [102], Response [117], and Reply [103], were each filed before the case was transferred and were refiled on this Court's docket following the transfer.

**I. *BACKGROUND***

Hurricane Katrina made landfall on the Mississippi Gulf Coast on August 29, 2005. As a result of the damages caused by the hurricane, Northrop Grumman Corporation ("NGC") made claims on an insurance policy issued to a subsidiary of NGC by Munich Re, an insurance company represented by attorney Gerald Fisher ("Fisher"). First Am. Compl. 5[43]; Aff. of Relator Gerald Fisher ("Fisher Aff.") ¶ 7 [11 (Attach.A), 23–24 of 86]. To obtain documents from NGC during the adjustment process,

Fisher, on behalf Munich Re, entered into a confidentiality agreement with NGC dated October 24, 2006, governing the use of documents produced by NGC. Fisher Aff. ¶ 7 [11 (Attach."A"), 26 of 86]; Confidentiality Agreement [11, 56 of 85].

By April 2010, NGC and Munich Re had commenced arbitration proceedings in London, England, to resolve coverage disputes which had arisen related to NGC's claim for insurance benefits ("UK Arbitration"). Fisher, along with attorney Donald Holmes ("Holmes"), represented Munich Re in the UK Arbitration. Mem. in Supp. of Relators' Mot. to Allow Them to Provide Information to Assist the [DOJ] in Its Investigation 7 [11, 12 of 86] ("Relators' Mot. to Assist the DOJ"). Fisher and Holmes filed a complaint on behalf of Munich Re on April 6, 2010, in the United States District Court for the District of Columbia seeking to obtain documents from the United States Navy ("the Navy") purportedly for use in the UK Arbitration. Compl. 1[1], Case No. 1:10–cv–00551–JEB (D.D.C.) (the *Touhy* Action). On June 2, 2010, while both the UK Arbitration and the *Touhy* Action remained pending, Fisher and Holmes filed the Complaint [1] in this case under seal in the United States District Court for the District of Columbia against NGC, Northrop Grumman Shipbuilding Corporation, and Northrop Grumman Ship Systems, Inc. (collectively, "Northrop Grumman"), under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729–3733 ("FCA"). [2] The United States has declined to intervene in this case. Notice of Election to Decline Intervention 1[20].

[2] "The FCA's *qui tam* provisions permit a private individual, as a relator, to sue on the United States' behalf to recover for false claims for payment submitted to the Government." *United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.,* 519 F. App'x 890, 892 (5th Cir.2013).

**\*2** On August 18, 2012, prior to the transfer of the case, Fisher apparently decided to withdraw from serving as a relator, and Holmes filed the operative First Amended Complaint [43] in this case. Holmes alleges that "[t]his case is a civil false claims action brought on behalf of the United States by [Holmes], who has properly gained access to documents and information showing that the U.S. Government has been defrauded in the amount of not less than $835 million by the unlawful actions of" Northrop Grumman. First Am. Compl. 5[43]. Holmes asserts that prior to Hurricane Katrina's landfall, Northrop Grumman was behind "in its budget in the performance" of various shipbuilding contracts with the Navy. *Id.* at 6. Holmes notes that "[w]ithin months after Hurricane Katrina ..., Congress appropriated $2.3 billion to the Navy in restricted emergency shipbuilding and conversion funding [ ] (hereinafter 'the Katrina Money')...." *Id.* at 7. According to Holmes, the Katrina Money "was to be used only for 'the consequences' of" Hurricane Katrina, but Northrop Grumman filed false claims with the Navy by seeking reimbursement for unrelated cost overruns which it experienced before and after Hurricane Katrina, thus allowing Northrop Grumman to avoid the consequences of its alleged inefficiency and mistakes. *Id.* at 7–11.

On the basis of these allegations, Holmes advances claims for violations of the FCA. Am. Compl. 15–24[1]. Holmes maintains that Northrop Gruman violated the FCA by misusing restricted Congressional funding to cover cost overruns on contracts for which Northrop Grumman was financially responsible and by using "[a]rtifices and [d]evices" to deceive the Navy into paying for Northrop Grumman's non-Katrina related cost overruns. *Id.* at 15–20. Holmes further asserts that Northrop Grumman violated the FCA by providing untruthful information to the Navy and Congress to prevent them from making accurate procurement decisions, to conceal the status of contract performance related to seven shipbuilding contracts, and to prevent discovery of the fact that Northrop Grumman was not keeping separate accounting records which segregated Hurricane Katrina's monetary consequences from unrelated costs. *Id.* at 20–23.

Northrop Grumman now moves to disqualify Holmes from serving as a relator and to dismiss the First Amended Complaint based on alleged ethical violations committed by Holmes. Mem. Br. in Supp. of Mot. to Disqualify Relator and Dismiss First Am. Compl. 1[153]. According to Northrop Grumman, Holmes has breached his ethical duties of obedience to court orders, candor and honesty to the courts and to Northrop Grumman, respect for Northrop Grumman's legal rights, and loyalty to his former client, Munich Re. *Id.* at 12–13. Northrop Grumman maintains that Holmes' conduct was not authorized or required by either the FCA or misprision of felony statute, 18 U.S.C. § 4. *Id.* at 19–24.

Holmes offers excerpts from various prior filings which he asserts address Northrop Grumman's Motion [151]. Resp. in Opp'n to Defs.' Mot. to Disqualify and Dismiss 2–9[156]. Holmes claims that "[f]ederal courts have repeatedly held that confidentiality agreements are not a bar to the disclosure of fraud to the government" and posits that such holdings are "directly applicable"

here. *Id.* at 3–5. Holmes asserts that Munich Re had no objection to his decision to report Northrop Grumman's alleged fraud to the United States Department of Justice ("DOJ"). *Id.* at 8–9. Holmes also acknowledges that he violated the terms of a Stipulated Protective Order issued by the Court in the *Touhy* Action and notes that "with 20/20 hindsight, he should have handled the situation differently[,]" but Holmes appears to argue the Order is not entitled to be accorded the weight of a court order. *Id.* at 10–11. Holmes also posits that the ethical nature of his conduct should not be considered because the FCA preempts the ethical rules governing his conduct. *Id.*

## II. *DISCUSSION*

### A. *Legal Standard*

 **\*3**  In allowing an attorney to serve as a relator and finding the attorney was nevertheless still required to abide by his ethical obligations as an attorney, one court has reasoned that "[w]hile the [FCA] permits any person ... to bring a *qui tam* suit, it does not authorize that person to violate state laws in the process." *United States ex rel. Doe v. X Corp. ("X Corp. II"),* 862 F.Supp. 1502, 1507 (E.D.Va.1994). Although attorneys may act as relators pro se, non-attorneys are prohibited from proceeding as relators pro se. *See, e.g., Timson v. Sampson,* 518 F.3d 870, 873–74 (11th Cir.2008) (finding that a non-attorney was "not [authorized to] maintain a *qui tam* suit under the FCA as a pro se relator"). A primary policy reason for this prohibition is that "[l]awyers are bound to ethical constraints to which non-lawyers may have no knowledge and no obligation[, and v]iolation of these fundamental canons may result in serious consequences to the errant attorney." *United States ex rel. Schwartz v. TRW Inc.,* 118 F.Supp.2d 991, 995 (C.D.Cal.2000). Furthermore, "[a]n attorney 'has an obligation which he owes to the court[ ... ], and he owes a public duty to aid in the administration of justice, to uphold the dignity of the court and respect its authority.' " *Id.* (quoting *United States v. Onan,* 190 F.2d 1, 6–7 (8th Cir.1951)). These ethical obligations and the consequences of breaching them remain applicable to attorneys proceeding as relators pro se. *See X–Corp. II,* 862 F.Supp. at 1507 ("[S]tate statutes and rules that regulate an attorney's disclosure of client confidences" apply in the context of a *qui tam* action, and attorneys serving as relators therefore have "significant incentives ... to abide by their" state law obligations in light of this fact and "given the existence of state disciplinary powers over attorneys...."). Because Holmes is permitted to act as a relator pro se in this matter due to his status as an attorney, the Court will evaluate whether he should be disqualified from serving as a relator by reference to the rules of professional conduct governing Holmes as an attorney.

An attorney's breach of his ethical obligations may be raised in a motion to disqualify counsel, which is a "substantive motion[ ] ... determined by applying standards developed under federal law ." *In re Am. Airlines,* 972 F.2d 605, 610 (5th Cir.1992) (citations omitted) (emphasis removed). Generally, when considering a motion to disqualify counsel in a civil case, the Fifth Circuit Court of Appeals "consider[s] the motion governed by the ethical rules announced by the national profession in the light of the public interest and the litigants' rights." *In re Dresser Industries, Inc.,* 972 F.2d 540, 543 (5th Cir.1992). While "the relevant local and national ethical canons provide a useful guide for adjudicating motions to disqualify, they are not controlling." *F.D.I.C. v. U.S. Fire Ins. Co.,* 50 F.3d 1304, 1314 (5th Cir.1995) (citation omitted). "A court must take into account not only the various ethical precepts adopted by the profession but also the social interests at stake[,]" including whether the lawyer's conduct "has (1) the appearance of impropriety in general, or (2) a possibility that a specific impropriety will occur, and (3) the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case." *Id.* (quoting *Dresser,* 972 F.2d at 544) (internal marks omitted). Disqualification of counsel "is a sanction that must not be imposed cavalierly[,]" and the record must reveal "at least a reasonable possibility that some identifiable impropriety actually occurred [ ]" before disqualification will be justified. *Id.* at 1316.

### B. *Analysis*

#### 1. *The Court Will Consider the Ethical Nature of Holmes' Conduct*

 **\*4**  Insofar as Holmes takes the position that the ethical nature of his conduct is not relevant because the FCA preempts the ethical rules governing his conduct, this argument is not persuasive. Resp. in Opp'n to Defs.' Mot. to Disqualify and Dismiss 10–11[156]. Courts addressing the issue of whether the FCA preempts state ethics rules have declined to find preemption. In

*United States v. Quest Diagnostics Inc.,* the Second Circuit Court of Appeals refused to conclude that the FCA preempts the State of New York's ethical rules governing attorneys' conduct. 734 F.3d 154, 163 (2d Cir.2013) ("Nothing in the [FCA] evinces a clear legislative intent to preempt state statutes and rules that regulate an attorney's disclosure of client confidences.") (citing *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 449 (2005)). Holmes' position is further refuted by the fact that non-lawyers are prohibited from proceeding pro se as *qui tam* relators while lawyers may proceed pro se as *qui tam* relators due to the ethical obligations to which lawyers remain bound and may be subjected to discipline for violating. *See Schwartz,* 118 F.Supp.2d at 995 (quoting *Onan,* 190 F.2d at 6–7). Accordingly, the Court rejects Holmes' invitation to ignore the ethical implications of his conduct.

**2.** *Holmes Has Breached Various Standards of Ethics*
In assessing the entirety of Holmes' conduct related to this case, the Court must identify the applicable "local and national ethical" standards. *See U.S. Fire,* 50 F.3d at 1314 (citation omitted). Much of Holmes' conduct occurred while the case was pending in the United States District Court for the District of Columbia. This Court therefore will look to "the Rules of Professional Conduct[, ]as adopted by the District of Columbia Court of Appeals" ("DCRPC"). D.D.C. Loc. R. 83.15(a). The Local Uniform Civil Rules for the Northern and Southern Districts of Mississippi provide that the Mississippi Rules of Professional Conduct ("MRPC") govern litigants practicing in this Court, and thus the Court will also consider the MRPC given the transfer of the case to this Court. *See* L.U. Civ. R. 83.1(c). In addition, the Fifth Circuit recognizes the American Bar Association's Model Rules of Professional Conduct ("ABA Model Rules") as "the national standards utilized by this circuit in ruling on disqualification motions." *Am. Airlines,* 972 F.2d at 610. Because of the unique procedural history of this case, the Court will consider the totality of Holmes' conduct related to this case in light of the ethical standards set forth in both the DCRPC and MRPC, as well as those of the ABA Model Rules.

**a.** *Holmes Violated His Duty of Candor*
The record reveals that Holmes has violated his ethical duty to act with candor. "A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer...." ABA Model Rule 3.3(a)(1); *see also* DCRPC 3.3(a)(1) (same); MRPC 3.3(a)(1) ("A lawyer shall not knowingly ... make a false statement of material fact or law to a tribunal...."). Additionally, "[i]n the course of representing a client a lawyer shall not knowingly[ ] ... make a false statement of material fact or law to a third person...." ABA Model Rule 4.1(a); *see also* DCRPC 4.1(a) (same); MRPC 4.1(a) (same). "It is professional misconduct for a lawyer to ... engage in conduct involving dishonesty, fraud, deceit or misrepresentation...." ABA Model Rule 8.4(c); DCRPC 8.4(c) (same); MRPC 8.4(c) (same).

 **\*5** Holmes and Fisher filed the *Touhy* Action on April 6, 2010, pursuant, in part, to 28 U.S.C. § 1782,[3] and represented to the Court that Munich Re sought documents from the Navy "in aid of" the UK Arbitration.[4] Com pl. 1–4[1], Case No. 1:10–cv–00551–JEB (D.D.C.). Northrop Grumman and Munich Re, through Holmes and Fisher, subsequently submitted a Stipulated Protective Order, the terms of which were agreed upon by Munich Re, Northrop Grumman, and the Navy, which specifically recited that Munich Re "has a need for the documents being produced by the U.S. Navy for the purposes of the UK Arbitration[,] ... [and Munich Re] is agreeable to entering into this protective order and protecting the documents [produced by the Navy] appropriately...." Stipulated Protective Order 3 [19–1], Case No. 1:10–cv–551–JEB (D.D.C.). The parties' Stipulated Protective Order was entered on June 24, 2010, as an Order of the United States District Court for the District of Columbia. Order 1, Ex. A[20], Case No. 1:10–cv–00551–JEB (D.D.C.).

---

[3]    Section 1782 allows parties to apply for and obtain an order that the Navy be required "to produce a document ... for use in a proceeding in a foreign ... tribunal." 28 U.S.C. § 1782(a).

[4]    Munich Re, through Holmes and Fisher, filed an Amended Complaint [21] on May 3, 2010, but the allegations in the Amended Complaint relevant to this Court's analysis do not differ from those of the Complaint. *See* Am. Compl. 7, 11[21], Case No. 1:10–cv–

551–JEB (D.D.C.). In fact, Holmes and Fisher, on behalf of Munich Re, further alleged that Munich Re's "exercise of rights provided by 28 U.S.C. § 1782 are in aid of private foreign arbitration only...." Am. Compl. 11[21].

Holmes points out that this *qui tam* case was not filed until June 2, 2010, nearly two months after he and Fisher filed the *Touhy* Action, and Holmes appears to suggest that there cannot be a connection between documents sought from the Navy in the previously filed *Touhy* Action and this *qui tam* case. Resp. in Opp'n to Defs.' Mot. to Disqualify and Dismiss 7[156]. Holmes, however, acknowledges in the First Amended Complaint [43] he filed in this case that he had "gained access to documents and information showing that the U.S. Government has been defrauded" and explicitly based his claim on "documentation submitted by Northrop Grumman to the Navy...." Am. Compl. 5, 6, 10, 11[43]. [5] These allegations reveal Holmes' clear intent to support his *qui tam* claims in this case with the documents he obtained from the Navy through the *Touhy* Action purportedly for use in the UK Arbitration. This calls into question the veracity of Holmes' statements made not only to the court in the *Touhy* Action as to why he sought the documents but also to this Court insofar as Holmes alleges he has "properly gained access to" the documents upon which the First Amended Complaint is based. *See, e .g.,* Am. Compl. 11[21], Case No. 1:10–cv–551–JEB (D.D.C.) (alleging, through Holmes and Fisher, that Munich Re's "exercise of rights provided by 28 U.S.C. § 1782 are in aid of private foreign arbitration only"); Ex. "A" to Jt. Mot. to Enter Protective Order 3 [19–1], Case No. 1:10–cv–551–JEB (D.D.C.) (submitting proposed stipulated protective order in which Munich Re, through Holmes and Fisher, recites that it "is agreeable to entering into this protective order and protecting the documents [produced by the Navy] appropriately"); First Am. Compl. 5[43]. There is no evidence in the record that Holmes ever attempted to correct these statements. As a result, the Court finds that Holmes violated his duty of candor by obtaining documents from the Navy through the *Touhy* Action without disclosing his intent to use the documents to support his claims in this *qui tam* case.

[5]    Holmes and Fisher even predicted in the original Complaint [1] that "[u]pon review of documents submitted by Northrop Grumman to the [Navy], ... those records will show that Northrop Grumman also improperly used Katrina Money for pre-Katrina overruns...." Compl. 8[1]. Though slightly rephrased, this allegation also appears in the First Amended Complaint [43] filed by Holmes. *See* First Am. Compl. 11[43] ("[Holmes] alleges that the records submitted by Northrop Grumman to the Naval Sea Systems Command in support of its claims for payment show that Northrop Grumman also improperly used Katrina Money for pre-Katrina overruns to its subcontracts and material costs.").

### b. *Holmes and His Duty of Loyalty to Munich Re*

 **\*6**  Unless the client gives informed consent, "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." ABA Model Rule 1.7(a). "A concurrent conflict of interest exists if[ ] ... there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to ... a third person or by a personal interest of the lawyer." *Id.* at 1.7(a)(2); *see also* DCRPC 1.7(b)(4) ("[A] lawyer shall not represent a client with respect to a matter if [ ] ... [t]he lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests."); MRPC 1 .7(b) ("A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities ... to a third person[ ] or by the lawyer's own interests unless ... the client has given knowing and informed consent after consultation.").

In the UK Arbitration, Holmes and Fisher, on Munich Re's behalf, took the position that Munich Re did not owe compensation to NGC for certain losses related to Hurricane Katrina because the Navy had previously paid Defendants to compensate for those losses. *See* United States' Consolidated Resp. to Relators' *Ex Parte* Motions 6–7[14]. However, at the same time he was representing Munich Re in the UK Arbitration Holmes filed the Complaint [1] and First Amended Complaint [43], in which he alleged that the Navy should have never paid funds to Defendants and that it was Defendants' fraudulent conduct which duped the Navy into paying the funds. *Id.* Holmes has not sufficiently disputed this characterization of the conflicting positions he took as counsel for Munich Re, on the one hand, and as a relator in this case seeking over 2.5 billion dollars, [6] on the other. These positions reflect a conflict between Holmes' personal interest as a relator, arguing that the Navy's payments to Northrop Grumman were invalid, and Holmes' interest as counsel to Munich Re, advocating the validity of those same payments to alleviate Munich Re's responsibilities to Northrop Grumman. Consequently, the record supports a finding that there was at least "a significant risk" that Holmes' representation of Munich Re was "materially limited by" Holmes' "personal interest"

in pursing this *qui tam* case, such that Holmes' conduct created a concurrent conflict of interest jeopardizing his obligation of loyalty to Munich Re. *See* ABA Model Rule 1.7(a).

6     Holmes alleges that the United States was defrauded in the amount of "not less than $835 million" and "prays ... for treble that sum or $2.505 billion" dollars. First Am. Compl. 23[43].

Faced with this conflict, there is no evidence that Holmes obtained any kind of "informed consent" from Munich Re to simultaneously represent Munich Re while prosecuting this *qui tam* action. *See* ABA Model Rule 1.7 (prohibiting concurrent conflicts of interest but making an exception where the attorney obtains affected clients' informed consent). " 'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." ABA Model Rules 1 .0(e); *see also* DCRPC 1.0(e) (same); MRPC, Terminology (" 'Informed consent' denotes voluntary acceptance and agreement by a person of a proposed course of conduct after adequate information has been imparted to the person that allows the person to arrive at a decision."). The Comment to ABA Model Rule 1.0(e) notes that informed consent is often required "before ... pursuing a course of conduct." Comment [6], ABA Model Rule 1.0 (citing ABA Model Rules 1.2(c), 1.6(a) and 1.7(b)). The Comment also states

> **\*7** [t]he lawyer must make reasonable efforts to ensure that the client or other person possesses information reasonably adequate to make an informed decision. Ordinarily, this will require communication that includes a disclosure of the facts and circumstances giving rise to the situation, any explanation reasonably necessary to inform the client or other person of the material advantages and disadvantages of the proposed course of conduct and a discussion of the client's or other person's options and alternatives.

Comment [6], ABA Model Rule 1.0.

The record does not reveal facts supporting a finding that Holmes obtained Munich Re's informed consent at any point in time to engage in a course of conduct which created a concurrent conflict of interest between Holmes' duties to Munich Re and his own personal interests in this case. Holmes suggests that he obtained consent from Munich Re, but the timing of Munich Re's "consent" is questionable and there is no evidence the consent was "informed." Specifically, Holmes contends

> [the DOJ] directly asked the client, Munich Re, orally and in writing, specifically whether it had any concerns about its counsel disclosing the information of the fraud to the DOJ. Munich Re specifically responded in writing that it had no objection and did not participate in that decision, but respected counsel's view of their obligations to disclose to [the] DOJ under U.S. law.

Resp. in Opp'n to Defs.' Mot. to Disqualify and Dismiss 9[156]. Holmes does not identify when he discussed his perceived legal obligations with Munich Re, the content of those discussions, or whether Munich Re had the benefit of independent counsel. *See id.; see also* Relators' Mot. to Assist the DOJ 10 [11, 12 of 86]; Holmes Aff. 6–7 [11, 41–42 of 86] (asserting that Munich Re consented to Holmes' actions without any indication of what, if any, information was provided to Munich Re, when that information was provided, or on what basis Munich Re made its alleged decision to consent). Holmes thus has not demonstrated facts supporting a finding that Holmes had Munich Re's informed consent to engage in conduct that involved a concurrent conflict of interest, and as such, Holmes breached his duty of loyalty to his client, Munich Re, in order to bolster his position in this case.

#### c. *Duty to Retain Confidentiality of Information*

The ABA Model Rules, the MRPC, and the DCRPC each require attorneys to keep information relating to the representation of a client confidential. "A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent[ ]...." ABA Model Rule 1.6(a); *see also* MRPC 1.6(a) (same); DCRPC 1.6(a) ("[A] lawyer shall not knowingly: ... reveal a confidence or secret of the lawyer's client[,] ... use a confidence or secret of the lawyer's client to the

disadvantage of the client[, or] ... use a confidence or secret of the lawyer's client for the advantage of the lawyer or of a third person....). [7]

7      Rule 1.6(b) of the DCRPC defines "confidence" and "secret" as follows: " 'Confidence' refers to information protected by the attorney-client privilege under applicable law, and 'secret' refers to other information gained in the professional relationship that the client has requested be held inviolate, or the disclosure of which would be embarrassing, or would be likely to be detrimental, to the client."

**\*8** Holmes has revealed and attempted to make personal use of information relating directly to his representation of Munich Re in the form of documents he obtained on Munich Re's behalf from the Navy and Northrop Grumman for use in the UK Arbitration. Relators' Mot. to Assist the DOJ [11, 4 of 86] ("Relators have provided the Government with an extensive Disclosure Memorandum pointing out that the evidence of this fraud is based on documents available directly from the Navy, many of which Relators obtained pursuant to *Touhy* Regulation Requests in connection with ongoing litigation on an insurance claim."). These documents were subject to various confidentiality obligations existing between Munich Re, Northrop Grumman, and the Navy, and a Stipulated Protective Order imposed by the United States District Court for the District of Columbia. *See* Ex. "1" to Relators' Mot. to Assist the DOJ [11, 56–66 of 86]; Stipulated Protective Order [20–1], Case No. 1:10–cv–551–JEB (D .D.C.). There is no indication that Holmes would have otherwise come into possession of these documents but for his representation of Munich Re. Holmes acknowledged using these documents to pursue this *qui tam* action in which he seeks over 2.5 billion dollars, a portion of which would be available to him by virtue of his serving as relator. *See, e.g.,* First Am. Compl. 9, 10, 23[43]. Absent Munich Re's informed consent, Holmes violated the duty to keep information related to his representation of Munich Re confidential when he revealed and made use of the documents he obtained during his representation of Munich Re. [8]

8      In addition, it is likely that Holmes' conduct violated Rule 4.4(a) of the ABA Model Rules. "In representing a client, a lawyer shall not use ... methods of obtaining evidence that violate the legal rights of ... a [third] person." ABA Model Rule 4.4(a); *see also* DCRPC 4.4(a) (same); MRPC 4.4(a) (same). In obtaining documents from Northrop Grumman and the Navy, Holmes, on behalf of Munich Re, submitted to at least one agreement to keep documents Munich Re received from Northrop Grumman confidential and participated in the creation and submission of the Stipulated Protective Order restricting the use and dissemination of documents received by Munich Re from the Navy. Holmes' use of these documents for his own purposes in this *qui tam* action can reasonably be construed as violating the legal rights of Northrop Grumman and the Navy.

Holmes has not shown that he obtained Munich Re's informed consent prior to revealing and making use of confidential information he obtained as counsel for Munich Re. *See* ABA Model Rule 1.6 (prohibiting attorneys from revealing clients' confidential information absent the client's informed consent). Holmes appears to acknowledge that Munich Re "did not participate in" his decision to disclose to the DOJ documents that he obtained on Munich Re's behalf and which fell within the scope of the various confidentiality obligations he owed Munich Re. Resp. in Opp'n to Defs.' Mot. to Disqualify and Dismiss 9[156]; *see also* ABA Model Rule 1.6(a) ("A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent [ ]...."); MRPC 1.6(a) (same); DCRPC 1.6(a) ("[A] lawyer shall not knowingly: ... reveal a confidence or secret of the lawyer's client[,] ... use a confidence or secret of the lawyer's client to the disadvantage of the client [, or] ... use a confidence or secret of the lawyer's client for the advantage of the lawyer or of a third person...."). Similar to his actions surrounding the concurrent conflict of interest which jeopardized his duty of loyalty to Munich Re, Holmes has not sufficiently established that he obtained Munich Re's informed consent prior to revealing Munich Re's confidential information. Consequently, Holmes breached his duty to protect his client's confidential information.

**d.** *Holmes' Duty to Obey Court Orders*

**\*9** Perhaps the most serious of the ethical violations committed by Holmes is his having knowingly ignored his obligations under the Stipulated Protective Order entered in the *Touhy* Action by the United States District Court for the District of Columbia. "A lawyer shall not[ ] ... knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists...." ABA Model Rule 3 .4(c); *see also* DCRPC 3.4(c) (same); MRPC 3.4(c) (same). Holmes notes that the Stipulated Protective Order was first submitted as a proposed order and seems to argue that it should not be treated as a court order. Resp. in Opp'n to Defs.' Mot. to Disqualify and Dismiss 10–11[156]. This argument

overlooks the fact that Holmes jointly submitted the Stipulated Protective Order as a proposed order, and the United States District Court for the District of Columbia specifically entered the Stipulated Protective Order "as an [O]rder of the Court...." Order 1 [20–1], Case No. 1:10cv551–JEB (D.D.C .). Holmes was undoubtedly required to comply with the obligations imposed by the Stipulated Protective Order.

The Stipulated Protective Order provides that documents produced by the Navy "shall be used or disclosed solely in the UK Arbitration" and "shall not be used in any other proceeding or for any other purpose without further order of this Court." *Id.* at 6–7 [20–1, 9–10 of 13]. Holmes openly acknowledges that he violated the terms of the Stipulated Protective Order by his admission that he disclosed documents subject to the Stipulated Protective Order to the DOJ and allowed his "expert team" to analyze such documents.[9] Relators' Mot. to Assist the DOJ 2, 10–12 [11, 4, 12–14 of 86]. If he had an objection to the Navy's designation of any information as being protected under the Stipulated Protective Order, the Stipulated Protective Order required Holmes to make an objection to the particular designations, but the record does not reveal that Holmes made any such objections. Stipulated Protective Order 8 [20–1, 11 of 13], Case No. 1:10cv551–JEB (D.D.C.); *see also* Resp. in Opp'n to Defs.' Mot. to Disqualify and Dismiss 6[156] ("With perfect 20/20 hindsight [,]" Holmes agrees that he "should have separately sought [the Court's] permission to use the documents" obtained in the *Touhy* Action and that doing so "would have been a good thing to do...."). Holmes was well aware of the terms of the Stipulated Protective Order, and requested that the District Court for the District of Columbia enter the Stipulated Protective Order, but knowingly violated the obligations imposed by that Order in pursuit of his own interests in this *qui tam* action. Holmes' violation of the Stipulated Protective Order is yet another example of his unethical conduct surrounding his actions as a relator in this case.

9      Prior cases indicate that one court generally should decline from evaluating whether a litigant before it has violated the order of another court. *See, e.g., In re Wright,* No. Civ. A. 06–356, 2006 WL 508050, at *3 (E.D.La. Feb. 22, 2006) ("[I]t would be an unwise policy for one court to determine whether a litigant violated another court's order.") (citing *In re Marriage of Smith,* 549 F.Supp. 761, 755 (W.D.Tex.1982)). The Court, however, finds that this general principle is not implicated under the specific facts of this case because Holmes has acknowledged repeatedly that he violated the Stipulated Protective Order and thus the Court need not determine whether a violation has occurred. Moreover, the Court expressly limits its consideration of Holmes' violation of the Stipulated Protective Order to being only one of several factors militating in favor of disqualifying Holmes from serving as a relator in this case. Still, the seriousness of Holmes' violation of the Stipulated Protective Order should not be overlooked. *See Holden v. Simpson Paper Co.,* 48 F. App'x 917, 2002 WL 31115137, at *2 (5th Cir. Sept. 18, 2002) ("Deliberately disobeying court orders demonstrates sufficient bad faith to justify a district court's sanction under its inherent powers.").

**3.** ***The Totality of Holmes' Ethical Violations Require His Disqualification as Relator***

**\*10**  When viewed in its entirety, Holmes' conduct reveals multiple improprieties. *See U.S. Fire,* 50 F.3d at 1314 (noting that courts adjudicating a motion to disqualify should consider, in addition to relevant ethical precepts, the impropriety of counsel's conduct and the extent to which public suspicion of that conduct outweighs any social interests served by allowing counsel to continue participating) (quoting *Dresser,* 972 F.2d at 544) (internal marks omitted). Holmes' conduct did not merely bear the appearance of impropriety but was in fact improper. Holmes violated his duty of loyalty to Munich Re by simultaneously advocating a position for Munich Re that was completely contrary to the position he continues to advocate as relator in this case. Holmes violated his duty to retain confidential information by allowing his own interest in pursing this *qui tam* action to override his duties to Munich Re related to the confidentiality of documents he obtained on Munich Re's behalf, which placed Munich Re in jeopardy of violating various confidentiality obligations to which Holmes knew his client was bound. In seeking to build support for his *qui tam* case, Holmes also knowingly violated the Stipulated Protective Order issued by the court in the *Touhy* Action. All the while, Holmes violated his duty of candor by failing to apprise the court in the *Touhy* Action or counsel for NGC in the UK Arbitration of his motives for obtaining the confidential information.

The accompanying public suspicion arising from Holmes' conduct outweighs any social interest in permitting him to continue participating as a relator. *See U.S. Fire,* 50 F.3d at 1314 (5th Cir.1995) (quoting *Dresser,* 972 F.2d at 544). The potential for public suspicion stemming from this conduct is exemplified by the DOJ's concerns that Holmes' conduct gave rise to "serious ethical and professional responsibility concerns...." United States' Consolidated Resp. to Relators' *Ex Parte* Motions 6[14].

Furthermore, in considering Holmes' disqualification, the Court is not faced with the prospect of disqualifying an innocent party's chosen counsel. Rather, disqualifying Holmes only precludes him from receiving the benefits which may otherwise be available to him personally as a relator, such that the social interests in allowing him to continue participating in this case are minimal. The Court finds that based on the totality of the ethical violations committed by Holmes surrounding this *qui tam* case, Holmes should be disqualified from serving as relator in this case.

**4.** *Dismissal of the First Amended Complaint*

In determining whether dismissal of the First Amended Complaint [43] is warranted, the pertinent inquiry is the extent to which Northrop Grumman stands to suffer prejudice if the action were to proceed to trial. *See Quest Diagnostics,* 734 F.3d at 166–67 (affirming district court's decision to disqualify relators and dismiss their *qui tam* complaint due to the fact that allowing the case to proceed "would taint the trial proceedings and prejudice defendants"). Here, the Court finds that merely disqualifying Holmes from serving as relator without dismissing the case would greatly prejudice Northrop Grumman because the case would be tried on a record developed primarily through the fruits of Holmes' unethical conduct. In addition, the fact that the United States government rather than Holmes is the real party in interest further supports dismissing Holmes' First Amended Complaint [43]. *See United States ex rel. Williams v. Bell Helicopter Textron Inc.,* 417 F.3d 450, 453 (5th Cir.2005). Namely, as the real party in interest, the government would not be prevented from bringing these or similar claims against Northrop Grumman. *See Quest Diagnostics,* 734 F.3d at 167 (noting that dismissal of the disqualified relators' complaint was further justified by the fact that neither the United States, as the real party in interest, nor any other relator was foreclosed from bringing the claims). The Court thus finds that the First Amended Complaint [43] should be dismissed with prejudice as to Holmes but without prejudice as to any rights of the United States. [10]

10    The Fifth Circuit has found that dismissal of a relator's complaint should not necessarily operate as a dismissal with prejudice against the United States merely because it opted not to intervene. *Williams,* 417 F.3d at 454–55 (finding that dismissal of a relator's complaint for failure to comply with Rule 9(b) did not operate as a dismissal with prejudice against the government simply because the government did not intervene). This is because the FCA "does not require the government to proceed if its investigation [of allegations in a *qui tam* complaint] yields a meritorious claim." *Id.* at 455.

### III. *CONCLUSION*

 **\*11**  Based on the foregoing, the Court concludes that Donald Holmes should be disqualified from serving as a relator in this *qui tam* case, and that this civil action should be dismissed with prejudice as to Holmes, but without prejudice to any rights possessed by the United States government.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that the Motion to Disqualify Relator and Dismiss the First Amended Complaint [151] filed by Defendants Northrop Grumman Corporation and Huntington Ingalls Incorporated is **GRANTED.**

**IT IS, FURTHER, ORDERED AND ADJUDGED** that Donald Holmes is **DISQUALIFIED** from serving as a relator in this *qui tam* case.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that this case is **DISMISSED WITH PREJUDICE** as to Donald Holmes, but **WITHOUT PREJUDICE** as to any rights of the United States government.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that the Motion to Dismiss Amended Complaint [102] filed by Defendants Northrop Grumman Corporation and Huntington Ingalls Incorporated is **DENIED AS MOOT.**

**SO ORDERED AND ADJUDGED.**

*FINAL JUDGMENT*

This matter came on to be heard on the Motion to Disqualify Relator and Dismiss First Amended Complaint [151] filed by Defendants Northrop Grumman Corporation and Huntington Ingalls Incorporated. The Court, after a full review and consideration of Defendants' Motion, Relator's Response [156], Defendants' Rebuttal [157], the record, and relevant legal authorities, finds that in accord with the reasons more fully stated in its Memorandum Opinion and Order entered herewith,

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that this civil action is **DISMISSED WITH PREJUDICE** as to Relator Donald Holmes, but **WITHOUT PREJUDICE** as to any rights of the United States government.

**SO ORDERED AND ADJUDGED.**

**All Citations**

Slip Copy, 2015 WL 3504525

---

**End of Document**                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

KeyCite Yellow Flag - Negative Treatment

**Called into Doubt by** Pulkkinen v. Pulkkinen, Fla.App. 1 Dist., November 26, 2013

129 S.Ct. 1187
Supreme Court of the United States

WYETH, Petitioner,

v.

Diana LEVINE.

No. 06–1249. | Argued Nov. 3, 2008. | Decided March 4, 2009.

**Synopsis**

**Background:** Patient brought action against drug manufacturer for failure to warn of dangers of administration of nausea medication directly into patient's vein, which resulted in onset of gangrene and amputation of patient's arm. The Washington Superior Court, Geoffrey W. Crawford, J., entered judgment on jury's verdict in patient's favor, and manufacturer appealed. The Vermont Supreme Court, Johnson, J., 183 Vt. 76, 944 A.2d 179, affirmed. Certiorari was granted.

**[Holding:]** The United States Supreme Court, Justice Stevens, held that state law failure-to-warn claims against manufacturer of antihistamine that was used to treat nausea, for failing to adequately warn of dangers of administering drug intravenously using an IV-push, rather than IV-drip, methodology, were not preempted by federal law, either on theory that manufacturer could not have modified warning label placed on drug once it had been approved by the Food and Drug Administration (FDA), and that it was impossible for manufacturer to comply with both state law duties underlying failure-to-warn claims and its federal labeling duties, or on theory that requiring manufacturer to comply with state law duty to provide stronger warning about IV-push administration, after the Food and Drug Administration (FDA) had previously approved warning label placed on drug, would obstruct purposes and objectives of federal drug labeling regulation.

Affirmed.

Justice Breyer concurred and filed opinion.

Justice Thomas concurred in judgment and filed opinion.

Justice Alito dissented and filed opinion, in which Chief Justice Roberts and Justice Scalia joined.

**\*\*1189  \*555** *Syllabus* [*]

[*]  The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

Petitioner Wyeth manufactures the antinausea drug Phenergan. After a clinician injected respondent Levine with Phenergan by the "IV-push" method, whereby a drug is injected directly into a patient's vein, the drug entered Levine's artery, she developed gangrene, and doctors amputated her forearm. Levine brought a state-law damages action, alleging, *inter alia,* that Wyeth had failed to provide an adequate warning about the significant risks of administering Phenergan by the IV-push method. The Vermont jury determined that Levine's injury would not have occurred if Phenergan's label included an adequate warning, and it

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

awarded damages for her pain and suffering, substantial medical expenses, and loss of her livelihood as a professional musician. Declining to overturn the verdict, the trial court rejected Wyeth's argument that Levine's failure-to-warn claims were pre-empted by federal law because Phenergan's labeling had been approved by the federal Food and Drug Administration (FDA). The Vermont Supreme Court affirmed.

*Held:* Federal law does not pre-empt Levine's claim that Phenergan's label did not contain an adequate warning about the IV-push method of administration. Pp. 1193 – 1204.

(a) The argument that Levine's state-law claims are pre-empted because it is impossible for Wyeth to comply with both the state-law duties underlying those claims and its federal labeling duties is rejected. Although a manufacturer generally may change a drug label only after the FDA approves a supplemental application, the agency's "changes being effected" (CBE) regulation permits certain preapproval labeling changes that add or strengthen a warning to improve drug safety. Pursuant to the CBE regulation, Wyeth could have unilaterally added a stronger warning about IV-push administration, and there is no evidence that the FDA would ultimately have rejected such a labeling change. Wyeth's cramped reading of the CBE regulation and its broad assertion that unilaterally changing the Phenergan label would have violated federal law governing unauthorized distribution and misbranding of drugs are based on the fundamental misunderstanding that the FDA, rather than the manufacturer, bears primary responsibility for drug labeling. It is a central premise of the Federal Food, Drug, and Cosmetic Act (FDCA) and the FDA's regulations that the manufacturer bears responsibility for the content of its label at all times. Pp. 1196 – 1199.

 **\*\*1190  \*556**  (b) Wyeth's argument that requiring it to comply with a state-law duty to provide a stronger warning would interfere with Congress' purpose of entrusting an expert agency with drug labeling decisions is meritless because it relies on an untenable interpretation of congressional intent and an overbroad view of an agency's power to pre-empt state law. The history of the FDCA shows that Congress did not intend to pre-empt state-law failure-to-warn actions. In advancing the argument that the FDA must be presumed to have established a specific labeling standard that leaves no room for different state-law judgments, Wyeth relies not on any statement by Congress but on the preamble to a 2006 FDA regulation declaring that state-law failure-to-warn claims threaten the FDA's statutorily prescribed role. Although an agency regulation with the force of law can pre-empt conflicting state requirements, this case involves no such regulation but merely an agency's assertion that state law is an obstacle to achieving its statutory objectives. Where, as here, Congress has not authorized a federal agency to pre-empt state law directly, the weight this Court accords the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness. Cf., *e.g.,Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124. Under this standard, the FDA's 2006 preamble does not merit deference: It is inherently suspect in light of the FDA's failure to offer interested parties notice or opportunity for comment on the pre-emption question; it is at odds with the available evidence of Congress' purposes; and it reverses the FDA's own longstanding position that state law is a complementary form of drug regulation without providing a reasoned explanation. *Geier v. American Honda Motor Co.,* 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914, is distinguished. Pp. 1199 – 1204.

183 Vt. 76, 944 A.2d 179, affirmed.

STEVENS, J., delivered the opinion of the Court, in which KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. BREYER, J., filed a concurring opinion. THOMAS, J., filed an opinion concurring in the judgment. ALITO, J., filed a dissenting opinion, in which ROBERTS, C.J., and SCALIA, J., joined.

**Attorneys and Law Firms**

Edwin S. Kneedler for the United States as amicus curiae, by special leave of the Court, supporting petitioner.

David C. Frederick, for respondent.

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

Bert W. Rein, Karyn K. Ablin, Brendan J. Morrissey, Wiley Rein LLP, Washington, DC, Allan R. Keyes, R. Joseph O'Rourke, Ryan, Smith, Carbine, Ltd., Rutland, VT, Seth P. Waxman, Counsel of Record, Paul R.Q. Wolfson, Catherine M.A. Carroll, Margaret Williams, Smith Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, William J. Ruane, Wyeth, Madison, NJ, for petitioner.

Richard I. Rubin, Rubin, Kidney, Myer & DeWolfe, Barre, Vermont, David C. Frederick, Counsel of Record, Scott H. Angstreich, Scott K. Attaway, Brendan J. Crimmins, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., for respondent.

**Opinion**

Justice STEVENS delivered the opinion of the Court.

**\*558** Directly injecting the drug Phenergan into a patient's vein creates a significant risk of catastrophic consequences. A Vermont **\*\*1191** jury found that petitioner Wyeth, the manufacturer of the drug, had failed to provide an adequate warning of that risk and awarded damages to respondent Diana Levine to compensate her for the amputation of her arm. The warnings on Phenergan's label had been deemed sufficient by the federal Food and Drug Administration (FDA) when it approved Wyeth's new drug application in 1955 and when it later approved changes in the drug's labeling. The question we must decide is whether the FDA's approvals provide **\*559** Wyeth with a complete defense to Levine's tort claims. We conclude that they do not.

**I**

Phenergan is Wyeth's brand name for promethazine hydrochloride, an antihistamine used to treat nausea. The injectable form of Phenergan can be administered intramuscularly or intravenously, and it can be administered intravenously through either the "IV-push" method, whereby the drug is injected directly into a patient's vein, or the "IV-drip" method, whereby the drug is introduced into a saline solution in a hanging intravenous bag and slowly descends through a catheter inserted in a patient's vein. The drug is corrosive and causes irreversible gangrene if it enters a patient's artery.

Levine's injury resulted from an IV-push injection of Phenergan. On April 7, 2000, as on previous visits to her local clinic for treatment of a migraine headache, she received an intramuscular injection of Demerol for her headache and Phenergan for her nausea. Because the combination did not provide relief, she returned later that day and received a second injection of both drugs. This time, the physician assistant administered the drugs by the IV-push method, and Phenergan entered Levine's artery, either because the needle penetrated an artery directly or because the drug escaped from the vein into surrounding tissue (a phenomenon called "perivascular extravasation") where it came in contact with arterial blood. As a result, Levine developed gangrene, and doctors amputated first her right hand and then her entire forearm. In addition to her pain and suffering, Levine incurred substantial medical expenses and the loss of her livelihood as a professional musician.

After settling claims against the health center and clinician, Levine brought an action for damages against Wyeth, relying on common-law negligence and strict-liability theories. Although Phenergan's labeling warned of the danger of gangrene and amputation following inadvertent intra-arterial **\*560** injection,[1] Levine alleged that **\*\*1192** the labeling was defective because it failed to instruct clinicians to use the IV-drip method of intravenous administration instead of the higher risk IV-push method. More broadly, she alleged that Phenergan is not reasonably safe for intravenous administration because the foreseeable risks of gangrene and loss of limb are great in relation to the drug's therapeutic benefits. App. 14–15.

---

1    The warning for "Inadvertent Intra-arterial Injection" stated: "Due to the close proximity of arteries and veins in the areas most commonly used for intravenous injection, extreme care should be exercised to avoid perivascular extravasation or inadvertent intra-arterial injection. Reports compatible with inadvertent intra-arterial injection of Phenergan Injection, usually in conjunction with other drugs intended for intravenous use, suggest that pain, severe chemical irritation, severe spasm of distal vessels, and resultant

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

gangrene requiring amputation are likely under such circumstances. Intravenous injection was intended in all the cases reported but perivascular extravasation or arterial placement of the needle is now suspect. There is no proven successful management of this condition after it occurs.... Aspiration of dark blood does not preclude intra-arterial needle placement, because blood is discolored upon contact with Phenergan Injection. Use of syringes with rigid plungers or of small bore needles might obscure typical arterial backflow if this is relied upon alone. When used intravenously, Phenergan Injection should be given in a concentration no greater than 25 mg per mL and at a rate not to exceed 25 mg per minute. When administering any irritant drug intravenously, it is usually preferable to inject it through the tubing of an intravenous infusion set that is known to be functioning satisfactorily. In the event that a patient complains of pain during intended intravenous injection of Phenergan Injection, the injection should be stopped immediately to provide for evaluation of possible arterial placement or perivascular extravasation." App. 390.

Wyeth filed a motion for summary judgment, arguing that Levine's failure-to-warn claims were pre-empted by federal law. The court found no merit in either Wyeth's field pre-emption argument, which it has since abandoned, or its conflict pre-emption argument. With respect to the contention that there was an "actual conflict between a specific FDA order,"*id.,* at 21, and Levine's failure-to-warn action, the **\*561** court reviewed the sparse correspondence between Wyeth and the FDA about Phenergan's labeling and found no evidence that Wyeth had "earnestly attempted" to strengthen the intra-arterial injection warning or that the FDA had "specifically disallowed" stronger language, *id.,* at 23. The record, as then developed, "lack[ed] any evidence that the FDA set a ceiling on this matter." *Ibid*.

The evidence presented during the 5–day jury trial showed that the risk of intra-arterial injection or perivascular extravasation can be almost entirely eliminated through the use of IV-drip, rather than IV-push, administration. An IV drip is started with saline, which will not flow properly if the catheter is not in the vein and fluid is entering an artery or surrounding tissue. See *id*., at 50–51, 60, 66–68, 75. By contrast, even a careful and experienced clinician using the IV-push method will occasionally expose an artery to Phenergan. See *id*., at 73, 75–76. While Phenergan's labeling warned against intra-arterial injection and perivascular extravasation and advised that "[w]hen administering any irritant drug intravenously it is usually preferable to inject it through the tubing of an intravenous infusion set that is known to be functioning satisfactorily," *id.,* at 390, the labeling did not contain a specific warning about the risks of IV-push administration.

The trial record also contains correspondence between Wyeth and the FDA discussing Phenergan's label. The FDA first approved injectable Phenergan in 1955. In 1973 and 1976, Wyeth submitted supplemental new drug applications, which the agency approved after proposing labeling changes. Wyeth submitted a third supplemental application in 1981 in response to a new FDA rule governing drug labels. Over the next 17 years, Wyeth and the FDA intermittently corresponded about Phenergan's label. The most notable activity occurred in 1987, when the FDA suggested different warnings about the risk of arterial exposure, and in 1988, when Wyeth submitted revised labeling incorporating the **\*562** proposed changes. The FDA did not respond. Instead, in 1996, it requested from Wyeth the labeling then in use and, without addressing Wyeth's 1988 submission, instructed it to "[r]etain verbiage in current label" regarding intra-arterial injection. *Id*., at 359. After a few further changes to the labeling not related to intra-arterial injection, the FDA approved Wyeth's 1981 application in 1998, instructing that Phenergan's final printed label "must be identical" to the approved package insert. *Id*., at 382.

Based on this regulatory history, the trial judge instructed the jury that it could **\*\*1193** consider evidence of Wyeth's compliance with FDA requirements but that such compliance did not establish that the warnings were adequate. He also instructed, without objection from Wyeth, that FDA regulations "permit a drug manufacturer to change a product label to add or strengthen a warning about its product without prior FDA approval so long as it later submits the revised warning for review and approval." *Id*., at 228.

Answering questions on a special verdict form, the jury found that Wyeth was negligent, that Phenergan was a defective product as a result of inadequate warnings and instructions, and that no intervening cause had broken the causal connection between the product defects and the plaintiff's injury. *Id*., at 233–235. It awarded total damages of $7,400,000, which the court reduced to account for Levine's earlier settlement with the health center and clinician.*Id.,* at 235–236.

On August 3, 2004, the trial court filed a comprehensive opinion denying Wyeth's motion for judgment as a matter of law. After making findings of fact based on the trial record (supplemented by one letter that Wyeth found after the trial), the court rejected

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

Wyeth's pre-emption arguments. It determined that there was no direct conflict between FDA regulations and Levine's state-law claims because those regulations permit strengthened warnings without FDA approval on an interim basis and the record contained evidence **\*563** of at least 20 reports of amputations similar to Levine's since the 1960's. The court also found that state tort liability in this case would not obstruct the FDA's work because the agency had paid no more than passing attention to the question whether to warn against IV-push administration of Phenergan. In addition, the court noted that state law serves a compensatory function distinct from federal regulation. *Id.*, at 249–252.

The Vermont Supreme Court affirmed. It held that the jury's verdict "did not conflict with FDA's labeling requirements for Phenergan because [Wyeth] could have warned against IV-push administration without prior FDA approval, and because federal labeling requirements create a floor, not a ceiling, for state regulation." 183 Vt. 76, 84, 944 A.2d 179, 184 (2006). In dissent, Chief Justice Reiber argued that the jury's verdict conflicted with federal law because it was inconsistent with the FDA's conclusion that intravenous administration of Phenergan was safe and effective.

The importance of the pre-emption issue, coupled with the fact that the FDA has changed its position on state tort law and now endorses the views expressed in Chief Justice Reiber's dissent, persuaded us to grant Wyeth's petition for certiorari. 552 U.S. 1161, 128 S.Ct. 1118, 169 L.Ed.2d 845 (2008). The question presented by the petition is whether the FDA's drug labeling judgments "preempt state law product liability claims premised on the theory that different labeling judgments were necessary to make drugs reasonably safe for use." Pet. for Cert. *i.*

## II

Wyeth makes two separate pre-emption arguments: first, that it would have been impossible for it to comply with the state-law duty to modify Phenergan's labeling without violating federal law, see *Fidelity Fed. Sav. & Loan Assn. v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), and second, that recognition of Levine's state tort action creates an unacceptable "obstacle to the accomplishment and execution of the full purposes **\*564** and objectives of Congress," **\*\*1194** *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941), because it substitutes a lay jury's decision about drug labeling for the expert judgment of the FDA. As a preface to our evaluation of these arguments, we identify two factual propositions decided during the trial court proceedings, emphasize two legal principles that guide our analysis, and review the history of the controlling federal statute.

The trial court proceedings established that Levine's injury would not have occurred if Phenergan's label had included an adequate warning about the risks of the IV-push method of administering the drug. The record contains evidence that the physician assistant administered a greater dose than the label prescribed, that she may have inadvertently injected the drug into an artery rather than a vein, and that she continued to inject the drug after Levine complained of pain. Nevertheless, the jury rejected Wyeth's argument that the clinician's conduct was an intervening cause that absolved it of liability. See App. 234 (jury verdict), 252–254. In finding Wyeth negligent as well as strictly liable, the jury also determined that Levine's injury was foreseeable. That the inadequate label was both a but-for and proximate cause of Levine's injury is supported by the record and no longer challenged by Wyeth.[2]

---

[2] The dissent nonetheless suggests that physician malpractice was the exclusive cause of Levine's injury. See, *e.g., post,* at 1217 (opinion of ALITO, J.) ("[I]t is unclear how a 'stronger' warning could have helped respondent"); *post,* at 1225 – 1227 (suggesting that the physician assistant's conduct was the sole cause of the injury). The dissent's frustration with the jury's verdict does not put the merits of Levine's tort claim before us, nor does it change the question we must decide—whether federal law pre-empts Levine's state-law claims.

The trial court proceedings further established that the critical defect in Phenergan's label was the lack of an adequate warning about the risks of IV-push administration. Levine also offered evidence that the IV-push method should **\*565** be contraindicated and that Phenergan should never be administered intravenously, even by the IV-drip method. Perhaps for this reason, the dissent incorrectly assumes that the state-law duty at issue is the duty to contraindicate the IV-push method. See, *e.g.,*

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

*post,* at 1221, 1230 – 1231. But, as the Vermont Supreme Court explained, the jury verdict established only that Phenergan's warning was insufficient. It did not mandate a particular replacement warning, nor did it require contraindicating IV-push administration: "There may have been any number of ways for [Wyeth] to strengthen the Phenergan warning without completely eliminating IV-push administration." 183 Vt., at ——, n. 2, 944 A.2d, at 189, n. 2. We therefore need not decide whether a state rule proscribing intravenous administration would be pre-empted. The narrower question presented is whether federal law pre-empts Levine's claim that Phenergan's label did not contain an adequate warning about using the IV-push method of administration.

 **[1]   [2]   [3]   [4]**    Our answer to that question must be guided by two cornerstones of our pre-emption jurisprudence. First, "the purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (internal quotation marks omitted); see *Retail Clerks v. Schermerhorn,* 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963). Second, "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated ... in a field which the States have traditionally occupied,' ... we 'start with the assumption that the historic police **\*\*1195**  powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Lohr,* 518 U.S., at 485, 116 S.Ct. 2240 (quoting *Rice v. Santa Fe Elevator Corp*., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). [3]

3       Wyeth argues that the presumption against pre-emption should not apply to this case because the Federal Government has regulated drug labeling for more than a century. That argument misunderstands the principle: We rely on the presumption because respect for the States as "independent sovereigns in our federal system" leads us to assume that "Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). The presumption thus accounts for the historic presence of state law but does not rely on the absence of federal regulation.

  For its part, the dissent argues that the presumption against pre-emption should not apply to claims of implied conflict pre-emption at all, *post,* at 1228, but this Court has long held to the contrary. See, *e.g.,California v. ARC America Corp.,* 490 U.S. 93, 101– 102, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989); *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 716, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985); see also *Rush Prudential HMO, Inc. v. Moran,* 536 U.S. 355, 387, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002). The dissent's reliance on *Buckman Co. v. Plaintiffs' Legal Comm*., 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), see *post,* at 1229, and n. 14, is especially curious, as that case involved state-law fraud-on-the-agency claims, and the Court distinguished state regulation of health and safety as matters to which the presumption does apply. See 531 U.S., at 347– 348, 121 S.Ct. 1012.

 **\*566**  In order to identify the "purpose of Congress," it is appropriate to briefly review the history of federal regulation of drugs and drug labeling. In 1906, Congress enacted its first significant public health law, the Federal Food and Drugs Act, ch. 3915, 34 Stat. 768. The Act, which prohibited the manufacture or interstate shipment of adulterated or misbranded drugs, supplemented the protection for consumers already provided by state regulation and common-law liability. In the 1930's, Congress became increasingly concerned about unsafe drugs and fraudulent marketing, and it enacted the Federal Food, Drug, and Cosmetic Act (FDCA), ch. 675, 52 Stat. 1040, as amended, 21 U.S.C. § 301 *et seq.* The Act's most substantial innovation was its provision for premarket approval of new drugs. It required every manufacturer to submit a new drug application, including reports of investigations and specimens of proposed labeling, to the FDA for review. Until its application became effective, a manufacturer was prohibited from distributing a drug. The FDA could reject an application if it determined that the drug was not safe for use as labeled, though if the agency failed to act, an application became effective 60 days after the filing. FDCA, § 505(c), 52 Stat. 1052.

 **\*567**  In 1962, Congress amended the FDCA and shifted the burden of proof from the FDA to the manufacturer. Before 1962, the agency had to prove harm to keep a drug out of the market, but the amendments required the manufacturer to demonstrate that its drug was "safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling" before it could distribute the drug. §§ 102(d), 104(b), 76 Stat. 781, 784. In addition, the amendments required the manufacturer to prove the drug's effectiveness by introducing "substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling." § 102(d), *id.,* at 781.

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

As it enlarged the FDA's powers to "protect the public health" and "assure the safety, effectiveness, and reliability of **\*\*1196** drugs," *id.,* at 780, Congress took care to preserve state law. The 1962 amendments added a saving clause, indicating that a provision of state law would only be invalidated upon a "direct and positive conflict" with the FDCA. § 202, *id.,* at 793. Consistent with that provision, state common-law suits "continued unabated despite ... FDA regulation." *Riegel v. Medtronic, Inc.,* 552 U.S. 312, ——, 128 S.Ct. 999, 1017, 169 L.Ed.2d 892 (2008) (GINSBURG, J., dissenting); see *ibid.,* n. 11 (collecting state cases). And when Congress enacted an express pre-emption provision for medical devices in 1976, see § 521, 90 Stat. 574 (codified at 21 U.S.C. § 360k(a)), it declined to enact such a provision for prescription drugs.

In 2007, after Levine's injury and lawsuit, Congress again amended the FDCA. 121 Stat. 823. For the first time, it granted the FDA statutory authority to require a manufacturer to change its drug label based on safety information that becomes available after a drug's initial approval. § 901(a), *id.,* at 924–926. In doing so, however, Congress did not enact a provision in the Senate bill that would have required the FDA to preapprove all changes to drug labels. See S. 1082, 110th Cong., 1st Sess., § 208, pp. 107–114 (2007) **\*568** (as passed) (proposing new § 506D). Instead, it adopted a rule of construction to make it clear that manufacturers remain responsible for updating their labels. See 121 Stat. 925–926.

### III

 **[5]**    Wyeth first argues that Levine's state-law claims are pre-empted because it is impossible for it to comply with both the state-law duties underlying those claims and its federal labeling duties. See *de la Cuesta,* 458 U.S., at 153, 102 S.Ct. 3014. The FDA's premarket approval of a new drug application includes the approval of the exact text in the proposed label. See 21 U.S.C. § 355; 21 CFR § 314.105(b) (2008). Generally speaking, a manufacturer may only change a drug label after the FDA approves a supplemental application. There is, however, an FDA regulation that permits a manufacturer to make certain changes to its label before receiving the agency's approval. Among other things, this "changes being effected" (CBE) regulation provides that if a manufacturer is changing a label to "add or strengthen a contraindication, warning, precaution, or adverse reaction" or to "add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product," it may make the labeling change upon filing its supplemental application with the FDA; it need not wait for FDA approval. §§ 314.70(c)(6)(iii)(A), (C).

Wyeth argues that the CBE regulation is not implicated in this case because a 2008 amendment provides that a manufacturer may only change its label "to reflect newly acquired information." 73 Fed.Reg. 49609. Resting on this language (which Wyeth argues simply reaffirmed the interpretation of the regulation in effect when this case was tried), Wyeth contends that it could have changed Phenergan's label only in response to new information that the FDA had not considered. And it maintains that Levine has not pointed to any such information concerning the risks of IV-push administration. Thus, Wyeth insists, it was impossible for it **\*569**  to discharge its state-law obligation to provide a stronger warning about IV-push administration without violating federal law. Wyeth's argument misapprehends both the federal drug regulatory scheme and its burden in establishing a pre-emption defense.

We need not decide whether the 2008 CBE regulation is consistent with the FDCA and the previous version of the **\*\*1197** regulation, as Wyeth and the United States urge, because Wyeth could have revised Phenergan's label even in accordance with the amended regulation. As the FDA explained in its notice of the final rule, " 'newly acquired information' " is not limited to new data, but also encompasses "new analyses of previously submitted data." *Id.,* at 49604. The rule accounts for the fact that risk information accumulates over time and that the same data may take on a different meaning in light of subsequent developments: "[I]f the sponsor submits adverse event information to FDA, and then later conducts a new analysis of data showing risks of a different type or of greater severity or frequency than did reports previously submitted to FDA, the sponsor meets the requirement for 'newly acquired information.' " *Id.,* at 49607; see also *id.,* at 49606.

The record is limited concerning what newly acquired information Wyeth had or should have had about the risks of IV-push administration of Phenergan because Wyeth did not argue before the trial court that such information was required for a CBE

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

labeling change. Levine did, however, present evidence of at least 20 incidents prior to her injury in which a Phenergan injection resulted in gangrene and an amputation. See App. 74, 252.[4] After the first such incident came to Wyeth's attention in 1967, it notified the FDA and worked with the agency to change Phenergan's label. **\*570** In later years, as amputations continued to occur, Wyeth could have analyzed the accumulating data and added a stronger warning about IV-push administration of the drug.

4      Levine also introduced evidence that Pfizer had withdrawn Vistaril, another antinausea drug, from intravenous use several decades earlier because its intravenous injection had resulted in gangrene and amputations. See App. 79.

Wyeth argues that if it had unilaterally added such a warning, it would have violated federal law governing unauthorized distribution and misbranding. Its argument that a change in Phenergan's labeling would have subjected it to liability for unauthorized distribution rests on the assumption that this labeling change would have rendered Phenergan a new drug lacking an effective application. But strengthening the warning about IV-push administration would not have made Phenergan a new drug. See 21 U.S.C. § 321(p)(1) (defining "new drug"); 21 CFR § 310.3(h). Nor would this warning have rendered Phenergan misbranded. The FDCA does not provide that a drug is misbranded simply because the manufacturer has altered an FDA-approved label; instead, the misbranding provision focuses on the substance of the label and, among other things, proscribes labels that fail to include "adequate warnings." 21 U.S.C. § 352(f). Moreover, because the statute contemplates that federal juries will resolve most misbranding claims, the FDA's belief that a drug is misbranded is not conclusive. See §§ 331, 332, 334(a)-(b). And the very idea that the FDA would bring an enforcement action against a manufacturer for strengthening a warning pursuant to the CBE regulation is difficult to accept—neither Wyeth nor the United States has identified a case in which the FDA has done so.

**[6]** Wyeth's cramped reading of the CBE regulation and its broad reading of the FDCA's misbranding and unauthorized distribution provisions are premised on a more fundamental misunderstanding. Wyeth suggests that the FDA, rather than the manufacturer, bears primary responsibility for drug labeling. Yet through many amendments to the FDCA and to FDA regulations, it has remained a central premise of federal drug regulation that the **\*\*1198** manufacturer bears responsibility **\*571** for the content of its label at all times. It is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market. See, *e.g.*, 21 CFR § 201.80(e) (requiring a manufacturer to revise its label "to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug"); § 314.80(b) (placing responsibility for postmarketing surveillance on the manufacturer); 73 Fed.Reg. 49605 ("Manufacturers continue to have a responsibility under Federal law ... to maintain their labeling and update the labeling with new safety information").

Indeed, prior to 2007, the FDA lacked the authority to order manufacturers to revise their labels. See 121 Stat. 924–926. When Congress granted the FDA this authority, it reaffirmed the manufacturer's obligations and referred specifically to the CBE regulation, which both reflects the manufacturer's ultimate responsibility for its label and provides a mechanism for adding safety information to the label prior to FDA approval. See *id.,* at 925–926 (stating that a manufacturer retains the responsibility "to maintain its label in accordance with existing requirements, including subpart B of part 201 and *sections 314.70* and 601.12 of title 21, Code of Federal Regulations (or any successor regulations)" (emphasis added)). Thus, when the risk of gangrene from IV-push injection of Phenergan became apparent, Wyeth had a duty to provide a warning that adequately described that risk, and the CBE regulation permitted it to provide such a warning before receiving the FDA's approval.

Of course, the FDA retains authority to reject labeling changes made pursuant to the CBE regulation in its review of the manufacturer's supplemental application, just as it retains such authority in reviewing all supplemental applications. But absent clear evidence that the FDA would not have approved a change to Phenergan's label, we will not conclude that it was impossible for Wyeth to comply with both federal and state requirements.

**\*572** Wyeth has offered no such evidence. It does not argue that it attempted to give the kind of warning required by the Vermont jury but was prohibited from doing so by the FDA.[5] See Tr. of Oral Arg. 12–13; see also Brief for United States as *Amicus Curiae* 25. And while it does suggest that the FDA intended to prohibit it from strengthening the warning about IV-

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

push administration because the agency deemed such a warning inappropriate in reviewing Phenergan's drug applications, both the trial court and the Vermont Supreme Court rejected this account as a matter of fact. In its decision on Wyeth's motion for judgment as a matter of law, **\*\*1199** the trial court found "no evidence in this record that either the FDA or the manufacturer gave more than passing attention to the issue of" IV-push versus IV-drip administration. App. 249. The Vermont Supreme Court likewise concluded that the FDA had not made an affirmative decision to preserve the IV-push method or intended to prohibit Wyeth from strengthening its warning about IV-push administration. 183 Vt., at ——, 944 A.2d, at 188–189. Moreover, Wyeth does not argue that it supplied the FDA with an evaluation **\*573** or analysis concerning the specific dangers posed by the IV-push method. We accordingly cannot credit Wyeth's contention that the FDA would have prevented it from adding a stronger warning about the IV-push method of intravenous administration. [6]

5    The record would not, in any event, support such an argument. In 1988, Wyeth did propose different language for Phenergan's warning about intra-arterial injection, adapted from revisions the FDA proposed in 1987. See App. 339–341, 311–312. When the FDA approved Wyeth's application, it instructed Wyeth to retain the wording in its current label. During the trial court proceedings, Levine indicated that the language proposed in 1988 would have more strongly warned against IV-push administration. But the trial court and the Vermont Supreme Court found that the 1988 warning did not differ in any material respect from the FDA-approved warning. See 183 Vt. 76, ——, 944 A.2d 179, 189 (2006) ("Simply stated, the proposed warning was different, but not stronger. It was also no longer or more prominent than the original warning ..."); App. 248–250. Indeed, the United States concedes that the FDA did not regard the proposed warning as substantively different: "[I]t appears the FDA viewed the change as non-substantive and rejected it for formatting reasons." Brief for United States as *Amicus Curiae* 25; see also 183 Vt., at ——, 944 A.2d, at 189.

6    The dissent's suggestion that the FDA intended to prohibit Wyeth from strengthening its warning does not fairly reflect the record. The dissent creatively paraphrases a few FDA orders—for instance by conflating warnings about IV-push administration and intra-arterial injection, see, *e.g., post,* at 1222, 1223 – 1224, 1225 – 1226—to suggest greater agency attention to the question, and it undertakes a study of Phenergan's labeling that is more elaborate than any FDA order. But even the dissent's account does not support the conclusion that the FDA would have prohibited Wyeth from adding a stronger warning pursuant to the CBE regulation.

Impossibility pre-emption is a demanding defense. On the record before us, Wyeth has failed to demonstrate that it was impossible for it to comply with both federal and state requirements. The CBE regulation permitted Wyeth to unilaterally strengthen its warning, and the mere fact that the FDA approved Phenergan's label does not establish that it would have prohibited such a change.

## IV

**[7]**    Wyeth also argues that requiring it to comply with a state-law duty to provide a stronger warning about IV-push administration would obstruct the purposes and objectives of federal drug labeling regulation. Levine's tort claims, it maintains, are pre-empted because they interfere with "Congress's purpose to entrust an expert agency to make drug labeling decisions that strike a balance between competing objectives." Brief for Petitioner 46. We find no merit in this argument, which relies on an untenable interpretation of congressional intent and an overbroad view of an agency's power to pre-empt state law.

Wyeth contends that the FDCA establishes both a floor and a ceiling for drug regulation: Once the FDA has approved **\*574** a drug's label, a state-law verdict may not deem the label inadequate, regardless of whether there is any evidence that the FDA has considered the stronger warning at issue. The most glaring problem with this argument is that all evidence of Congress' purposes is to the contrary. Building on its 1906 Act, Congress enacted the FDCA to bolster consumer protection against harmful products. See *Kordel v. United States,* 335 U.S. 345, 349, 69 S.Ct. 106, 93 L.Ed. 52 (1948);*United States v. Sullivan,* 332 U.S. 689, 696, 68 S.Ct. 331, 92 L.Ed. 297 (1948). Congress did not provide a federal remedy for consumers harmed by unsafe or ineffective drugs in the 1938 statute or in any subsequent amendment. Evidently, it determined that widely available state rights of action provided appropriate relief for injured consumers. [7] It may also have recognized that **\*\*1200** state-law remedies further consumer protection by motivating manufacturers to produce safe and effective drugs and to give adequate warnings.

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

7    Although the first version of the bill that became the FDCA would have provided a federal cause of action for damages for injured consumers, see H.R. 6110, 73d Cong., 1st Sess., § 25 (1933) (as introduced), witnesses testified that such a right of action was unnecessary because common-law claims were already available under state law. See Hearings on S.1944 before a Subcommittee of the Senate Committee on Commerce, 73d Cong., 2d Sess., 400 (1933) (statement of W.A. Hines); see *id.,* at 403 (statement of J.A. Ladds) ("This act should not attempt to modify or restate the common law with respect to personal injuries").

 **[8]**    If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70–year history. But despite its 1976 enactment of an express pre-emption provision for medical devices, see § 521, 90 Stat. 574 (codified at 21 U.S.C. § 360k(a)), Congress has not enacted such a provision for prescription drugs. See *Riegel,* 552 U.S., at ——, 128 S.Ct., at 1009 ("Congress could have applied the pre-emption clause to the entire FDCA. It did not do so, but instead wrote a pre-emption clause that applies only to medical devices **\*575** "). [8] Its silence on the issue, coupled with its certain awareness of the prevalence of state tort litigation, is powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness. As Justice O'Connor explained in her opinion for a unanimous Court: "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 166–167, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) (internal quotation marks omitted); see also *supra,* at 1194 (discussing the presumption against pre-emption).

8    In 1997, Congress pre-empted certain state requirements concerning over-the-counter medications and cosmetics but expressly preserved product liability actions. See 21 U.S.C. §§ 379r(e), 379s(d) ("Nothing in this section shall be construed to modify or otherwise affect any action or the liability of any person under the product liability law of any State").

 **[9]**    Despite this evidence that Congress did not regard state tort litigation as an obstacle to achieving its purposes, Wyeth nonetheless maintains that, because the FDCA requires the FDA to determine that a drug is safe and effective under the conditions set forth in its labeling, the agency must be presumed to have performed a precise balancing of risks and benefits and to have established a specific labeling standard that leaves no room for different state-law judgments. In advancing this argument, Wyeth relies not on any statement by Congress, but instead on the preamble to a 2006 FDA regulation governing the content and format of prescription drug labels. See Brief for Petitioner 8, 11, 42, 45, and 50 (citing 71 Fed.Reg. 3922 (2006)). In that preamble, the FDA declared that the FDCA establishes "both a 'floor' and a 'ceiling,' " so that "FDA approval of labeling ... preempts conflicting or contrary State law." *Id.,* at 3934–3935. It further stated that certain state-law actions, such as those involving failure-to-warn claims, "threaten FDA's statutorily **\*576** prescribed role as the expert Federal agency responsible for evaluating and regulating drugs." *Id.,* at 3935.

This Court has recognized that an agency regulation with the force of law can pre-empt conflicting state requirements. See, *e.g.,Geier v. American Honda Motor Co.,* 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000); *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). In such cases, the Court has **\*\*1201** performed its own conflict determination, relying on the substance of state and federal law and not on agency proclamations of pre-emption. We are faced with no such regulation in this case, but rather with an agency's mere assertion that state law is an obstacle to achieving its statutory objectives. Because Congress has not authorized the FDA to pre-empt state law directly, cf. 21 U.S.C. § 360k (authorizing the FDA to determine the scope of the Medical Devices Amendments' pre-emption clause), [9] the question is what weight we should accord the FDA's opinion.

9    For similar examples, see 47 U.S.C. §§ 253(a), (d) (2000 ed.) (authorizing the Federal Communications Commission to pre-empt "any [state] statute, regulation, or legal requirement" that "may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service"); 30 U.S.C. § 1254(g) (2006 ed.) (pre-empting any statute that conflicts with "the purposes and the requirements of this chapter" and permitting the Secretary of the Interior to "set forth any State law or regulation which is preempted and superseded"); and 49 U.S.C. § 5125(d) (2000 ed. and Supp. V) (authorizing the Secretary of Transportation to decide whether a state or local statute that conflicts with the regulation of hazardous waste transportation is pre-empted).

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

 **[10]** **[11]** In prior cases, we have given "some weight" to an agency's views about the impact of tort law on federal objectives when "the subject matter is technica[l] and the relevant history and background are complex and extensive." *Geier,* 529 U.S., at 883, 120 S.Ct. 1913. Even in such cases, however, we have not deferred to an agency's *conclusion* that state law is pre-empted. Rather, we have attended to an agency's explanation of how state law affects the regulatory scheme. While **\*577** agencies have no special authority to pronounce on pre-emption absent delegation by Congress, they do have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines,* 312 U.S, at 67, 61 S.Ct. 399; see *Geier,* 529 U.S., at 883, 120 S.Ct. 1913;*Lohr,* 518 U.S., at 495–496, 116 S.Ct. 2240. The weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness. Cf. *United States v. Mead Corp.,* 533 U.S. 218, 234–235, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

Under this standard, the FDA's 2006 preamble does not merit deference. When the FDA issued its notice of proposed rulemaking in December 2000, it explained that the rule would "not contain policies that have federalism implications or that preempt State law." 65 Fed.Reg. 81103; see also 71 *id.,* at 3969 (noting that the "proposed rule did not propose to preempt state law"). In 2006, the agency finalized the rule and, without offering States or other interested parties notice or opportunity for comment, articulated a sweeping position on the FDCA's pre-emptive effect in the regulatory preamble. The agency's views on state law are inherently suspect in light of this procedural failure.

Further, the preamble is at odds with what evidence we have of Congress' purposes, and it reverses the FDA's own longstanding position without providing a reasoned explanation, including any discussion of how state law has interfered with the FDA's regulation of drug labeling during decades of coexistence. The FDA's 2006 position plainly does not reflect the agency's own view at all times relevant to this litigation. Not once prior to Levine's injury **\*\*1202** did the FDA suggest that state tort law stood as an obstacle to its statutory mission. To the contrary, it cast federal labeling standards as a floor upon which States could build and repeatedly disclaimed **\*578** any attempt to pre-empt failure-to-warn claims. For instance, in 1998, the FDA stated that it did "not believe that the evolution of state tort law [would] cause the development of standards that would be at odds with the agency's regulations." 63 *id.,* at 66384. It further noted that, in establishing " minimal standards" for drug labels, it did not intend "to preclude the states from imposing additional labeling requirements." *Ibid.*[10]

[10]　See also 44 Fed.Reg. 37437 (1979) ("It is not the intent of the FDA to influence the civil tort liability of the manufacturer"); 59 Fed.Reg. 3948 (1994) ("[P]roduct liability plays an important role in consumer protection"); Porter, The *Lohr*Decision: FDA Perspective and Position, 52 Food & Drug L.J. 7, 10 (1997) (former chief counsel to the FDA stating that the FDA regarded state law as complementing the agency's mission of consumer protection).

In keeping with Congress' decision not to pre-empt common-law tort suits, it appears that the FDA traditionally regarded state law as a complementary form of drug regulation. The FDA has limited resources to monitor the 11,000 drugs on the market,[11] and manufacturers have superior access **\*579** to information about their drugs, especially in the postmarketing phase as new risks emerge. State tort suits uncover unknown drug hazards and provide incentives for drug manufacturers to disclose safety risks promptly. They also serve a distinct compensatory function that may motivate injured persons to come forward with information. Failure-to-warn actions, in particular, lend force to the FDCA's premise that manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times. Thus, the FDA long maintained that state law offers an additional, and important, layer of consumer protection that complements FDA regulation. **\*\*1203**[12] The agency's 2006 preamble represents a dramatic change in position.

[11]　In 1955, the same year that the agency approved Wyeth's Phenergan application, an FDA advisory committee issued a report finding "conclusively" that "the budget and staff of the Food and Drug Administration are inadequate to permit the discharge of its existing responsibilities for the protection of the American public." Citizens Advisory Committee on the FDA, Report to the Secretary of Health, Education, and Welfare, H.R. Doc. No. 227, 84th Cong., 1st Sess., 53. Three recent studies have reached similar conclusions. See FDA Science Board, Report of the Subcommittee on Science and Technology: FDA Science and Mission at Risk

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

2, 6 (2007), online at http://www.fda.gov/ohrms/ dockets/ac/07/briefing/2007–4329b_02_01_FDA% 20Report% 20*o*n% 20Science % 20 and% 20Technology.pdf (all Internet materials as visited Feb. 23, 2009, and available in Clerk of Court's case file) ("[T]he Agency suffers from serious scientific deficiencies and is not positioned to meet current or emerging regulatory responsibilities"); National Academies, Institute of Medicine, The Future of Drug Safety: Promoting and Protecting the Health of the Public 193–194 (2007) ("The [FDA] lacks the resources needed to accomplish its large and complex mission .... There is widespread agreement that resources for postmarketing drug safety work are especially inadequate and that resource limitations have hobbled the agency's ability to improve and expand this essential component of its mission"); GAO, Drug Safety: Improvement Needed in FDA's Postmarket Decision-making and Oversight Process 5 (GAO–06–402, 2006), http://www.gao.gov/new.items/d06402.pdf ("FDA lacks a clear and effective process for making decisions about, and providing management oversight of, postmarket safety issues"); see also House Committee on Oversight and Government Reform, Majority Staff Report, FDA Career Staff Objected to Agency Preemption Policies 4 (2008) ("[T]he Office of Chief Counsel ignored the warnings from FDA scientists and career officials that the preemption language [of the 2006 preamble] was based on erroneous assertions about the ability of the drug approval process to ensure accurate and up-to-date drug labels").

12      See generally Brief for Former FDA Commissioners Drs. Donald Kennedy and David Kessler as *Amici Curiae;* see also Kessler & Vladeck, A Critical Examination of the FDA's Efforts To Preempt Failure–To–Warn Claims, 96 Geo. L.J. 461, 463 (2008); *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 451, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) (noting that state tort suits "can serve as a catalyst" by aiding in the exposure of new dangers and prompting a manufacturer or the federal agency to decide that a revised label is required).

Largely based on the FDA's new position, Wyeth argues that this case presents a conflict between state and federal law analogous to the one at issue in *Geier.* There, we held that state tort claims premised on Honda's failure to install airbags conflicted with a federal regulation that did not require airbags for all cars. The Department of Transportation **\*580** (DOT) had promulgated a rule that provided car manufacturers with a range of choices among passive restraint devices. *Geier,* 529 U.S., at 875, 120 S.Ct. 1913. Rejecting an " 'all airbag' " standard, the agency had called for a gradual phase-in of a mix of passive restraints in order to spur technological development and win consumer acceptance. *Id.,* at 879, 120 S.Ct. 1913. Because the plaintiff's claim was that car manufacturers had a duty to install airbags, it presented an obstacle to achieving "the variety and mix of devices that the federal regulation sought." *Id.,* at 881, 120 S.Ct. 1913.

Wyeth and the dissent contend that the regulatory scheme in this case is nearly identical, but, as we have described, it is quite different. In *Geier,* the DOT conducted a formal rulemaking and then adopted a plan to phase in a mix of passive restraint devices. Examining the rule itself and the DOT's contemporaneous record, which revealed the factors the agency had weighed and the balance it had struck, we determined that state tort suits presented an obstacle to the federal scheme. After conducting our own pre-emption analysis, we considered the agency's explanation of how state law interfered with its regulation, regarding it as further support for our independent conclusion that the plaintiff's tort claim obstructed the federal regime.

By contrast, we have no occasion in this case to consider the pre-emptive effect of a specific agency regulation bearing the force of law. And the FDA's newfound opinion, expressed in its 2006 preamble, that state law "frustrate[s] the agency's implementation of its statutory mandate," 71 Fed.Reg. 3934, does not merit deference for the reasons we have explained. [13] Indeed, the "complex and extensive" regulatory **\*581** history and background relevant to this case, *Geier,* 529 U.S., at 883, 120 S.Ct. 1913, undercut the FDA's recent pronouncements of pre-emption, as they reveal the longstanding coexistence of state and federal law and the FDA's traditional recognition of state-law remedies—a recognition in place each time the agency reviewed Wyeth's Phenergan label. [14]

13      The United States' *amicus* brief is similarly undeserving of deference. Unlike the Government's brief in *Geier v. American Honda Motor Co.,* 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), which explained the effects of state law on the DOT's regulation in a manner consistent with the agency's prior accounts, see *id.,* at 861, 120 S.Ct. 1913, the Government's explanation of federal drug regulation departs markedly from the FDA's understanding at all times relevant to this case.

14      Wyeth's more specific contention—that this case resembles *Geier* because the FDA determined that no additional warning on IV-push administration was needed, thereby setting a ceiling on Phenergan's label—is belied by the record. As we have discussed, the FDA did not consider and reject a stronger warning against IV-push injection of Phenergan. See also App. 249–250 ("[A] tort case

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

is unlikely to obstruct the regulatory process when the record shows that the FDA has paid very little attention to the issues raised by the parties at trial").

**\*\*1204** In short, Wyeth has not persuaded us that failure-to-warn claims like Levine's obstruct the federal regulation of drug labeling. Congress has repeatedly declined to pre-empt state law, and the FDA's recently adopted position that state tort suits interfere with its statutory mandate is entitled to no weight. Although we recognize that some state-law claims might well frustrate the achievement of congressional objectives, this is not such a case.

## V

We conclude that it is not impossible for Wyeth to comply with its state and federal law obligations and that Levine's common-law claims do not stand as an obstacle to the accomplishment of Congress' purposes in the FDCA. Accordingly, the judgment of the Vermont Supreme Court is affirmed.

*It is so ordered.*

Justice BREYER, concurring.

I write separately to emphasize the Court's statement that "we have no occasion in this case to consider the pre-emptive effect of a specific agency regulation bearing the force of law." *Ante,* at 1203. State tort law will sometimes help the **\*582** Food and Drug Administration (FDA) "uncover unknown drug hazards and [encourage] drug manufacturers to disclose safety risks." *Ante,* at 1202. But it is also possible that state tort law will sometimes interfere with the FDA's desire to create a drug label containing a specific set of cautions and instructions. I also note that some have argued that state tort law can sometimes raise prices to the point where those who are sick are unable to obtain the drugs they need. See Lasagna, The Chilling Effect of Product Liability on New Drug Development, in The Liability Maze 334, 335–336 (P. Huber & R. Litan eds.1991). The FDA may seek to determine whether and when state tort law acts as a help or a hindrance to achieving the safe drug-related medical care that Congress sought. *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 506, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (BREYER, J., concurring in part and concurring in judgment); cf. *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 454–455, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) (BREYER, J., concurring). It may seek to embody those determinations in lawful specific regulations describing, for example, when labeling requirements serve as a ceiling as well as a floor. And it is possible that such determinations would have pre-emptive effect. See *Lohr, supra,* at 505, 116 S.Ct. 2240 (opinion of BREYER, J.) (citing *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)). I agree with the Court, however, that such a regulation is not at issue in this case.

Justice THOMAS, concurring in the judgment.

I agree with the Court that the fact that the Food and Drug Administration (FDA) approved the label for petitioner Wyeth's drug Phenergan does not pre-empt the state-law judgment before the Court. That judgment was based on a jury finding that the label did not adequately warn of the risk involved in administering Phenergan through the IV-push injection method. Under federal law, without prior approval from the FDA, Wyeth could have "add[ed] or strengthen[ed]" information on its label about "a contraindication, **\*583** warning, precaution, or adverse reaction," **\*\*1205** 21 CFR § 314.70(c)(6)(iii)(A) (2008), or "about dosage and administration that is intended to increase the safe use of the drug product," § 314.70(c)(6)(iii)(C), in order to "reflect newly acquired information," including "new analyses of previously submitted data," about the dangers of IV-push administration of Phenergan, 73 Fed.Reg. 49603, 49609 (2008). It thus was possible for Wyeth to label and market Phenergan in compliance with federal law while also providing additional warning information on its label beyond that previously approved by the FDA. In addition, federal law does not give drug manufacturers an unconditional right to market their federally approved drug at all times with the precise label initially approved by the FDA. The Vermont court's judgment in this case, therefore, did not directly conflict with federal law and is not pre-empted.

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

I write separately, however, because I cannot join the majority's implicit endorsement of far-reaching implied pre-emption doctrines. In particular, I have become increasingly skeptical of this Court's "purposes and objectives" pre-emption jurisprudence. Under this approach, the Court routinely invalidates state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law. Because implied pre-emption doctrines that wander far from the statutory text are inconsistent with the Constitution, I concur only in the judgment.

## I

## A

In order "to ensure the protection of our fundamental liberties," *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) (internal quotation marks omitted), the "Constitution establishes a system of dual sovereignty between the States and the Federal Government." **\*584** *Gregory v. Ashcroft,* 501 U.S. 452, 457, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). The Framers adopted this " 'constitutionally mandated balance of power,' " *Atascadero State Hospital, supra,* at 242, 105 S.Ct. 3142, to "reduce the risk of tyranny and abuse from either front," because a "federalist structure of joint sovereigns preserves to the people numerous advantages," such as "a decentralized government that will be more sensitive to the diverse needs of a heterogeneous society" and "increase[d] opportunity for citizen involvement in democratic processes," *Gregory, supra,* at 458, 111 S.Ct. 2395. Furthermore, as the Framers observed, the " compound republic of America" provides "a double security ... to the rights of the people" because "the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments." The Federalist No. 51, p. 266 (M. Beloff ed., 2d ed.1987).

Under this federalist system, "the States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause." *Tafflin v. Levitt,* 493 U.S. 455, 458, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990). In this way, the Supremacy Clause gives the Federal Government "a decided advantage in [a] delicate balance" between federal and state sovereigns. *Gregory,* 501 U.S., at 460, 111 S.Ct. 2395. "As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States." *Ibid.* That is an "extraordinary power in a federalist system." *Ibid.*

Nonetheless, the States retain substantial sovereign authority. U.S. Const., Amdt. 10 ("The powers not delegated to **\*\*1206** the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people"); see also *Alden v. Maine,* 527 U.S. 706, 713, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999); *Printz v. United States,* 521 U.S. 898, 918–922, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997); *New York v. United States,* 505 U.S. 144, 155–156, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992); *Gregory, supra,* at 457–459, 111 S.Ct. 2395; *Tafflin, supra,* at 458, 110 S.Ct. 792. In accordance with the text and structure of the Constitution, "[t]he powers delegated by the proposed constitution to the **\*585** federal government, are few and defined" and "[t]hose which are to remain in the state governments, are numerous and indefinite." The Federalist No. 45, at 237–238. Indeed, in protecting our constitutional government, "the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government." *Texas v. White,* 7 Wall. 700, 725, 19 L.Ed. 227 (1869), quoted in *New York v. United States, supra,* at 162, 112 S.Ct. 2408.

As a result, in order to protect the delicate balance of power mandated by the Constitution, the Supremacy Clause must operate only in accordance with its terms. The clause provides:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2.

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

With respect to federal laws, then, the Supremacy Clause gives "supreme" status only to those that are "made in Pursuance" of "[t]his Constitution." *Ibid.;* see 3 J. Story, Commentaries on the Constitution of the United States § 1831, p. 694 (1833) (hereinafter Story) ("It will be observed, that the supremacy of the laws is attached to those only, which are made in pursuance of the constitution").

Federal laws "made in Pursuance" of the Constitution must comply with two key structural limitations in the Constitution that ensure that the Federal Government does not amass too much power at the expense of the States. The first structural limitation, which the parties have not raised in this case, is "the Constitution's conferral upon Congress of not all governmental powers, but only discrete, enumerated ones." *Printz,supra,* at 919, 117 S.Ct. 2365; see also *United States v. Morrison,* **\*586** 529 U.S. 598, 618, n. 8, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000); *New York v. United States, supra,* at 155–157, 112 S.Ct. 2408;*McCulloch v. Maryland,* 4 Wheat. 316, 405, 4 L.Ed. 579 (1819) ("This government is acknowledged by all to be one of enumerated powers"). [1]

[1] This structural limitation may be implicated in a pre-emption case if the federal law at issue is beyond the scope of Congress' enumerated powers. Expansion of congressional power through an "increasingly generous ... interpretation of the commerce power of Congress," for example, creates "a real risk that Congress will gradually erase the diffusion of power between State and Nation on which the Framers based their faith in the efficiency and vitality of our Republic." *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 583–584, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) (O'Connor, J., dissenting); see also *Marbury v. Madison,* 1 Cranch 137, 176, 2 L.Ed. 60 (1803) ("The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written").

The second structural limitation is the complex set of procedures that Congress **\*\*1207** and the President must follow to enact "Laws of the United States." See *INS v. Chadha,* 462 U.S. 919, 945–946, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (setting forth the Constitution's Bicameral and Presentment Clauses, Art. I, § 7, cls. 2–3, which "prescribe and define the respective functions of the Congress and of the Executive in the legislative process"). "[T]he Framers were acutely conscious that the bicameral requirement and the Presentment Clauses would serve essential constitutional functions," *Chadha,* 462 U.S., at 951, 103 S.Ct. 2764, by allowing the passage of legislation only after it has proceeded through "a step-by-step, deliberate and deliberative process," *id.,* at 959, 103 S.Ct. 2764, that was "finely wrought and exhaustively considered" by the Framers, *id.,* at 951, 103 S.Ct. 2764. The Supremacy Clause thus requires that pre-emptive effect be given only those to federal standards and policies that are set forth in, or necessarily follow from, the statutory text that was produced through the constitutionally required bicameral and presentment procedures. See 3 J. Story § 1831, at 694 (Actions of the Federal Government "which are not pursuant to its constitutional powers, but which are invasions of the residuary authorities of the smaller societies," are not "the **\*587** supreme law of the land. They will be merely acts of usurpation, and will deserve to be treated as such").

### B

In light of these constitutional principles, I have become "increasing[ly] reluctan[t] to expand federal statutes beyond their terms through doctrines of implied pre-emption." *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 459, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) (THOMAS, J., concurring in judgment in part and dissenting in part). My review of this Court's broad implied pre-emption precedents, particularly its "purposes and objectives" pre-emption jurisprudence, has increased my concerns that implied pre-emption doctrines have not always been constitutionally applied. Under the vague and "potentially boundless" doctrine of "purposes and objectives" pre-emption, *Geier v. American Honda Motor Co.,* 529 U.S. 861, 907, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (STEVENS, J., dissenting), for example, the Court has pre-empted state law based on its interpretation of broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not contained within the text of federal law. See, *e.g.,Pharmaceutical Research and Mfrs. of America v. Walsh,* 538 U.S. 644, 678, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003) (THOMAS, J., concurring in judgment) (referring to the "concomitant danger of invoking obstacle pre-emption based on the arbitrary selection of one purpose to the exclusion of others"); *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 388–391, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (SCALIA, J., concurring in judgment) (criticizing the majority's reliance on legislative history to discern statutory intent when that intent was "perfectly obvious on the face of th[e]

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

statute"); *Geier, supra,* at 874–883, 120 S.Ct. 1913 (relying on regulatory history, agency comments, and the Government's litigating position to determine that federal law pre-empted state law).

Congressional and agency musings, however, do not satisfy the Art. I, § 7 requirements for enactment of federal law and, therefore, do not pre-empt state law under the Supremacy **\*588** Clause. When analyzing the pre-emptive effect of federal statutes or regulations validly promulgated thereunder, "[e]vidence of pre-emptive purpose [must be] sought in the text and structure of the [provision] at issue" to comply with the Constitution. **\*\*1208** *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993); see also *New York v. FERC,* 535 U.S. 1, 18, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002) ("[A] federal agency may pre-empt state law only when and if it is acting within the scope of its congressional delegated authority ... [for] an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it" (internal quotation marks omitted; second alteration in original)); *Camps Newfound/Owatonna, Inc. v. Town of Harrison,* 520 U.S. 564, 617, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) (THOMAS, J., dissenting) (noting that "treating unenacted congressional intent as if it were law would be constitutionally dubious"). Pre-emption analysis should not be "a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives, but an inquiry into whether the ordinary meanings of state and federal law conflict." *Bates, supra,* at 459, 125 S.Ct. 1788 (THOMAS, J., concurring in judgment in part and dissenting in part) (internal quotation marks and citation omitted); see also *Geier, supra,* at 911, 120 S.Ct. 1913 (STEVENS, J., dissenting) ("[P]re-emption analysis is, or at least should be, a matter of precise statutory [or regulatory] construction rather than an exercise in free-form judicial policymaking" (internal quotation marks omitted)). Pre-emption must turn on whether state law conflicts with the text of the relevant federal statute or with the federal regulations authorized by that text. See *Foster v. Love,* 522 U.S. 67, 71, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997) (finding that conflict pre-emption question "turn[ed] entirely on the meaning of the state and federal statutes" at issue before the Court); see also *New York v. FERC, supra,* at 19, 122 S.Ct. 1012.

## II

This Court has determined that there are two categories of conflict pre-emption, both of which Wyeth contends are at **\*589** issue in this case. First, the Court has found pre-emption "where compliance with both federal and state regulations is a physical impossibility for one engaged in interstate commerce." *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). Second, the Court has determined that federal law pre-empts state law when, "under the circumstances of [a] particular case, [state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941).[2]

2    The majority's pre-emption analysis relies in part on a presumption against pre-emption. *Ante,* at 1194, and n. 3 (opinion of STEVENS, J.). Because it is evident from the text of the relevant federal statutes and regulations themselves that the state-law judgment below is not pre-empted, it is not necessary to decide whether, or to what extent, the presumption should apply in a case such as this one, where Congress has not enacted an express-pre-emption clause. Cf. *Altria Group, Inc. v. Good,* 555 U.S. 70, ——, 129 S.Ct. 538, 551–552, 172 L.Ed.2d 398 (2008) (THOMAS, J., dissenting) (rejecting the use of a presumption against pre-emption in express pre-emption cases).

## A

Wyeth first contends that "it would have been impossible for it to comply with the state-law duty to modify Phenergan's labeling without violating federal law." *Ante,* at 1193 (opinion for the Court by STEVENS, J.). But, as the majority explains, the text of the relevant federal statutory provisions and the corresponding regulations do not directly conflict with the state-law judgment before us.

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

This Court has used different formulations of the standard to be used in deciding **\*\*1209** whether state and federal law conflict, and thus lead to pre-emption, under the "impossibility" doctrine. See, *e.g.,Geier, supra,* at 873, 120 S.Ct. 1913 ("a case in which state law penalizes what federal law requires"); *American Telephone & Telegraph Co. v. Central Office Telephone, Inc.,* 524 U.S. 214, 227, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998)*(AT & T)* (when state-law claims "directly conflict" with federal law), cited in *Geier, supra,* at 874, 120 S.Ct. 1913 (describing *AT & T* as a "cas[e] involving impossibility"); *Florida* **\*590** *Lime & Avocado Growers, supra,* at 142–143, 83 S.Ct. 1210 ("where compliance with both federal and state regulations is a physical impossibility"). The Court has generally articulated a very narrow "impossibility standard," see *Crosby,* 530 U.S., at 372–373, 120 S.Ct. 2288 (citing *Florida Lime & Avocado Growers, supra,* at 142–143, 83 S.Ct. 1210); see also *Sprietsma v. Mercury Marine,* 537 U.S. 51, 64–65, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002); *United States v. Locke,* 529 U.S. 89, 109, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000)—in part because the overly broad sweep of the Court's "purposes and objectives" approach, see *infra,* at 1211 – 1217, has rendered it unnecessary for the Court to rely on "impossibility" pre-emption.

The Court, in fact, has not explained why a narrow "physical impossibility" standard is the best proxy for determining when state and federal laws "directly conflict" for purposes of the Supremacy Clause. There could be instances where it is not "physically impossible" to comply with both state and federal law, even when the state and federal laws give directly conflicting commands. See Nelson, Preemption, 86 Va. L.Rev. 225, 260–261 (2000). For example, if federal law gives an individual the right to engage in certain behavior that state law prohibits, the laws would give contradictory commands notwithstanding the fact that an individual could comply with both by electing to refrain from the covered behavior. *Ibid.* Therefore, "physical impossibility" may not be the most appropriate standard for determining whether the text of state and federal laws directly conflict. See *ibid.* (concluding that the Supremacy Clause does not limit direct conflicts to cases with "physically impossible" conflicts and arguing that evidence from the Founding supports a standard of "logical-contradiction"); see also *AT & T, supra,* at 227, 118 S.Ct. 1956 (requiring that the state-law claims "directly conflict" with federal law); 3 Story § 1836, at 701 (suggesting instead that a state law is pre-empted by the Supremacy Clause when it is "*repugnant* to the constitution of the United States" (emphasis added)).

 **\*591** Nonetheless, whatever the precise constitutional contours of implied pre-emption may be, I am satisfied that it does not operate against respondent's judgment below. The text of the federal laws at issue do not require that the state-court judgment at issue be pre-empted, under either the narrow "physical impossibility" standard, *Florida Lime & Avocado Growers,supra,* at 142–143, 83 S.Ct. 1210, or a more general "direc[t] conflict" standard, *AT & T,supra,* at 227, 118 S.Ct. 1956.

Under the FDA's "changes being effected" regulation, 21 CFR § 314.70(c)(6)(iii), which was promulgated pursuant to the FDA's statutory authority, it is physically possible for Wyeth to market Phenergan in compliance with federal and Vermont law. As the majority explains, Wyeth could have changed the warning on its label regarding IV-push without violating federal law. See *ante,* at 1196 – 1197. The "changes being effected" regulation allows drug manufacturers to change their labels without the FDA's preapproval if the changes "add or strengthen a contraindication, warning, precaution, or adverse **\*\*1210** reaction," § 314.70(c)(6)(iii)(A), or "add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product," § 314.70(c)(6)(iii)(C), in order to "reflect newly acquired information," including "new analyses of previously submitted data," 73 Fed.Reg. 49603, 49609. Under the terms of these regulations, after learning of new incidences of gangrene-induced amputation resulting from the IV-push administration of Phenergan, see *ante,* at 1196 – 1197, federal law gave Wyeth the authority to change Phenergan's label to "strengthen a ... warning," "strengthen a ... precaution," § 314.70(c)(6)(iii)(A), or to "strengthen an instruction about ... administration [of the IV-push method] ... to increase the safe use of the drug product," § 314.70(c)(6)(iii)(C). Thus, it was physically possible for Wyeth to comply with a state-law requirement to provide stronger warnings on Phenergan about the risks of the IV-push administration method **\*592** while continuing to market Phenergan in compliance with federal law.

In addition, the text of the statutory provisions governing FDA drug labeling, and the regulations promulgated thereunder, do not give drug manufacturers an unconditional right to market their federally approved drug at all times with the precise label initially approved by the FDA. Thus, there is no "direct conflict" between the federal labeling law and the state-court judgment. The statute prohibits the interstate marketing of any drug, except for those that are federally approved. See 21 U.S.C. § 355(a) ("*No person shall* introduce or deliver for introduction into interstate commerce any new drug, *unless* an approval of

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

an application filed pursuant to subsection (b) or (j) of this section is effective with respect to such drug" (emphasis added)). To say, as the statute does, that Wyeth may not market a drug without federal approval (*i.e.,* without an FDA-approved label) is not to say that federal approval gives Wyeth the unfettered right, for all time, to market its drug with the specific label that was federally approved. Initial approval of a label amounts to a finding by the FDA that the label is safe for purposes of gaining federal approval to market the drug. It does not represent a finding that the drug, as labeled, can never be deemed unsafe by later federal action, or as in this case, the application of state law.

Instead, FDA regulations require a drug manufacturer—after initial federal approval of a drug's label—to revise the federally approved label "to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug."21 CFR § 201.80(e). Drug manufacturers are also required to "establish and maintain records and make reports" to the FDA about "[a]ny adverse event associated with the use of a drug in humans, whether or not considered drug related," after it has received federal approval. §§ 314.80(a), (c), (j). In addition, the manufacturer must make periodic reports about "adverse drug experience **\*593** [s]" associated with its drug and include "a history of actions taken since the last report because of adverse drug experiences (for example, labeling changes or studies initiated)." §§ 314.80(c)(2)(i)-(ii). When such records and reports are not made, the FDA can withdraw its approval of the drug. § 314.80(j); see also 21 U.S.C. § 355(e) ("The Secretary may ... withdraw the approval of an application ... if the Secretary finds ... that the applicant has failed to establish a system for maintaining required records, or has repeatedly or deliberately failed to maintain such records or to make required reports"). The FDA may also determine that a drug is no longer safe for use based on "clinical or other experience, tests, or other scientific **\*\*1211** data." *Ibid.* (approval may be withdrawn if "the Secretary finds ... that clinical or other experience, tests, or other scientific data show that such drug is unsafe for use under the conditions of use upon the basis of which the application was approved").

The text of the statutory provisions and the accompanying regulatory scheme governing the FDA drug approval process, therefore, establish that the FDA's initial approval of a drug is not a guarantee that the drug's label will never need to be changed. And nothing in the text of the statutory or regulatory scheme necessarily insulates Wyeth from liability under state law simply because the FDA has approved a particular label.

In sum, the relevant federal law did not give Wyeth a right that the state-law judgment took away, and it was possible for Wyeth to comply with both federal law and the Vermont-law judgment at issue here. The federal statute and regulations neither prohibited the stronger warning label required by the state judgment, nor insulated Wyeth from the risk of state-law liability. With no "direct conflict" between the federal and state law, then, the state-law judgment is not pre-empted. Cf. *AT & T,* 524 U.S., at 221–226, 118 S.Ct. 1956 (finding pre-emption where federal law forbade common carriers from extending communications privileges requested by state-law **\*594** claims); *Foster,* 522 U.S., at 68–69, 118 S.Ct. 464 (finding pre-emption where the federal statute required congressional elections on a particular date different from that provided by state statute).

**B**

Wyeth also contends that state and federal law conflict because "recognition of [this] state tort action creates an unacceptable 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941), because it substitutes a lay jury's decision about drug labeling for the expert judgment of the FDA." *Ante,* at 1193 – 1194. This Court's entire body of "purposes and objectives" pre-emption jurisprudence is inherently flawed. The cases improperly rely on legislative history, broad atextual notions of congressional purpose, and even congressional inaction in order to pre-empt state law. See *supra,* at 1192 – 1194. I, therefore, cannot join the majority's analysis of this claim, see *ante,* at 1199 – 1204, or its reaffirmation of the Court's "purposes and objectives" jurisprudence, *ante,* at 1199 – 1200 (analyzing congressional purposes); *ante,* at 1201 (quoting the " 'purposes and objectives' " pre-emption standard from *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941), and *Geier,* 529 U.S., at 883, 120 S.Ct. 1913);*ante,* at 1202 – 1203, and nn. 13–14 (analyzing this case in light of *Geier,* 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914).

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

**1**

The Court first formulated its current "purposes and objectives" pre-emption standard in *Hines* when it considered whether the federal Alien Registration Act pre-empted an Alien Registration Act adopted by the Commonwealth of Pennsylvania. The Court did not find that the two statutes, by their terms, directly conflicted. See *Hines, supra,* at 59–60, and n. 1, 61 S.Ct. 399 (citing Pa. Stat. Ann., Tit. 35, §§ 1801–1806 (Purdon Supp.1940)); 312 U.S., at 60, and n. 5, 61 S.Ct. 399 (citing Act of June 28, 1940, 54 Stat. 670); 312 U.S., at 69–74, 61 S.Ct. 399 (analyzing numerous extratextual sources and finding pre-emption without **\*595** concluding that the terms of the federal and state laws directly conflict); see also *id.*, at 78, 61 S.Ct. 399 (noting that "[i]t is conceded that the federal **\*\*1212** act in operation does not at any point conflict with the state statute" (Stone, J., dissenting)). [3] Nonetheless, the Court determined that it was not confined to considering merely the terms of the relevant federal law in conducting its pre-emption analysis. Rather, it went on to ask whether the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.,* at 67, 61 S.Ct. 399.

[3]   According to the Court, the Pennsylvania Act required:

"every alien 18 years or over, with certain exceptions, to register once each year; provide such information as is required by the statute, plus any 'other information and details' that the Department of Labor and Industry may direct; pay $1 as an annual registration fee; receive an alien identification card and carry it at all times; show the card whenever it may be demanded by any police officer or any agent of the Department of Labor and Industry; and exhibit the card as a condition precedent to registering a motor vehicle in his name or obtaining a license to operate one. ... Nonexempt aliens who fail to register are subject to a fine ... or imprisonment .... For failure to carry an identification card or for failure to show it upon proper demand, the punishment is a fine ... or imprisonment ...." *Hines,* 312 U.S., at 59–60, 61 S.Ct. 399 (footnote omitted).

The Court explained that the federal Alien Registration Act required:

"a single registration of aliens 14 years of age and over; detailed information specified by the Act, plus 'such additional matters as may be prescribed by the Commissioner, with the approval of the Attorney General'; finger-printing of all registrants; and secrecy of the federal files .... No requirement that aliens carry a registration card to be exhibited to police or others is embodied in the law, and only the wilful failure to register is made a criminal offense ...." *Id.,* at 60–61, 61 S.Ct. 399.

In so doing, the Court looked far beyond the relevant federal statutory text and instead embarked on its own freeranging speculation about what the purposes of the federal law must have been. See *id.,* at 69–74, 61 S.Ct. 399. In addition to the meaning of the relevant federal text, the Court attempted to discern "[t]he nature of the power exerted by Congress, the object sought to be attained, and the character of the obligations **\*596** imposed by the law." *Id.,* at 70, 61 S.Ct. 399. To do so, the Court looked in part to public sentiment, noting that "[o]pposition to laws ... singling out aliens as particularly dangerous and undesirable groups, is deep-seated in this country." *Ibid.* The Court also relied on statements by particular Members of Congress and on congressional inaction, finding it pertinent that numerous bills with requirements similar to Pennsylvania's law had failed to garner enough votes in Congress to become law. *Id.,* at 71–73, and nn. 32–34, 61 S.Ct. 399. Concluding that these sources revealed a federal purpose to "protect the personal liberties of law-abiding aliens through one uniform national registration system," the Court held that the Pennsylvania law was pre-empted. *Id.,* at 74, 61 S.Ct. 399.

Justice Stone, in dissent, questioned the majority's decision to read an exclusive registration system for aliens into a statute that did not specifically provide such exclusivity. See *id.,* at 75, 61 S.Ct. 399. He noted his concern that state power would be improperly diminished through a pre-emption doctrine driven by the Court's "own conceptions of a policy which Congress ha[d] not expressed and which is not plainly to be inferred from the legislation which it ha[d] enacted." *Ibid.* In his view, nothing that Congress enacted had "denie[d] the states the practicable means of identifying their alien residents and of recording their whereabouts." *Id.,* at 78, 61 S.Ct. 399. Yet, the *Hines* majority employed pre-emption to override numerous state alien-registration laws even though enacted federal law "at no point conflict[ed] with the state legislation and [was] **\*\*1213** harmonious with it." *Id.,* at 79, 61 S.Ct. 399. [4]

[4]   According to Justice Stone, the *Hines* majority's analysis resembled an inquiry into whether the federal act " 'occupied the field,' " rather than an application of simple conflict pre-emption principles. *Id.,* at 78, 61 S.Ct. 399 (dissenting opinion). Regardless of

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

whether *Hines* involved field or conflict pre-emption, the dissent accurately observed that in assessing the boundaries of the federal law—*i.e.,* the scope of its pre-emptive effect—the Court should look to the federal statute itself, rather than speculate about Congress' unstated intentions. *Id.,* at 78–79, 61 S.Ct. 399. See also *Camps Newfound/Owatonna, Inc. v. Town of Harrison,* 520 U.S. 564, 616–617, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) (THOMAS, J., dissenting) (noting that "field pre-emption is itself suspect, at least as applied in the absence of a congressional command that a particular field be pre-empted").

### *597 2

The consequences of this Court's broad approach to "purposes and objectives" pre-emption are exemplified in this Court's decision in *Geier,* which both the majority and the dissent incorporate into their analysis today. See *ante,* at 1202 – 1203, and nn. 13–14; *post,* at 1220 – 1222 (opinion of ALITO, J.). In *Geier,* pursuant to the National Traffic and Motor Vehicle Safety Act of 1966 (Safety Act), 80 Stat. 718, 15 U.S.C. § 1381 *et seq.* (1988 ed.), the Department of Transportation (DOT) had promulgated a Federal Motor Vehicle Safety Standard that "required auto manufacturers to equip some but not all of their 1987 vehicles with passive restraints." 529 U.S., at 864–865, 120 S.Ct. 1913. The case required this Court to decide whether the Safety Act pre-empted a state common-law tort action in which the plaintiff claimed that an auto manufacturer, though in compliance with the federal standard, should nonetheless have equipped a 1987 automobile with airbags. *Id.,* at 865, 120 S.Ct. 1913. The Court first concluded that the Safety Act's express pre-emption provision and its saving clause, read together, did not expressly pre-empt state common-law claims. See *id.,* at 867–868, 120 S.Ct. 1913.[5] The Court **\*598** then proceeded to consider whether the state action was nonetheless pre-empted as an "obstacle" to the purposes of the federal law. The Court held that the state tort claim was pre-empted, relying in large part on comments that DOT made when promulgating its regulation, statements that the Government made in its brief to the Court, and regulatory history that related to the federal regulation of passive restraints. See *id.,* at 874–886, 120 S.Ct. 1913.

[5]      The Safety Act's express pre-emption provision stated in part:

"Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State ... shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment[,] any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard." 15 U.S.C. § 1392(d) (1988 ed.).

The Safety Act also included a saving clause, which stated: "Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law." § 1397(k). The majority and dissent in *Geier* agreed that the import of the express pre-emption provision and the saving clause, read together, was that by its terms, the Safety Act did not expressly pre-empt state common-law actions. See *Geier,* 529 U.S., at 867–868, 120 S.Ct. 1913; *id.,* at 895–898, 120 S.Ct. 1913 (STEVENS, J., dissenting).

In particular, the majority found that DOT intended to "deliberately provid[e] the manufacturer[s] with a range of choices among different passive restraint devices" and to "bring about a mix of different devices introduced gradually over time," based on comments that DOT made when promulgating its regulation, rather **\*\*1214** than the Safety Act's text. *Id.,* at 875, 120 S.Ct. 1913. The majority also embarked on a judicial inquiry into "why and how DOT sought these objectives," *ibid.,* by considering regulatory history and the Government's brief, which described DOT's safety standard as " 'embod[ying] the Secretary's policy judgment that safety would best be promoted if manufacturers installed *alternative* protection systems in their fleets rather than one particular system in every car,' " *id.,* at 881, 120 S.Ct. 1913 (quoting Brief for United States as *Amicus Curiae* in *Geier v. American Honda Motor Co.,* O.T.1999, No. 98–1811, p. 25); see also 529 U.S., at 883–884, 120 S.Ct. 1913. Based on this "*ex post* administrative litigating position and inferences from regulatory history and final commentary," *id.,* at 910–911, 120 S.Ct. 1913 (STEVENS, J., dissenting), the Court found that the state action was pre-empted because it would have required manufacturers of all cars similar to that in which the plaintiff was injured to "install airbags rather than other passive restraint systems" and would have, therefore, "presented an obstacle to the variety and mix of devices that the federal regulation sought" to phase in gradually, *id.,* at 881, 120 S.Ct. 1913.

The Court's decision in *Geier* to apply "purposes and objectives" pre-emption based on agency comments, regulatory **\*599** history, and agency litigating positions was especially flawed, given that it conflicted with the plain statutory text of the saving

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

clause within the Safety Act, which explicitly preserved state common-law actions by providing that "[c]ompliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law," 15 U.S.C. § 1397(k) (1988 ed.). [6] See *Engine Mfrs. Assn. v. South Coast Air Quality Management Dist.,* 541 U.S. 246, 252, 124 S.Ct. 1756, 158 L.Ed.2d 529 (2004) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose" (internal quotation marks omitted)); *West Virginia Univ. Hospitals, Inc. v. Casey,* 499 U.S. 83, 98, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) ("The best evidence of th[e] purpose [of a statute] is the statutory text adopted by both Houses of Congress and submitted to the President"). In addition, the Court's reliance on its divined purpose of the federal law—to gradually phase in a mix of **\*600** passive restraint systems—in order to invalidate **\*\*1215** a State's imposition of a greater safety standard was contrary to the more general express statutory goal of the Safety Act "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents," 15 U.S.C. § 1381 (1988 ed.). This Court has repeatedly stated that when statutory language is plain, it must be enforced according to its terms. See *Jimenez v. Quarterman,* 555 U.S. 113, 129 S.Ct. 681, 172 L.Ed.2d 475 (2009); see also, *e.g.,Dodd v. United States,* 545 U.S. 353, 359, 125 S.Ct. 2478, 162 L.Ed.2d 343 (2005); *Lamie v. United States Trustee,* 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004); *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). The text in *Geier* "directly addressed the precise question at issue" before the Court, so that should have been "the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *National Assn. of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, ——, 127 S.Ct. 2518, 2534, 168 L.Ed.2d 467 (2007) (internal quotation marks omitted). With text that allowed state actions like the one at issue in *Geier,* the Court had no authority to comb through agency commentaries to find a basis for an alternative conclusion.

[6]    In addition to the impropriety of looking beyond the plain text of the saving clause to regulatory history, DOT comments, and an administrative litigating position to evaluate the Safety Act's pre-emptive effect, it is unclear that the Court in *Geier* accurately assessed the federal objectives of the relevant federal law. As the dissent in *Geier* pointed out, the purpose of the Safety Act, as stated by Congress, was generally " 'to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents.' " *Id.,* at 888–889, 120 S.Ct. 1913 (opinion of STEVENS, J.) (quoting 15 U.S.C. § 1381 (1988 ed.)). On its face, that goal is of course consistent with a state-law judgment that a particular vehicle needed a passive restraint system that would better protect persons from death and injury during traffic accidents. Furthermore, the dissent observed that "by definition all of the standards established under the Safety Act ... impose minimum, rather than fixed or maximum, requirements." 529 U.S., at 903, 120 S.Ct. 1913 (citing 15 U.S.C. § 1391(2) (1988 ed.)). Thus, in the dissent's view, the requirements of the DOT regulation were not ceilings, and it was "obvious that the Secretary favored a more rapid increase" than required by the regulations. 529 U.S., at 903, 120 S.Ct. 1913. That goal also would be consistent with a state-law judgment finding that a manufacturer acted negligently when it failed to include an airbag in a particular car. See *id.,* at 903–904, 120 S.Ct. 1913.

Applying "purposes and objectives" pre-emption in *Geier,* as in any case, allowed this Court to vacate a judgment issued by another sovereign based on nothing more than assumptions and goals that were untethered from the constitutionally enacted federal law authorizing the federal regulatory standard that was before the Court. See *Watters v. Wachovia Bank, N. A.,* 550 U.S. 1, 44, 127 S.Ct. 1559, 167 L.Ed.2d 389 (2007) (STEVENS, J., dissenting) (noting that pre-emption "affects the allocation of powers among sovereigns"). " '[A]n agency literally has no power to act, let alone pre-empt the [law] of a sovereign State, unless and until Congress confers power upon it.' " *New York v. FERC,* 535 U.S., at 18, 122 S.Ct. 1012 (quoting *Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986)). Thus, no agency or individual Member of Congress can pre-empt a State's judgment by merely musing about goals or **\*601** intentions not found within or authorized by the statutory text. See *supra,* at 1206 – 1208.

The Court's "purposes and objectives" pre-emption jurisprudence is also problematic because it encourages an overly expansive reading of statutory text. The Court's desire to divine the broader purposes of the statute before it inevitably leads it to assume that Congress wanted to pursue those policies "at all costs"—even when the text reflects a different balance. See *Geier, supra,* at 904, 120 S.Ct. 1913 (STEVENS, J., dissenting) (finding no evidence to support the notion that the DOT Secretary intended to advance the purposes of the safety standard "at all costs"); Nelson, 86 Va. L.Rev., at 279–280. As this Court has repeatedly noted, " 'it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.' " *E.g.,Norfolk Southern R. Co. v. Sorrell,* 549 U.S. 158, 171, 127 S.Ct. 799, 166 L.Ed.2d 638

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

(2007) (quoting *Rodriguez v. United States,* 480 U.S. 522, 526, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987)(*per curiam*)). Federal legislation is often the result of compromise between legislators and "groups with marked but divergent interests." See *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 93–94, 122 S.Ct. 1155, 152 L.Ed.2d 167 (2002). Thus, a statute's text might reflect a compromise between parties who wanted to pursue a particular goal to different extents. See, *e.g.,ibid.* (noting that the Family and Medical Leave Act's provision of only 12 workweeks **\*\*1216** of yearly leave "was the result of compromise" that must be given effect by courts); *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 257, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) (finding that a state law was not pre-empted though it allegedly frustrated a primary purpose of the Atomic Energy Act because the Act provided that its purpose was to be furthered only "to the extent it is consistent 'with the health and safety of the public' " (quoting 42 U.S.C. § 2013(d) (1982 ed.))); see also Manning, What Divides Textualists from Purposivists? 106 Colum. L.Rev. 70, 104 (2006) ("Legislators may compromise on a statute that does not fully address a perceived mischief, accepting half a loaf to **\*602** facilitate a law's enactment"). Therefore, there is no factual basis for the assumption underlying the Court's "purposes and objectives" pre-emption jurisprudence that every policy seemingly consistent with federal statutory text has necessarily been authorized by Congress and warrants pre-emptive effect. Instead, our federal system in general, and the Supremacy Clause in particular, accords pre-emptive effect to only those policies that are actually authorized by and effectuated through the statutory text.

**3**

The majority, while reaching the right conclusion in this case, demonstrates once again how application of "purposes and objectives" pre-emption requires inquiry into matters beyond the scope of proper judicial review. For example, the majority relies heavily on Congress' failure "during the ... 70–year history" of the federal Food, Drug, and Cosmetic Act to enact an express pre-emption provision that addresses approval of a drug label by the FDA. *Ante,* at 1200. That "silence on the issue, coupled with [Congress'] certain awareness of the prevalence of state tort litigation," the majority reasons, is evidence that Congress did not intend for federal approval of drug labels to pre-empt state tort judgments. *Ibid.;* see also *ante,* at 1199 – 1200 (construing from inaction that Congress "[e]vidently [had] determined that widely available state rights of action provided appropriate relief"). Certainly, the absence of a statutory provision pre-empting all state tort suits related to approved federal drug labels is pertinent to a finding that such lawsuits are not pre-empted. But the relevance is in the fact that no statute explicitly pre-empts the lawsuits, and not in any inferences that the Court may draw from congressional silence about the motivations or policies underlying Congress' failure to act. See *Brown v. Gardner,* 513 U.S. 115, 121, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) ( "[C]ongressional silence lacks persuasive significance" (internal **\*603** quotation marks omitted)); *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 85, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) ("[M]atters left unaddressed in [a comprehensive and detailed federal] scheme are presumably left subject to the disposition provided by state law"); *Camps Newfound,* 520 U.S., at 616, 117 S.Ct. 1590 ("[O]ur pre-emption jurisprudence explicitly rejects the notion that mere congressional silence on a particular issue may be read as pre-empting state law").

In this case, the majority has concluded from silence that Congress believed state lawsuits pose no obstacle to federal drug-approval objectives. See *ante,* at 1200. That is the required conclusion, but only because it is compelled by the text of the relevant statutory and regulatory provisions, not judicial suppositions about Congress' unstated goals. The fact that the Court reaches the proper conclusion does not justify its speculation about the reasons for congressional inaction. In this case, the Court has relied on the perceived congressional policies underlying inaction **\*\*1217** to find that state law is *not* pre-empted. But once the Court shows a willingness to guess at the intent underlying congressional inaction, the Court could just as easily rely on its own perceptions regarding congressional inaction to give unduly broad pre-emptive effect to federal law. See, *e.g.,American Ins. Assn. v. Garamendi,* 539 U.S. 396, 401, 405–408, 429, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003) (finding that Congress' failure to pass legislation indicating that it disagreed with the President's executive agreement supported, at least in part, the Court's determination that the agreement pre-empted state law). Either approach is illegitimate. Under the Supremacy Clause, state law is pre-empted only by federal law "made in Pursuance" of the Constitution, Art. VI, cl. 2—not by extratextual considerations of the purposes underlying congressional inaction. See *Hoffman v. Connecticut Dept. of Income Maintenance,* 492 U.S. 96, 104, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989) (plurality opinion) (finding that policy arguments that "are not based in the text of

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

the statute ...  **\*604**  are not helpful"); *TVA v. Hill,* 437 U.S. 153, 194, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) ("Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute"). Our role, then, is merely "to interpret the language of the statute[s] enacted by Congress." *Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 461, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002).

### III

The origins of this Court's "purposes and objectives" pre-emption jurisprudence in *Hines,* and its broad application in cases like *Geier,* illustrate that this brand of the Court's pre-emption jurisprudence facilitates freewheeling, extratextual, and broad evaluations of the "purposes and objectives" embodied within federal law. This, in turn, leads to decisions giving improperly broad pre-emptive effect to judicially manufactured policies, rather than to the statutory text enacted by Congress pursuant to the Constitution and the agency actions authorized thereby. Because such a sweeping approach to pre-emption leads to the illegitimate—and thus, unconstitutional—invalidation of state laws, I can no longer assent to a doctrine that pre-empts state laws merely because they "stan[d] as an obstacle to the accomplishment and execution of the full purposes and objectives" of federal law, *Hines,* 312 U.S., at 67, 61 S.Ct. 399, as perceived by this Court. I therefore respectfully concur only in the judgment.

Justice ALITO, with whom THE CHIEF JUSTICE and Justice SCALIA join, dissenting.

This case illustrates that tragic facts make bad law. The Court holds that a state tort jury, rather than the Food and Drug Administration (FDA), is ultimately responsible for regulating warning labels for prescription drugs. That result cannot be reconciled with *Geier v. American Honda Motor Co.,* 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), or general principles of conflict pre-emption. I respectfully dissent.

### *605  I

The Court frames the question presented as a "narro[w]" one—namely, whether Wyeth has a duty to provide "an adequate warning about using the IV-push method" to administer Phenergan. *Ante,* at 1194. But that ignores the antecedent question of who—the FDA or a jury in Vermont—has the authority and responsibility for determining the "adequacy" of Phenergan's warnings. Moreover, it is unclear how a "stronger" warning could have helped respondent, see *ante,* at 1199; after  **\*\*1218**  all, the physician's assistant who treated her disregarded at least six separate warnings that are already on Phenergan's labeling, so respondent would be hard pressed to prove that a seventh would have made a difference. [1]

[1]    Indeed, respondent conceded below that Wyeth *did* propose an adequate warning of Phenergan's risks. See Plaintiff Diana Levine's Memorandum in Opposition to Wyeth's Motion for Summary Judgment in *Levine v. American Home Products Corp.* (now Wyeth), No. 670–12–01 Wncv (Super. Ct. Washington Cty., Vt.), ¶ 7, p. 26. Specifically, respondent noted: "In 1988, Wyeth proposed language that would have prevented this accident by requiring a running IV and explaining why a running IV will address and reduce the risk [of intra-arterial injection]." *Ibid.* See also *id.,* at 24 ("Although not strong enough, this improved the labeling instruction, if followed, would have prevented the inadvertent administration of Phenergan into an artery ..."). The FDA rejected Wyeth's proposal. See App. 359.

More to the point, the question presented by this case is not a "narrow" one, and it does not concern whether Phenergan's label should bear a "stronger" warning. Rather, the real issue is whether a state tort jury can countermand the FDA's considered judgment that Phenergan's FDA-mandated warning label renders its intravenous (IV) use "safe." Indeed, respondent's amended complaint alleged that Phenergan is "not reasonably safe for intravenous administration," App. 15, ¶ 6; respondent's attorney told the jury that Phenergan's label should say, " 'Do not use this drug intravenously,' " *id.,* at 32; respondent's expert told the  **\*606**  jury, "I think the drug should be labeled 'Not for IV use,' " *id.,* at 59; and during his closing argument, respondent's

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

attorney told the jury, "Thank God we don't rely on the FDA to ... make the safe[ty] decision. You will make the decision. ... The FDA doesn't make the decision, you do," *id.,* at 211–212. [2]

[2] Moreover, in the trial judge's final charge, he told the jury that "the critical factual issue which you must decide" is whether Phenergan's FDA-mandated label reflects a proper balance between "the risks and benefits of intravenous administration and the potential for injury to patients." *Id.,* at 220. See also 183 Vt. 76, ——, 944 A.2d 179, 182 (2006) (recognizing that respondent's argument is that Phenergan's "label should not have allowed IV push as a means of administration").

Federal law, however, *does* rely on the FDA to make safety determinations like the one it made here. The FDA has long known about the risks associated with IV push in general and its use to administer Phenergan in particular. Whether wisely or not, the FDA has concluded—over the course of extensive, 54–year–long regulatory proceedings—that the drug is "safe" and "effective" when used in accordance with its FDA-mandated labeling. The unfortunate fact that respondent's healthcare providers ignored Phenergan's labeling may make this an ideal medical-malpractice case. [3] But turning a common-law tort suit into a "frontal assault" on the FDA's regulatory regime for drug labeling upsets the well-settled meaning of the Supremacy Clause and our conflict pre-emption jurisprudence. Brief for United States as *AmicusCuriae* 21.

[3] Respondent sued her physician, physician's assistant, and hospital for malpractice. After the parties settled that suit for an undisclosed sum, respondent's physician sent her a letter in which he admitted "responsibility" for her injury and expressed his "profoun[d] regre[t]" and "remors[e]" for his actions. 1 Tr. 178–179 (Mar. 8, 2004) (testimony of Dr. John Matthew); see also App. 102–103 (testimony of physician's assistant Jessica Fisch) (noting that her "sense of grief" was so "great" that she "would have gladly cut off [her own] arm" and given it to respondent). Thereafter, both the physician and the physician's assistant agreed to testify on respondent's behalf in her suit against Wyeth.

## *607 **1219 II

### A

To the extent that "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case," *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (internal quotation marks omitted), Congress made its "purpose" plain in authorizing the FDA—not state tort juries—to determine when and under what circumstances a drug is "safe." "[T]he process for approving new drugs is at least as rigorous as the premarket approval process for medical devices," *Riegel v. Medtronic, Inc.,* 552 U.S. 312, ——, 128 S.Ct. 999, 1018, 169 L.Ed.2d 892 (2008) (GINSBURG, J., dissenting), and we held that the latter pre-empted a state-law tort suit that conflicted with the FDA's determination that a medical device was "safe," *id.,* at ——, 128 S.Ct., at 1018 (opinion of the Court).

Under the Federal Food, Drug, and Cosmetic Act (FDCA), a drug manufacturer may not market a new drug before first submitting a new drug application (NDA) to the FDA and receiving the agency's approval. See 21 U.S.C. § 355(a). An NDA must contain, among other things, "the labeling proposed to be used for such drug," § 355(b)(1)(F), "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use," § 355(b)(1)(A), and "a discussion of why the benefits exceed the risks [of the drug] under the conditions stated in the labeling," 21 CFR § 314.50(d)(5)(viii) (2008). The FDA will approve an NDA only if the agency finds, among other things, that the drug is "safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof," there is "substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof," and the proposed labeling is not "false or misleading in any particular." 21 U.S.C. § 355(d).

 *608 After the FDA approves a drug, the manufacturer remains under an obligation to investigate and report any adverse events associated with the drug, see 21 CFR § 314.80, and must periodically submit any new information that may affect the FDA's previous conclusions about the safety, effectiveness, or labeling of the drug, 21 U.S.C. § 355(k). If the FDA finds that

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

the drug is not "safe" when used in accordance with its labeling, the agency "shall" withdraw its approval of the drug. § 355(e). The FDA also "shall" deem a drug "misbranded" if "it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof." § 352(j).

Thus, a drug's warning label "serves as the standard under which the FDA determines whether a product is safe and effective." 50 Fed.Reg. 7470 (1985). Labeling is "[t]he centerpiece of risk management," as it "communicates to health care practitioners the agency's formal, authoritative conclusions regarding the conditions under which the product can be used safely and effectively." 71 Fed.Reg. 3934 (2006). The FDA has underscored the importance it places on drug labels by promulgating comprehensive regulations—spanning an entire part of the Code of Federal Regulations, see 21 CFR pt. 201, with seven subparts and 70 separate sections—that set forth drug manufacturers' labeling obligations. Under those regulations, the FDA must be satisfied that a drug's warning label contains, among other things, "a summary of the essential scientific information needed for the safe and effective use of the drug," § 201.56(1), including a **1220** description of "clinically significant adverse reactions," "other potential safety hazards," "limitations in use imposed by them, ... and steps that should be taken if they occur," § 201.57(c)(6) (i). Neither the FDCA nor its implementing regulations suggest that juries may second-guess the FDA's labeling decisions.

## *609 B

### 1

Where the FDA determines, in accordance with its statutory mandate, that a drug is on balance "safe," our conflict pre-emption cases prohibit any State from countermanding that determination. See, *e.g.,Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 348, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001) (after the FDA has struck "a somewhat delicate balance of statutory objectives" and determined that petitioner submitted a valid application to manufacture a medical device, a State may not use common law to negate it); *International Paper Co. v. Ouellette,* 479 U.S. 481, 494, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987) (after the EPA has struck "the balance of public and private interests so carefully addressed by" the federal permitting regime for water pollution, a State may not use nuisance law to "upse[t]" it); *Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 321, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981) (after the Interstate Commerce Commission has struck a "balance" between competing interests in permitting the abandonment of a railroad line, a State may not use statutory or common law to negate it).

Thus, as the Court itself recognizes, it is irrelevant in conflict pre-emption cases whether Congress "enacted an express pre-emption provision at some point during the FDCA's 70–year history." *Ante,* at 1200; see also *Geier,* 529 U.S., at 869, 120 S.Ct. 1913 (holding the absence of an express pre-emption clause "does *not* bar the ordinary working of conflict pre-emption principles"). Rather, the ordinary principles of conflict pre-emption turn solely on whether a State has upset the regulatory balance struck by the federal agency. *Id.,* at 884–885, 120 S.Ct. 1913; see also *Chicago & North Western Transp. Co., supra,* at 317, 101 S.Ct. 1124 (describing conflict pre-emption as "a two-step process of first ascertaining the construction of the [federal and state laws] and then determining the constitutional question *610* whether they are actually in conflict" (internal quotation marks omitted)).

### 2

A faithful application of this Court's conflict pre-emption cases compels the conclusion that the FDA's 40–year–long effort to regulate the safety and efficacy of Phenergan pre-empts respondent's tort suit. Indeed, that result follows directly from our conclusion in *Geier*.

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

*Geier* arose under the National Traffic and Motor Safety Vehicle Act of 1966, which directs the Secretary of the Department of Transportation (DOT) to "establish by order ... motor vehicle safety standards," 15 U.S.C. § 1392(a) (1988 ed.), which are defined as "minimum standard[s] for motor vehicle performance, or motor vehicle equipment performance," § 1391(2). Acting pursuant to that statutory mandate, the Secretary of Transportation promulgated Federal Motor Vehicle Safety Standard 208, which required car manufacturers to include passive restraint systems (*i.e.,* devices that work automatically to protect occupants from injury during a collision) in a certain percentage of their cars built in or after 1987. See 49 CFR § 571.208 (1999). Standard 208 did not require installation of any particular type of passive restraint; instead, it gave manufacturers the option to install automatic **\*\*1221** seatbelts, airbags, or any other suitable technology that they might develop, provided the restraint(s) met the performance requirements specified in the rule. *Ibid.*

Alexis Geier drove her 1987 Honda Accord into a tree, and although she was wearing her seatbelt, she nonetheless suffered serious injuries. She then sued Honda under state tort law, alleging that her car was negligently and defectively designed because it lacked a driver's-side airbag. She argued that Congress had empowered the Secretary to set only "minimum standard[s]" for vehicle safety. 15 U.S.C. § 1391(2). She also emphasized that the National Traffic and Motor Safety Vehicle Act contains a saving clause, which **\*611** provides that "[c]ompliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law." § 1397(k).

Notwithstanding the statute's saving clause, and notwithstanding the fact that Congress gave the Secretary authority to set only "minimum" safety standards, we held Geier's state tort suit pre-empted. In reaching that result, we relied heavily on the view of the Secretary of Transportation—expressed in an *amicus* brief—that Standard 208 " 'embodies the Secretary's policy judgment that safety would best be promoted if manufacturers installed *alternative* protection systems in their fleets rather than one particular system in every car.' " 529 U.S., at 881, 120 S.Ct. 1913 (quoting Brief for United States as *Amicus Curiae,* O.T.1999, No. 98–1811, p. 25). Because the Secretary determined that a menu of alternative technologies was "safe," the doctrine of conflict pre-emption barred Geier's efforts to deem some of those federally approved alternatives "unsafe" under state tort law.

The same rationale applies here. Through Phenergan's label, the FDA offered medical professionals a menu of federally approved, "safe" and "effective" alternatives—including IV push—for administering the drug. Through a state tort suit, respondent attempted to deem IV push "unsafe" and "ineffective." To be sure, federal law does not prohibit Wyeth from contraindicating IV push, just as federal law did not prohibit Honda from installing airbags in all its cars. But just as we held that States may not compel the latter, so, too, are States precluded from compelling the former. See also *Fidelity Fed. Sav. & Loan Assn. v. de la Cuesta,* 458 U.S. 141, 155, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) ("The conflict does not evaporate because the [agency's] regulation simply permits, but does not compel," the action forbidden by state law). If anything, a finding of pre-emption is even more appropriate here because the FDCA—unlike the National Traffic and Motor Safety Vehicle Act— contains no evidence that Congress intended **\*612** the FDA to set only "minimum standards," and the FDCA does not contain a saving clause.[4] SEE ALSO **\*\*1222** *ante,* at 1200 (conceding congress' " silence" on the issue).

4   To be sure, Congress recognized the principles of conflict pre-emption in the FDCA. See Drug Amendments of 1962, § 202, 76 Stat. 793 ("Nothing in the amendments made by this Act to the Federal Food, Drug, and Cosmetic Act shall be construed as invalidating any provision of State law ... unless there is a direct and positive conflict between such amendments and such provision of State law"). But a provision that simply recognizes the background principles of conflict pre-emption is not a traditional "saving clause," and even if it were, it would not displace our conflict-pre-emption analysis. See *Geier v. American Honda Motor Co.,* 529 U.S. 861, 869, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) ("[T]he saving clause ... does *not* bar the ordinary working of conflict pre-emption principles"); *id.,* at 873–874, 120 S.Ct. 1913 ("The Court has ... refused to read general 'saving' provisions to tolerate actual conflict both in cases involving impossibility *and* in 'frustration-of-purpose' cases" (emphasis deleted and citation omitted)).

## III

In its attempt to evade *Geier* 's applicability to this case, the Court commits both factual and legal errors. First, as a factual matter, it is demonstrably untrue that the FDA failed to consider (and strike a "balance" between) the specific costs and benefits

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

associated with IV push. Second, as a legal matter, *Geier* does not stand for the legal propositions espoused by the dissenters (and specifically rejected by the majority) in that case. Third, drug labeling by jury verdict undermines both our broader pre-emption jurisprudence and the broader workability of the federal drug-labeling regime.

## A

Phenergan's warning label has been subject to the FDA's strict regulatory oversight since the 1950's. For at least the last 34 years, the FDA has focused specifically on whether IV-push administration of Phenergan is "safe" and "effective" when performed in accordance with Phenergan's label. The agency's ultimate decision—to retain IV push as one **\*613** means for administering Phenergan, albeit subject to stringent warnings—is reflected in the plain text of Phenergan's label (sometimes in boldfaced font and all-capital letters). And the record contains ample evidence that the FDA specifically considered and reconsidered the strength of Phenergan's IV-push-related warnings in light of new scientific and medical data. The majority's factual assertions to the contrary are mistaken.

## 1

The FDA's focus on IV push as a means of administering Phenergan dates back at least to 1975. In August of that year, several representatives from both the FDA and Wyeth met to discuss Phenergan's warning label. At that meeting, the FDA specifically proposed "that Phenergan Injection should not be used in Tubex & reg;." 2 Record 583, 586 (Plaintiff's Trial Exh. 17, Internal Correspondence from W.E. Langeland to File (Sept. 5, 1975) (hereinafter 1975 Memo)). "Tubex" is a syringe system used exclusively for IV push. See App. 43. An FDA official explained that the agency's concerns arose from medical-malpractice lawsuits involving IV push of the drug, see 1975 Memo 586, and that the FDA was aware of "5 cases involving amputation where the drug had been administered by Tubex together with several additional cases involving necrosis," *id.,* at 586–587. Rather than contraindicating Phenergan for IV push, however, the agency and Wyeth agreed "that there was a need for better instruction regarding the problems of intraarterial injection." *Id.,* at 587.

The next year, the FDA convened an advisory committee to study, among other things, the risks associated with the Tubex system and IV push. App. 294. At the conclusion of its study, the committee recommended an additional IV-push-specific warning for Phenergan's label, see *ibid.,* but did not recommend eliminating IV push from the drug label altogether. In response to the committee's recommendations, the FDA instructed Wyeth to make several changes to **\*614** strengthen Phenergan's label, including the addition of upper case warnings related to IV push. See *id.,* at 279–280, 282–283.

**\*\*1223** In 1987, the FDA directed Wyeth to amend its label to include the following text:

" '[1] When used intravenously, [Phenergan] should be given in a concentration no greater than 25 mg/ml and at a rate not to exceed 25 mg/minute. [2] Injection through a properly running intravenous infusion may enhance the possibility of detecting arterial placement.' " *Id.,* at 311–312.

The first of the two quoted sentences refers specifically to IV push; as respondent's medical expert testified at trial, the label's recommended rate of administration (not to exceed 25 mg per minute) refers to "IV push, as opposed to say being in a bag and dripped over a couple of hours." *Id.,* at 52. The second of the two quoted sentences refers to IV drip. See *id.,* at 15–16 (emphasizing that a "running IV" is the same thing as "IV drip").

In its 1987 labeling order, the FDA cited voluminous materials to "suppor[t]" its new and stronger warnings related to IV push and the preferability of IV drip.[5] *Id.,* at 313. One of those articles specifically discussed the relative advantages and disadvantages of IV drip compared to IV push, as **\*615** well as the costs and benefits of administering Phenergan via IV push.[6] The FDA also cited published case reports from the 1960's of gangrene caused by the intra-arterial injection of Phenergan,[7] and

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

the FDA instructed Wyeth to amend Phenergan's label in accordance with the latest medical research.[8] The FDA also studied drugs similar to Phenergan and cited numerous cautionary articles—one of which urged the agency to consider contraindicating **\*\*1224** such drugs for IV use altogether.[9]

[5]   The FDA cited numerous articles that generally discuss the costs and benefits associated with IV push. See, *e.g.,* Nahrwold & Phelps, Inadvertent Intra–Arterial Injection of Mephenteramine, 70 Rocky Mountain Medical J. 38 (Sept.1973) (cited in App. 314, no. 14); Albo, Cheung, Ruth, Snyder, & Reemtsma, Effect of Intra–Arterial Injections of Barbituates, 120 Am. J. of Surgery 676 (1970) (cited in App. 314, no. 12); Corser, Masey, Jacob, Kernoff, & Browne, Ischaemia Following Self-administered Intra-arterial Injection of Methylphenidate and Diamorphine, 40 Anaesthesia 51 (1985) (cited in App. 314, no. 9); Correspondence Regarding Thiopental and Thiamylal (3 letters), 59 Anesthesiology 153 (1983) (cited in App. 314, no. 11); Miller, Arthur, & Stratigos, Intra-arterial Injection of a Barbituate, 23 Anesthesia Progress 25 (1976) (cited in App. 315, no. 19).

[6]   See Webb & Lampert, Accidental Arterial Injections, 101 Am. J. Obstetrics & Gynecology 365 (1968) (cited in App. 313, no. 5).

[7]   See Hager & Wilson, Gangrene of the Hand Following Intra-arterial Injection, 94 Archives of Surgery 86 (1967) (cited in App. 313, no. 7); Enloe, Sylvester, & Morris, Hazards of Intra–Arterial Injection of Hydroxyzine, 16 Canadian Anaesthetists' Society J. 425 (1969) (hereinafter Enloe) (noting "recent reports" of "the occurrence of severe necrosis and gangrene following [administration of] promethazine (Phenergan & reg;)" (cited in App. 314, no. 15)). See also Mostafavi & Samimi, Accidental Intra-arterial Injection of Promethazine HCl During General Anesthesia, 35 Anesthesiology 645 (1971) (reporting a case of gangrene, which required partial amputation of three fingers, after Phenergan was inadvertently pushed into an artery in the "antecubital" area); Promethazine, p. 7, in Clinical Pharmacology (Gold Standard Multimedia Inc. CD–ROM, version 1.16 (1998) (noting that "[i]nadvertent intra-arterial injection [of Phenergan] can result in arteriospasm ... and development of gangrene")).

[8]   Hager and Wilson noted that the most common reactions to intra-arterial injections of drugs like Phenergan include "[i]mmediate, severe, burning pain," as well as "blanching." 94 Archives of Surgery, at 87–88. The FDA required Wyeth to include Hager and Wilson's observations on Phenergan's label. See App. 311 (requiring the label to warn that " '[t]he first sign [of an intra-arterial injection] may be the patient's reaction to a sensation of fiery burning' " pain and " '[b]lanching' ").

[9]   See Enloe 427 (discussing hydroxyzine—an antihistamine with chemical properties similar to those of Phenergan—and suggesting its "temporary" benefits can never outweigh the risks of intra-arterial injection); see also Goldsmith & Trieger, Accidental Intra–Arterial Injection: A Medical Emergency, 22 Anesthesia Progress 180 (1975) (noting the risks of intra-arterial administration of hydroxyzine) (cited in App. 315, no. 18); Klatte, Brooks, & Rhamy, Toxicity of Intra–Arterial Barbituates and Tranquilizing Drugs, 92 Radiology 700 (1969) (same) (cited in App. 314, no. 13). With full knowledge of those risks, FDA retained IV push for Phenergan, although the agency required Wyeth to incorporate observations from the Enloe article into Phenergan's label. Compare Enloe 427 (arguing that "every precaution should be taken to avoid inadvertent intra-arterial injection," including the use of "an obviously well-functioning venoclysis"), with App. 312 (FDA's 1987 changes to Phenergan's label). In contrast, at some time around 1970, the FDA prohibited all intravenous use of hydroxyzine. See *id.,* at 79 (testimony of Dr. Harold Green). The FDA's decision to regulate the two drugs differently—notwithstanding (1) the agency's knowledge of the risks associated with both drugs and (2) the agency's recognition of the relevance of hydroxyzine-related articles and case reports in its regulation of Phenergan—further demonstrates that the FDA intentionally preserved IV-push administration for Phenergan. See also Haas, Correspondence, 33 Anesthesia Progress 281 (1986) ("[Hydroxyzine's] restriction does not lie with the medicine itself, but in the practice and malpractice of intravenous techniques. Unfortunately, the practitioner who knows how to treat injection technique problems is usually not the practitioner with the intravenous technique problems").

**\*616** In "support" of its labeling order, the FDA also cited numerous articles that singled out the inner crook of the elbow —known as the "antecubital fossa" in the medical community—which is both a commonly used injection site, see *id.,* at 70 (noting that respondent's injection was pushed into "the antecubital space"), and a universally recognized high-risk area for inadvertent intra-arterial injections. One of the articles explained:

"Because of the numerous superficial positions the ulnar artery might occupy, it has often been entered during attempted venipuncture [of the antecubital fossa]. ... However, the brachial and the radial arteries might also be quite superficial in the elbow region .... The arterial variations of the arm, especially in and about the cubital fossa, are common and numerous. If venipuncture must be performed in this area, a higher index of suspicion must be maintained to forestall misdirected

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

injections." Stone & Donnelly, The Accidental Intra-arterial Injection of Thiopental, 22 Anesthesiology **\*617** 995, 996 (1961) (footnote omitted; cited in App. 315, no. 20). [10]

10    See also Engler, Freeman, Kanavage, Ogden, & Moretz, Production of Gangrenous Extremities by Intra–Arterial Injections, 30 Am. Surgeon 602 (1964) ("Accidental arterial injection most often occurs in the antecubital region because this is a favorite site for venopuncture and in this area the ulnar and brachial arteries are superficial and easily entered" (cited in App. 313, no. 6)); Engler, Gangrenous Extremities Resulting from Intra-arterial Injections, 94 Archives of Surgery 644 (1966) (similar) (cited in App. 314, no. 16); Lynas & Bisset, Intra-arterial Thiopentone, 24 Anaesthesia 257 (1969) ("Most [anesthesiologists] agree that injections on the medial aspect of the antecubital fossa are best avoided" (cited in App. 314, no. 8)); Waters, Intra-arterial Thiopentone, 21 Anesthesia 346 (1966) ("The risk of producing gangrene of the forearm by accidental injection of sodium thiopentone into an artery at the elbow has been recognised for many years" (cited in App. 314, no. 10)); see also Hager & Wilson, 94 Archives of Surgery, at 88 (emphasizing that one of the best ways to prevent inadvertent intra-arterial injections is to be aware of "aberrant or superficial arteries at the antecubital, forearm, wrist, and hand level"); Mostafavi & Samimi, *supra* (warning against antecubital injections).

**\*\*1225** Based on this and other research, the FDA ordered Wyeth to include a specific warning related to the use of the antecubital space for IV push. [11]

11    See App. 311 (requiring Phenergan's label to warn that practitioners should " '[b]eware of the close proximity of arteries and veins at commonly used injection sites and consider the possibility of aberrant arteries' ").

**2**

When respondent was injured in 2000, Phenergan's label specifically addressed IV push in several passages (sometimes in lieu of and sometimes in addition to those discussed above). For example, the label warned of the risks of intra-arterial injection associated with "aspiration," which is a technique used only in conjunction with IV push. [12] The **\*618** label also cautioned against the use of "syringes with rigid plungers," App. 390, which are used only to administer the drug via IV push. As respondent's medical expert testified at trial, "by talking plungers and rigid needles, that's the way you do it, to push it with the plunger." *Id.,* at 53 (testimony of Dr. John Matthew). Moreover, Phenergan's 2000 label devoted almost a full page to discussing the "Tubex system," see *id.,* at 391, which, as noted above, is used only to administer the drug via IV push.

12    "Aspiration" refers to drawing a small amount of blood back into the needle to determine whether the needle is in an artery or a vein. Ordinarily, arterial blood is brighter than venous blood—but contact with Phenergan causes discoloration, which makes aspiration an unreliable method of protecting against intra-arterial injection. See *id.,* at 282. Therefore, the label warned that when using IV push, a medical professional should beware that "[a]spiration of dark blood does not preclude intra-arterial needle placement, because blood is discolored upon contact with Phenergan Injection." *Id.,* at 390.

While Phenergan's label very clearly authorized the use of IV push, it also made clear that IV push is the delivery method of last resort. The label specified that "[t]he preferred parenteral route of administration is by deep intramuscular injection." *Id.,* at 390. If an intramuscular injection is ineffective, then "it is usually preferable to inject [Phenergan] through the tubing of an intravenous infusion set that is known to be functioning satisfactorily." *Ibid.* See also *id.,* at 50–51 (testimony of respondent's medical expert, Dr. John Matthew) (conceding that the best way to determine that an IV set is functioning satisfactorily is to use IV drip). Finally, if for whatever reason a medical professional chooses to use IV push, he or she is on notice that "**INADVERTENT INTRA–ARTERIAL INJECTION CAN RESULT IN GANGRENE OF THE AFFECTED EXTREMITY.**" *Id.,* at 391; see also *id.,* at 390 ("Under no circumstances should Phenergan Injection be given by intra-arterial injection due to the likelihood of severe arteriospasm and the possibility of resultant gangrene").

Phenergan's label also directs medical practitioners to choose veins wisely when using IV push:

"Due to the close proximity of arteries and veins in the areas most commonly used for intravenous injection, extreme **\*619** care should be exercised to avoid perivascular extravasation or inadvertent intra-arterial injection. Reports compatible with

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

inadvertent intra-arterial injection of Phenergan Injection, usually in conjunction with other drugs intended for intravenous use, suggest that pain, severe chemical irritation, severe spasm of distal vessels, and resultant gangrene requiring amputation are likely under such circumstances." *Ibid.*

Thus, it is demonstrably untrue that, as of 2000, Phenergan's "labeling did not contain a specific warning about the risks of **\*\*1226** IV-push administration." *Ante,* at 1192. And whatever else might be said about the extensive medical authorities and case reports that the FDA cited in "support" of its approval of IV-push administration of Phenergan, it cannot be said that the FDA "paid no more than passing attention to" IV push, *ante,* at 1193; nor can it be said that the FDA failed to weigh its costs and benefits, Brief for Respondent 50.

**3**

For her part, respondent does not dispute the FDA's conclusion that IV push has certain benefits. At trial, her medical practitioners testified that they used IV push in order to help her "in a swift and timely way" when she showed up at the hospital for the second time in one day complaining of "intractable" migraines, "terrible pain," inability to "bear light or sound," sleeplessness, hours-long spasms of "retching" and "vomiting," and when "every possible" alternative treatment had "failed." App. 40 (testimony of Dr. John Matthew); *id.,* at 103, 106, 109 (testimony of physician's assistant Jessica Fisch).

Rather than disputing the benefits of IV push, respondent complains that the FDA and Wyeth underestimated its costs (and hence did not provide sufficient warnings regarding its risks). But when the FDA mandated that Phenergan's label read, "**INADVERTENT INTRA–ARTERIAL INJECTION \*620 CAN RESULT IN GANGRENE OF THE AFFECTED EXTREMITY**," *id.,* at 391, and when the FDA required Wyeth to warn that "[u]nder no circumstances should Phenergan Injection be given by intra-arterial injection," *id.,* at 390, the agency could reasonably assume that medical professionals would take care not to inject Phenergan intra-arterially. See also 71 Fed.Reg. 3934 (noting that a drug's warning label "communicates to health care practitioners the agency's formal, authoritative conclusions regarding the conditions under which the product can be used safely and effectively"). Unfortunately, the physician's assistant who treated respondent in this case disregarded Phenergan's label and pushed the drug into the single spot on her arm that is *most* likely to cause an inadvertent intra-arterial injection.

As noted above, when the FDA approved Phenergan's label, it was textbook medical knowledge that the "antecubital fossa" creates a high risk of inadvertent intra-arterial injection, given the close proximity of veins and arteries. See *supra,* at 1224 – 1225; see also The Lippincott Manual of Nursing Practice 99 (7th ed.2001) (noting, in a red-text "NURSING ALERT," that the antecubital fossa is "not recommended" for administering dangerous drugs, "due to the potential for extravasation").[13] According to the physician's assistant who injured respondent, however, "[i]t never crossed my mind" that an antecubital injection of Phenergan could hit an artery. App. 110; see also *ibid.* ("[It just wasn't something that I was aware of at the time"). Oblivious to the risks emphasized in Phenergan's warnings, the physician's assistant pushed a double dose of the drug into an antecubital artery over the course of "[p]robably about three to four minutes," *id.,* at 111; *id.,* at 105, notwithstanding respondent's **\*621** complaints of a " 'burn [ing]' " sensation that she subsequently described as " 'one of the most extreme pains that I've ever felt,' " **\*\*1227** *id.,* at 110, 180–181. And when asked why she ignored Phenergan's label and failed to stop pushing the drug after respondent complained of burning pains, the physician's assistant explained that it would have been "just crazy" to "worr[y] about an [intra-arterial] injection" under the circumstances, *id.,* at 111.

---

[13]    In addition, respondent's own medical expert testified at trial that it is a principle of "basic anatomy" that the antecubital fossa contains aberrant arteries. See 2 Tr. 34–35 (Mar. 9, 2004) (testimony of Dr. Daniel O'Brien); see also *ibid.* (noting that Gray's Anatomy, which is "the Bible of anatomy," also warns of arteries in the antecubital space).

The FDA, however, did not think that the risks associated with IV push—especially in the antecubital space—were "just crazy." That is why Phenergan's label so clearly warns against them.

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

**B**

Given the "balance" that the FDA struck between the costs and benefits of administering Phenergan via IV push, *Geier* compels the pre-emption of tort suits (like this one) that would upset that balance. The contrary conclusion requires turning yesterday's dissent into today's majority opinion.

First, the Court denies the existence of a federal-state conflict in this case because Vermont merely countermanded the FDA's determination that IV push is "safe" when performed in accordance with Phenergan's warning label; the Court concludes that there is no conflict because Vermont did not "mandate a particular" label as a "replacement" for the one that the jury nullified, and because the State stopped short of altogether "contraindicating IV-push administration." *Ante,* at 1194. But as we emphasized in *Geier* (over the dissent's assertions to the contrary), the degree of a State's intrusion upon federal law is irrelevant —the Supremacy Clause applies with equal force to a state tort law that merely countermands a federal safety determination and to a state law that altogether prohibits car manufacturers from selling cars without airbags. Compare 529 U.S., at 881– 882, 120 S.Ct. 1913, with *id.,* at 902, 120 S.Ct. 1913 (STEVENS, J., dissenting). Indeed, as recently as last Term, we held that the Supremacy Clause pre-empts **\*622** a "[s]tate tort law that requires a manufacturer's catheters to be safer, but hence less effective, than the model the FDA has approved ...." *Riegel,* 552 U.S., at ——, 128 S.Ct., at 1008. It did not matter there that the State stopped short of altogether prohibiting the use of FDA-approved catheters—just as it does not matter here that Vermont stopped short of altogether prohibiting an FDA-approved method for administering Phenergan. See also *Lohr,* 518 U.S., at 504, 116 S.Ct. 2240 (BREYER, J., concurring in part and concurring in judgment) (noting it would be an "anomalous result" if pre-emption applied differently to a state tort suit premised on the inadequacy of the FDA's safety regulations and a state law that specifically prohibited an FDA-approved design).

Second, the Court today distinguishes *Geier* because the FDA articulated its pre-emptive intent "without offering States or other interested parties notice or opportunity for comment." *Ante,* at 1201; see also *ante,* at 1203. But the *Geier* Court specifically rejected the argument (again made by the dissenters in that case) that conflict pre-emption is appropriate only where the agency expresses its pre-emptive intent through notice-and-comment rulemaking. Compare 529 U.S., at 885, 120 S.Ct. 1913 ("To insist on a specific expression of agency intent to pre-empt, made after notice-and-comment rulemaking, would be in certain cases to tolerate conflicts that an agency, and therefore Congress, is most unlikely to have intended. The dissent, as we have said, apparently welcomes that result .... We do not"), with *id.,* at 908–910, 120 S.Ct. 1913 (STEVENS, J., dissenting) (emphasizing that "we generally expect an administrative regulation to declare any intention to **\*\*1228** pre-empt state law with some specificity," and that "[t]his expectation ... serves to ensure that States will be able to have a dialog with agencies regarding pre-emption decisions *ex ante* through the normal notice-and-comment procedures of the Administrative Procedure Act" (internal quotation marks omitted)). Indeed, pre-emption is arguably more appropriate here than in *Geier* because the FDA (unlike the DOT) declared its pre-emptive intent in the Federal Register **\*623** . See 71 Fed.Reg. 3933–3936. Yet the majority dismisses the FDA's published preamble as "inherently suspect," *ante,* at 1201, and an afterthought that is entitled to "no weight," *ante,* at 1204. Compare *Lohr, supra,* at 506, 116 S.Ct. 2240 (opinion of BREYER, J.) (emphasizing that the FDA has a "special understanding of the likely impact of both state and federal requirements, as well as an understanding of whether (or the extent to which) state requirements may interfere with federal objectives," and that "[t]he FDA can translate these understandings into particularized pre-emptive intentions ... through statements in 'regulations, preambles, interpretive statements, and responses to comments' ").

Third, the Court distinguishes *Geier* because the DOT's regulation "bear[s] the force of law," whereas the FDA's preamble does not. *Ante,* at 1203; see also *ante,* at 1200. But it is irrelevant that the FDA's preamble does not "bear the force of law" because the FDA's labeling decisions surely do. See 21 U.S.C. § 355. It is well within the FDA's discretion to make its labeling decisions through administrative adjudications rather than through less-formal and less-flexible rulemaking proceedings, see *SEC v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), and we have never previously held that our pre-emption analysis turns on the agency's choice of the latter over the former. Moreover, it cannot be said that *Geier* 's outcome

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

hinged on the agency's choice to promulgate a rule. See *ante,* at 1200, 1203. The *Geier* Court relied—again over the dissenters' protestations—on materials other than the Secretary's regulation to explain the conflict between state and federal law. Compare 529 U.S., at 881, 120 S.Ct. 1913, with *id.,* at 899–900, 120 S.Ct. 1913 (STEVENS, J., dissenting), and *ante,* at 1204 (BREYER, J., concurring).

Fourth, the Court sandwiches its discussion of *Geier* between the "presumption against pre-emption," *ante,* at 1200, and heavy emphasis on "the longstanding coexistence of state and federal law and the FDA's traditional recognition of state-law remedies," *ante,* at 1203. But the *Geier* Court specifically rejected the argument (again made by the dissenters **\*624** in that case) that the "presumption against pre-emption" is relevant to the conflict pre-emption analysis. See 529 U.S., at 906–907, 120 S.Ct. 1913 (STEVENS, J., dissenting) ("[T]he Court simply ignores the presumption [against pre-emption]"). Rather than invoking such a "presumption," the Court emphasized that it was applying "ordinary," "longstanding," and "experience-proved principles of conflict pre-emption." *Id.,* at 874, 120 S.Ct. 1913. Under these principles, the sole question is whether there is an "actual conflict" between state and federal law; if so, then pre-emption follows automatically by operation of the Supremacy Clause. *Id.,* at 871–872, 120 S.Ct. 1913. See also *Buckman,* 531 U.S., at 347–348, 121 S.Ct. 1012 (" [P]etitioner's dealings with the FDA were prompted by [federal law], and the very subject matter of petitioner's statements [to the FDA] were dictated by [federal law]. Accordingly—and in contrast to situations implicating 'federalism concerns and the historic primacy of state regulation of matters of health and safety'—no presumption **\*\*1229** against pre-emption obtains in this case" (citation omitted)). [14]

14    Thus, it is not true that "this Court has long" applied a presumption against pre-emption in conflict pre-emption cases. *Ante,* at 1195, n. 3 (majority opinion). As long ago as *Gibbons v. Ogden,* 9 Wheat. 1, 210, 6 L.Ed. 23 (1824), the Court inquired whether a state law "interfer[ed] with," was "contrary to," or "c[a]me into collision with" federal law—and it did so without ever invoking a "presumption." See also Davis, Unmasking the Presumption in Favor of Preemption, 53 S.C.L.Rev. 967, 974 (2002) (noting that many of the Court's early pre-emption cases "resulted in almost automatic preemption of concurrent state regulation"). In subsequent years the Court has sometimes acknowledged a limited "presumption against pre-emption," but it nonetheless remained an open question—before today—whether that presumption applied in conflict pre-emption cases. See *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 374, n. 8, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) ("We leave for another day a consideration in this context of a presumption against preemption"). Moreover, this Court has never held that the "presumption" applies in an area—such as drug labeling—that has long been "reserved for federal regulation." *United States v. Locke,* 529 U.S. 89, 111, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000). See also *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 347–348, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001).

**\*625** Finally, the *Geier* Court went out of its way to emphasize (yet again over the dissenters' objections) that it placed "some weight" on the DOT's *amicus* brief, which explained the agency's regulatory objectives and the effects of state tort suits on the federal regulatory regime. 529 U.S., at 883, 120 S.Ct. 1913; compare *id.,* at 910–911, 120 S.Ct. 1913 (STEVENS, J., dissenting) (criticizing the majority for "uph[olding] a regulatory claim of frustration-of-purposes implied conflict pre-emption based on nothing more than an *ex post* administrative litigating position and inferences from regulatory history and final commentary"). See also *Lohr,* 518 U.S., at 496, 116 S.Ct. 2240 (recognizing that the FDA is "uniquely qualified" to explain whether state law conflicts with the FDA's objectives). Yet today, the FDA's explanation of the conflict between state tort suits and the federal labeling regime, set forth in the agency's *amicus* brief, is not even mentioned in the Court's opinion. Instead of relying on the FDA's explanation of its own regulatory purposes, the Court relies on a decade-old and now-repudiated statement, which the majority finds preferable. See *ante,* at 1201 – 1202, 1203, n. 13. Cf. *Riegel,* 552 U.S., at ——, 128 S.Ct., at 1010 (noting that "the agency's earlier position (which the dissent describes at some length and finds preferable) is ... compromised, indeed deprived of all claim to deference, by the fact that it is no longer the agency's position" (citation omitted)); *Altria Group, Inc. v. Good,* 555 U.S. 70, ——, 129 S.Ct. 538, 549–550, 172L.Ed.2d 398 (2008) (rejecting petitioners' reliance on the pre-emptive effect of the agency's "longstanding policy" because it is inconsistent with the agency's current one). And Justice BREYER suggests that state tort suits may "help the [FDA]," *ante,* at 1204 (concurring opinion), notwithstanding the FDA's insistence that state tort suits will "disrupt the agency's balancing of health risks and benefits," Brief for United States as *Amicus Curiae* 9.

*Geier* does not countenance the use of state tort suits to second-guess the FDA's labeling decisions. And the Court's contrary conclusion has potentially far-reaching consequences.

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

### *626 C

By their very nature, juries are ill equipped to perform the FDA's cost-benefit-balancing function. As we explained in *Riegel,* juries tend to focus on the risk of a **\*\*1230** particular product's design or warning label that arguably contributed to a particular plaintiff's injury, not on the overall benefits of that design or label; "the patients who reaped those benefits are not represented in court." 552 U.S., at 325, 128 S.Ct., at 1008. Indeed, patients like respondent are the only ones whom tort juries ever see, and for a patient like respondent—who has already suffered a tragic accident—Phenergan's risks are no longer a matter of probabilities and potentialities.

In contrast, the FDA has the benefit of the long view. Its drug-approval determinations consider the interests of all potential users of a drug, including "those who would suffer without new medical [products]" if juries in all 50 States were free to contradict the FDA's expert determinations. *Id.,* at ——, 128 S.Ct., at 1009. And the FDA conveys its warnings with one voice, rather than whipsawing the medical community with 50 (or more) potentially conflicting ones. After today's ruling, however, parochialism may prevail.

The problem is well illustrated by the labels borne by "vesicant" drugs, many of which are used for chemotherapy. As a class, vesicants are much more dangerous than drugs like Phenergan, [15] but the vast majority of vesicant labels—like Phenergan's—either allow or do not disallow IV push. See Appendix, *infra.* Because vesicant extravasation can have devastating consequences, and because the potentially lifesaving benefits of these drugs offer hollow solace to the victim *\*627* of such a tragedy, a jury's cost-benefit analysis in a particular case may well differ from the FDA's.

[15]   Vesicants may cause "blistering, severe tissue injury, or tissue necrosis" upon extravasation—even if the drug is not injected into an artery. See, *e.g.,* Schulmeister, Administering Vesicants, 9 Clinical J. of Oncology Nursing 469, 469–470 (2005). See also *ante,* at 1192 (majority opinion) (noting that Phenergan is labeled as an "irritant"); cf. Brief for Anju Budhwani et al. as *Amici Curiae* 15 (suggesting Phenergan should be considered a "vesicant").

For example, consider Mustargen (mechlorethamine HCl)—the injectable form of mustard gas—which can be used as an anticancer drug. Mustargen's FDA-approved label warns in several places that "**This drug is HIGHLY TOXIC**." [16] Indeed, the drug is so highly toxic:

[16]   FDA, Oncology Tools Product Label Details, online at http:// www.accessdata.fda.gov/scripts/cder/onctools/labels.cfm? GN=meclorethamine,% 20nitrogen% 20mustard (as visited Mar. 2, 2009, and available in Clerk of Court's case file).

"Should accidental eye contact occur, copious irrigation for at least 15 minutes with water, normal saline or a balanced salt ophthalmic irrigating solution should be instituted immediately, followed by prompt ophthalmologic consultation. Should accidental skin contact occur, the affected part must be irrigated immediately with copious amounts of water, for at least 15 minutes while removing contaminated clothing and shoes, followed by 2% sodium thiosulfate solution. Medical attention should be sought immediately. Contaminated clothing should be destroyed." [17]

[17]   *Ibid.*

Yet when it comes to administering this highly toxic drug, the label provides that "the drug may be injected *directly into any suitable vein,* [but] it is injected preferably into the rubber or plastic tubing of a flowing intravenous infusion set. This reduces the possibility of severe local reactions due to extravasation or high concentration of the drug." (Emphasis added.) Similarly, the FDA-approved labels for other powerful chemotherapeutic vesicants **\*\*1231** —including Dactinomycin, Oxaliplatin, Vinblastine, and Vincristine—specifically allow IV push, notwithstanding their devastating effects when extravasated.

*\*628* The fact that the labels for such drugs allow IV push is striking—both because vesicants are much more dangerous than Phenergan, and also because they are so frequently extravasated, see Boyle & Engelking, Vesicant Extravasation: Myths and

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

Realities, 22 Oncology Nursing Forum 57, 58 (1995) (arguing that the rate of extravasation is "considerably higher" than 6.4% of all vesicant administrations). Regardless of the FDA's reasons for not contraindicating IV push for these drugs, it is odd (to say the least) that a jury in Vermont can now order for Phenergan what the FDA has chosen not to order for mustard gas. [18]

[18]     The same is true of FDA's regulation of hydroxyzine. See n. 9, *supra*.

\* \* \*

To be sure, state tort suits can peacefully coexist with the FDA's labeling regime, and they have done so for decades. *Ante,* at 1199 – 1200. But this case is far from peaceful coexistence. The FDA told Wyeth that Phenergan's label renders its use "safe." But the State of Vermont, through its tort law, said: "Not so."

The state-law rule at issue here is squarely pre-empted. Therefore, I would reverse the judgment of the Supreme Court of Vermont.

## *629 APPENDIX TO OPINION OF ALITO, J.

| Vesicant [1] | IV Push [2] |
| --- | --- |
| Dactinomycin | Specifically allowed |
| Mechlorethamine (Mustargen) | Specifically allowed |
| Oxaliplatin | Specifically allowed |
| Vinblastine | Specifically allowed |
| Vincristine | Specifically allowed |
| Bleomycin | Neither mentioned nor prohibited |
| Carboplatin | Neither mentioned nor prohibited |
| Dacarbazine | Neither mentioned nor prohibited |
| Mitomycin | Neither mentioned nor prohibited |
| Carmustine | Not prohibited; IV drip recommended |
| Cisplatin | Not prohibited; IV drip recommended |
| Epirubicin | Not prohibited; IV drip recommended |
| Etoposide | Not prohibited; IV drip recommended |
| Ifosfamide | Not prohibited; IV drip recommended |
| Mitoxantrone | Not prohibited; IV drip recommended |

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

| Paclitaxel | Not prohibited; IV drip recommended |
| --- | --- |
| Teniposide | Not prohibited; IV drip recommended |
| Vinorelbine | Not prohibited; IV drip recommended |
| Daunorubicin | Prohibited |
| Doxorubicin | Prohibited |

[1]    Wilkes & Barton–Burke, 2008 Oncology Nursing Drug Handbook 27–33 (2008) (Table 1.6).

[2]    IV-push information is derived from the "dosage and administration" sections of individual drug labels (available in Clerk of Court's case file).

**All Citations**

555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176, 09 Cal. Daily Op. Serv. 2644, 2009 Daily Journal D.A.R. 3199, 21 Fla. L. Weekly Fed. S 675

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.